

FILED

NOV 02 2010 X 2 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Lauren Tratar & Steven Olson
1021 Royal Saint George Drive
Naperville, IL 60562
*filing pro-se, without an attorney*

## UNITED STATES DISTRICT COURT

## NORTHERN DIST~~~~~~~~~~

| | |
|---|---|
| **Lauren Tratar & Steven Olson**<br><br>Plaintiff,<br><br><br>vs.<br><br>**BAC Home Loans Servicing, LP**<br>Defendant | 10cv7063<br>C JUDGE LEFKOW<br>MAG. JUDGE FINNEGAN<br><br>**ORIGINAL PETITION**<br><br>Date:   November 2, 2010 |

### PARTIES

(1) Plaintiff is Steven Olson and Lauren J Tratar, 1021 Royal Saint George Drive, Naperville, IL 60563, hereinafter referred to as "Plaintiff."  Currently known defendant is BAC Home Loans Servicing, LP , 400 Countrywide Way SV-314,  Simi Valley,  CA  93065, hereinafter referred to as "Lender," or "Defendant" or "Defendant Lender."

### JURISDICTION AND VENUE

(2) This Court has personal jurisdiction over the Defendants named herein because a substantial portion of the wrongdoing alleged in this complaint took place in the Northern District of Illinois, and the Defendants are authorized to and regularly do business in the Northern District of Illinois.  Property address is 1021 Royal Saint George Drive, Naperville, IL. LOT 2 (EXCEPT THAT PART DESCRIBED AS FOLLOWS: BEGINNING AT THE MOST NORTHERLY CORNER OF SAID LOT 2 AND RUNNING THENCE SOUTHWESTERLY ALONG THE NORTHWESTERLY LINE OF SAID LOT 14.89 FEET; THENCE SOUTHEASTERLY 149.46 TO THE SOUTHEAST CORNER OF SAID LOT; THENCE NORTHWESTERLY ALONG THE NORTHEASTERLY LINE OF SAID LOT 150.00 FEET TO PLACE OF BEGINNING;) IN BLOCK 6 IN CRESS CREEK, BEING A SUBDIVISION OF PART OF SECTIONS 11, 12 AND 14, TOWNSHIP 38 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPLE MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED APRIL 4,1962 AS DOCUMENT R62-9660, IN DUPAGE COUNTY, ILLINOIS.

This is an action for violations of TILA (*15 U.S.C. §§1601 et seq.*) and the Real Estate Settlement and Procedures Act ("**RESPA**" (*12 U.S.C. §2602*)). Plaintiff further invokes the pendent jurisdiction of this Court to consider claims arising under state law. Jurisdiction is thus founded on *28 U.S.C. §§1331* and *1367* [*6] .

(3) Venue is proper in this judicial district pursuant to *28 U.S.C.§ 1391(b)* because a substantial portion of the events and omissions giving rise to this complaint occurred within the Northern District of Illinois. The loan contracts between Plaintiff and Defendants were made and to be performed, and the obligations arose in the Northern District of Illinois

### STATEMENT OF FACTS

(4) Plaintiff entered into an express contract with Defendants. Said contract consisted of a promissory note (see attachment labeled as Exhibit A), hereinafter referred to as "note," and a lien document (see attachment labeled as Exhibit B), hereinafter referred to as "lien."

(5) Plaintiff and seller engaged the services of Countrywide Bank FSB, as a duly licensed mortgage broker in the state of Illinois, hereinafter referred to as "Broker," to assist Plaintiff and seller in the sale of the property. Broker was compensated from funds assessed to Plaintiff at closing (see Housing and Urban Development Form 1, hereinafter referred to as "settlement statement, attached and labeled as Exhibit C,") creating a duty of good faith and fair dealing of Broker to Plaintiff. Broker, acting in violation of Broker's fiduciary duty to Plaintiff, gave partial disclosure to Plaintiff as to the value of the property and the then current condition of the real estate market, but failed to give full disclosure of the true value of the property or the volatile nature of the real estate market and the high risk of dramatic changes in property values resulting from blatant fraudulent practices being practiced by broker, et al.

(6) Broker further misinformed Plaintiff as to the availability of credit to Plaintiff by failing to advise Plaintiff that Plaintiff qualified for a less expensive loan product than the loan product proposed to Plaintiff by Broker.

(7) Plaintiff, by engaging the services of a duly licensed professional, exercised due diligence to insure good faith and fair dealings concerning compliance with all laws, rules, and regulations concerning the note and associated lien document.

(8) Plaintiff was referred by Broker to Countrywide Bank FSB, a duly licensed mortgage company in the state of Illinois, hereinafter referred to as "Lender," for the purpose of financing the intended sale of the property. Lender gave *partial disclosure* to Plaintiff concerning the value of the property, the condition of the real estate market, and the availability of credit to Plaintiff. Lender failed to give *full disclosure* to Plaintiff concerning the true value of the property, the then current risks and trends of the real estate market toward market instability, and the then current credit available to Plaintiff.

(9) Plaintiff exercised due diligence by only dealing with a duly licensed mortgage company, to insure good faith and fair dealings in accordance with all existing law, rules, and regulations concerning the note and associated lien.

(10) Lender engaged the services of First Executive Appraisal Services, a duly licensed appraiser in the state of Illinois, hereinafter referred to as "Appraiser," to prepare an appraisal of the then current value of the property. Lender, at closing, assessed fees to Plaintiff as compensation for the services of Appraiser. Appraiser accepted said compensation creating a fiduciary duty on the part of Appraiser to Plaintiff (See Appraisal Fee as assessed on the settlement statement attached and labeled Attachment D).

(11) Lender, by way of rules passed by the banking industry, had exclusive authority to engage the services of Appraiser. In as much as Appraiser has a fiduciary duty to Plaintiff to provide fair and honest services, when Lender takes it upon itself to exclusively select the Appraiser, Lender takes on responsibility for the Appraiser Lender chooses to employ. In as much as Appraiser violated his fiduciary duty to Plaintiff, Lender is responsible for said violation and is, thereby, civilly responsible as if Lender had committed the violation. *Lender, thereby, owed a duty of good faith and fair dealing* to Plaintiff and violated said duty by taking unfair advantage of said exclusive hiring authority by exerting improper influence on Appraiser in order to induce Appraiser to breach Appraiser's fiduciary duty to Plaintiff by preparing an artificially inflated appraisal of the currently existing true value of the property.

(12) Plaintiff exercised due diligence by only dealing with a duly licensed appraiser to insure good faith and fair dealings in accordance with all existing law, rules, and regulations concerning the note and associated lien.

(13) Lender, after being provided with a completed Housing and Urban Development Form 1003, on September 7, 2007, failed to provide necessary statutorily required notices to Plaintiff that would give Plaintiff full disclosure as to the costs of the note so as to allow Plaintiff to make an informed decision as to competitive offers, thereby denying Plaintiff in Plaintiff's reasonable expectation of good faith and fair dealing from licensed professionals.

(14) Lender engaged the services of Greater Illinois Title Company, in the state of Illinois, hereinafter referred to as "Closing Agent," to perform the closing services on the sale of the property. On the 7th day of September, 2007, under the guidance of Closing Agent, Plaintiff entered into a contract loan with Lender, said contract is attached and referred to as Attachment A, hereinafter referred to as the "note."

(15) On the day of closing on the property, Plaintiff was provided with the Truth in Lending Statement (see Truth In Lending Statement attached and labeled as Exhibit E) and settlement statement (see attachment labeled Exhibit C).

At closing on the property, Lender assessed fees as listed on the settlement statement. The fees assessed on the settlement statement were as follows:

| 803 | Appraisal Fee | $222.00 |
|------|---------------|---------|
| 804 | Credit Report Fee | $35.00 |
| 808 | Lender Fee | $585.00 |
| 809 | Tax Service Fee | $90.00 |
| 810 | Flood Check Fee | $26.00 |
| 901 | Interest from 09/07/07 to 10/01/07 @ $283.5600 /day24 | $5,805.40 |
| 1001 | Hazard Insurance | $430.77 |
| 1004 | County Property Taxes | $1,265.45 |
| 1008 | Aggregate Accounting Adjustment | $500.00 |
| 1101 | Settlement fee | $200.00 |
| 1108 | Title Insurance | $765.00 |
| 1111 | Construction Escrow Fee | $200.00 |
| 1112 | Email and Delivery Fee | $112.00 |
| 1113 | State of IL Policy Fee | $3.00 |
| 1201 | Recording Fee | $57.00 |

(16) At closing, Lender failed to provide documentation to show that the above referenced fees were authorized by law, that the services billed for were necessary, that the amounts charged for said services were reasonable, and that Lender did not take an undisclosed markup on said fees. The fees assessed on the settlement statement were added to the principal on the note and interest was charged to Plaintiff on said amounts.

(17) Plaintiff provided to Lender, at the time of the consummation of the note, a document witch established a lien against the property. Said lien document specifically stated that it was intended to protect Lender from loss if Plaintiff failed to abide by the promises made in the note.

(18) Within days after the consummation of the above referenced note, Lender traded the note from Countrywide Bank FSB to Serviced by Countrywide, hereinafter referred to as "Initial Investor," for consideration accepted.

(19) At the sale of the note to Initial Investor, Lender bi-furcated the note and lien by retaining possession of the lien while transferring possession of the note to Initial Investor. *(see Landmark v. Kessler)*.

(20) The note was subsequently sold repeatedly to other parties who failed to properly register said sales with the court recorder's office in the county in which the property lies, thereby, obscuring the true holder of the note.

(21) After sale of the note, Lender became the servicer of the note, in that Lender contracted with the Initial Investor who was the real party in interest on the note at the time of sale to collect the monthly payments made on the note.

## SUBSEQUENT TO PROPER DISCOVERY PLAINTIFF WILL PROVE THE FOLLOWING

(22) Subsequent to proper discovery, Plaintiff is prepared to prove, by a preponderance of evidence that:

**a)** Loan Originator committed fraudulent concealment against Plaintiff by failing to give full disclosure of the value and condition of the property, acting in concert and collusion with Lender for the purpose of defrauding Plaintiff and, therefore, the note is a void contract based on fraud; **b)** Lender gave partial disclosure of the true value and current condition of the property in order to induce Plaintiff to enter into a contract detrimental to Plaintiff with the conscious intent that Plaintiff default on said contract; **c)** Lender conspired with appraiser in order to induce appraiser to violate his duty of good faith and fair dealing with Plaintiff by appraising the property at an artificially high price in order to induce Plaintiff into entering into a falsely inflated loan product; **d)** to Plaintiff, but failed to give full disclosure of information with full knowledge that Plaintiff did not have equal access to said information **e)** Lender is not a real party in interest in any contract which can claim a collateral interest in the property; **f)** even if Lender were to prove up a contract to which Lender had standing to enforce against Plaintiff, no valid lien exists which would give Lender a claim against the property; **g)** even if Lender were to prove up a contract to which Lender had standing to enforce against Plaintiff, said contract was fraudulent in its creation as endorsement was secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of Pooled Assets," "Trustee or officers of Structured Investment Vehicle," "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans pooled together in a trust fund; **h)** Lenders have concocted a carefully crafted connivance wherein Lender conspired with Agents, et al, to strip Plaintiff of Plaintiff's equity in the property by inducing Plaintiff to enter into a predatory loan inflated loan product; **i)** Lender received unjust enrichment in the amount of 5% of each payment made late to Lender while Lender and Lender's assigns acted as servicer of the note; **j)** Lender and Lender's assigns, who acted as servicer in place of Lender, profited by handling the foreclosure process on a contract Lender designed to have a high probability of default; **k)** Lender intended to defraud Investor by converting the promissory note into a security instrument and selling same to Investor; **l)** Lender intended to defraud Investor and the taxpayers of the United States by withholding the lien document from the sale of the promissory note in order that Lender could then hold the lien for three years, then prepare and file Internal

Revenue Form 1099a and falsely claim the full lien amount as abandoned funds and deduct same from Lender's income tax obligation, and thereby comes to the court with dirty hands; **m)** Lender defrauded backers of derivatives by betting on the failure of the promissory note the lender designed to default; **n)** participant Lenders, et al, in the securitization scheme described herein have devised business plans to reap millions of dollars in profits at the expense of Plaintiff and others similarly situated.

### ALL POSSIBLE PARTIES NOT NAMED

(23) Plaintiffs have alleged that Lenders together, in a "conspiratorial nature", undertook the misdeeds herein. Lenders named herein are indeed liable to the extent that they acted as agents, servants and/or employees of the remaining Lenders and for each other. The Ninth Circuit has held that averments of agency are not required in a complaint. (See, Greenberg v. Sala, 822 F.2d 882, 886 (9th Cir. 1987) (holding that "[a] person legally responsible for an act may be alleged to have committed it without going into the theories which support that ultimate fact").) As such, the "civil conspiracy" as alleged and incorporated into [*12] all subsequent Causes of Action sufficiently provides the threshold legal and factual basis for several causes of action that at first blush may seem inappropriate for a particular Lender. The overview to this "shell" game is that all who participated in this scheme cannot now claim that they are somehow an innocent, unrelated third party.

(24) Since all actors in a conspiracy act *in pari delicto,* and, thereby, are equally culpable for the acts of each, Plaintiff did not name Agent, Appraiser, Underwriter, Closing Agent, et, as said actors are not necessary parties. In the interest of judicial economy, Plaintiff only specifically named the party(parties) presently claiming agency and standing to enforce the note. If said Lender has reason to believe that others are liable, Lender is certainly free to cross-complain in order to lessen the potential financial burden on Lender.)

### FAILED TO MAKE CONSPICUOUS DISCLOSURES

(25) Broker, Appraiser, Closing Agent, and Lender failed to make all disclosures to Plaintiff clearly and conspicuously as required by 12 CFR 226.17(a)). The above referenced Lenders crafted disclosures in turgid and confusing language, laced with undefined terms of art (legalese) and grouped with many unnecessary and confusing documents for the purpose of rendering the disclosures unintelligible to a reasonable person of ordinary knowledge and understanding of the English language. The above referenced failure defrauded Plaintiff by effecting a lack of full disclosure to Plaintiff which unduly induced Plaintiff to enter into the contract herein referred to as the note.

### TRUTH IN LENDING STATEMENT NOT TIMELY

(26) Lender failed to provide a Truth in lending statement at least three days before closing in violation of 12 CFR 226.31(c)(1). This failure on the part of Lender had the effect of perpetrating fraud against Plaintiff by denying Plaintiff in timely full disclosure. Beyond the obvious violation of the Truth in Lending Act, Lender gave partial disclosure to plaintiff and by so doing invoked a duty to give full disclosure. Lender gave false disclosure by only disclosing facts intended to induce Plaintiff to proceed with the purchase of said property while consciously withholding information that would have given Plaintiff reason to make a different decision.

### TERMS FOR THE NOTE CHANGED AT CLOSING

(27) The terms for the note were changed at closing without prior notice to Plaintiff in violation of 21 CFR 226 (c)(1)(i). Lender contrived to defraud Plaintiff by exerting undue influence by on Plaintiff by making an offer Lender did not intend to honor, but rather, induced Plaintiff to so arrange Plaintiff's affairs so as to commit Plaintiff to the contract. Lender then, at the last moment, improperly changed the contract conditions, thereby defrauding Plaintiff and forcing Plaintiff into an unfavorable contract.

### DISCLOSURES DID NOT REFLECT TERMS

(28) The disclosures to provided Plaintiff by Lender did not accurately reflect the closing amounts and did not clearly state that the disclosures were estimates in violation of 12 CFR 226.31(d)(1). Lender perpetrated fraudulent concealment by representing to Plaintiff certain information as if said information were facts when, in fact, said information was only estimates, thereby giving Plaintiff a false impression of the conditions of the contract.

### PER DIEM INTEREST NOT ACCURATELY DISCLOSED

(29) Lender failed to provide documentation to show that the calculation of the per diem interest was true and accurate in violation of 12 CFR 226.3(a)(ii). The act of "breach of fiduciary duty," represented the note to plaintiff as the best loan available to Plaintiff.

### IMPROPERLY CHARGED FEES

(30) Lender(s), at closing, charged fees to Plaintiff that were intended to be included in the finance charge. Lender(s), instead of absorbing said costs as the normal part of doing business, improperly assessed charges to Plaintiff, added said charges to the original principal, and intended to charge plaintiff interest on said charges for the full term of the agreement.

(31) Plaintiff was induced to accept the fees as genuine and proper because of the licensed status of the closing agent. Plaintiff, by virtue of said licensed status, had cause to hold a reasonable expectation of good faith and fair dealings from Lender agent, Lender, and closing agent.

(32) The amount of overpayment on the note Lender intended Plaintiff pay over the term of the note would be in the amount of $162,127.37. Said improper charges include, but are not limited to charges by third parties which are not otherwise excluded under 12 CFR 226.4(a)(1)(i)). Lender required the use of said third parties as a condition of or an incident to the extension of credit which included, but is not limited to charges for appraisers, inspectors, underwriters, and others to be determined subsequent to discovery.

## UNSUPPORTED CLAIM OF AGENCY BY LENDER

(33) The identity of the real party in interest on the promissory note alleged to have been created by Plaintiff is unknown to Plaintiff. Plaintiff has no way of knowing, *absent full disclosure* under discovery, who is the real party in interest. If Plaintiff were to completely pay off the note, Plaintiff cannot be sure that Plaintiff will be able to secure quiet title to the property as the true holder is not known and, because of the actions of Defendants, may actually be unknowable.

(34) Subsequent to Lender's failure to identify the real party in interest as contemplated by Uniform Commercial Code 3-501, Lender is statutorily estopped from pursuing collection on the promissory note alleged to have been created by Plaintiff as Plaintiff is authorized to cease all payments without dishonor until such time as Lender complies with all tenants of the alleged promissory note and all applicable law. Lender entered into a sales contract with an as yet unknown party for the sale of the promissory note alleged to have been created by Plaintiff yet failed to publicly record said sale with the clerk of the court.

(35) The current servicer of the alleged promissory note, claims agency to act in the place of the real party in interest on the above referenced security instrument. In as much as all sales of the security instrument have not been properly filed in the public record with the county recorder, Plaintiff has no way of tracing the chain of ownership of the security instrument and, therefore, is unable to determine who the current holder of the note is. Plaintiff, at closing, was given a photocopy of the original note signed by Plaintiff. Plaintiff, at the time of closing, bolstered by the state of false trust in the "trustee" and others, was not noticed or aware that Lender could have produced multiple originals of the promissory note document. Lender took the original promissory note out of sight of Plaintiff and allegedly made a true and accurate copy and provided said copy to Plaintiff. With the current state of technology, there is no way for Plaintiff to tell if the copy provided to Plaintiff by Trustee was a true and correct copy of the promissory note allegedly signed by Plaintiff. Lender then retained the only original of the promissory note signed by Plaintiff. Lender, upon request of Plaintiff, has failed to produce the original promissory note signed by Plaintiff for examination.

(36) The failure of Lender to produce, for inspection, as contemplated by Uniform Commercial Code 3-501, an original promissory note creates the adverse inference that no such note is in the possession of Lender. Lender, or current servicer, has failed to prove that Lender is a true agent of the principal holder of the above referenced security instrument. Plaintiff has reason to believe and does believe that the security instrument does not exist and was deliberately destroyed by an agent of the real party in interest. To the knowledge of Plaintiff, there exists only photo copies of the original security instrument that could have been easily altered to favor Lender with covenants not present in the original signed by Plaintiff.

## SECURITIZATION PRACTICES VOID CONTRACT

(37) The original note contained a provision for modification of the original loan agreement. The modification provision of the note has been rendered unenforceable as there is no one known to Plaintiff who has authority to authorize a modification of the original contract. By secretly selling the note as a security instrument, Lender(s) have nullified a provision of the contract which authorizes modification of the note. Plaintiff, having reason to believe that fraud was involved in the creation of the loan instruments, has a claim against the real party in interest, and thereby, has need to know all parties who have received enrichment from the proceeds of said security instrument. In as much as, in the case of a security instrument created from a note which is the result of a consumer transaction, there can be no holder in due course and, according to the Federal Trade Commission Holder Rule, 16 CFR 433, and 12 CFR 226 (Regulation Z), the holder of the such security instrument stands in the shoes of the Lender and is subject to any claim Plaintiff would have on the Lender, Plaintiff has a right to know the identity of any person or entity currently claiming, or who has ever claimed real party interest in said security instrument.

## AGENT LACKS AGENCY

(38) It is the belief and specific allegation of Plaintiff that the alleged agent for the lender is not the agent for the lender, but rather, is an unauthorized intervener who merely claims agency for the purpose of defrauding Plaintiff of Plaintiff's property. It is the further belief and allegation of Plaintiff that the alleged agent for the lender has no contract to with the real party in interest on the note and, therefore, has no agency to represent said real party in interest.

## ASSIGNMENT OF NOTE IS FRAUD

(39) Plaintiff alleges and is prepared to prove at trial that the alleged assignment of standing to enforce the note to Current Servicer is a fraud on the court as said instrument fails to identify the real party in interest and does not contain evidence, affirmed and verified by the current principal on the note granting agency to Current Servicer.

(40) It is the assertion and allegation of Plaintiff that the alleged assignment presented by Current Servicer, was not made by the real party in interest, but rather, by an employee of the servicer bank, or some other person specifically designated to impersonate the real party in interest. Therefore, it is the allegation of Plaintiff that the Current Servicer lacks legal standing to enforce the note and, therefore, are unable to invoke the subject matter jurisdiction of the court.

### *RESPA PENALTIES*

(41) From a cursory examination of the records, with the few available, the apparent RESPA violations are as follows:

**a)** Good Faith Estimate not within limits **b)** No HUD-1 Booklet **c)** Truth In Lending Statement not within limits compared to Note **d)** Truth in Lending Statement not timely presented **e)** HUD-1 not presented at least one day before closing **f)** No Holder Rule Notice in Note **g)** No 1st Payment Letter **h)** No signed and dated **i)** Financial Privacy Act Disclosure **j)** Equal Credit Reporting Act Disclosure **k)** notice of right to receive appraisal report **l)** servicing disclosure statement **m)** borrower's Certification of Authorization **n)** notice of credit score **o)** RESPA servicing disclosure letter **p)** loan discount fee disclosure **q)** business insurance company arrangement disclosure **r)** notice of right to rescind.

(42) The courts have held that the borrower does not have to show harm to claim a violation of the Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And, in as much as the courts are directed to assess a penalty of no less than two hundred dollars and no more than two thousand, considering the large number enumerated here, it is reasonable to consider that the court will assess the maximum amount for each violation. Since the courts have held that the penalty for a violation of RESPA accrues at consummation of the note, borrower has calculated that, the number of violations found in a cursory examination of the note, if deducted from the principal, would result in an overpayment on the part of the borrower, over the life of the note, of $320,558.14

(43) If the violation penalty amounts for each of the unsupported fees listed above are included, the amount by which the borrower would be defrauded is $365,760.81. Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note variance, it appears that lender intended to defraud borrower in the amount of $848,446.32.

### *TILA & RESPA SUBJECT TO EQUITABLE TOLLING*

(44) Plaintiff acted with due diligence by dealing only with licensed professionals. Plaintiff, by so doing had cause to trust in the proactive statements of Defendants concerning the true value of the property, the condition of the real estate market, and the propriety of the fees charged to Plaintiff at closing. Defendants acted with deliberate malice toward Plaintiff in that Defendants by making proactive statements to Plaintiff that revealed certain facts which would give a reasonable person of ordinary

prudence cause to believe the current loan was properly priced and that said loan was the only loan Plaintiff qualified for while withholding facts which would have given Plaintiff full disclosure. Defendants actively concealed the complete truth from Plaintiff with the intent of defrauding Plaintiff.

    a. The Eleventh Circuit stated that "in deciding whether the statute should be tolled, it must be determined whether a 'reasonably diligent plaintiff' would have discovered the fraud." Id. ( *Sterlin v. Biomune Systems, 154 F.3d 1191, 1201 (10th Cir. 1998))*.

(45) Plaintiff, once put on notice of the pervasive fraud affecting the real estate industry, acted immediately with due diligence and engaged professionals to examine into the propriety of the practices engaged in by Defendants.

    b. The First Circuit, based on the same rationale as the Seventh Circuit, has stated that while "'storm warnings' of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner, . . . his cause of action is deemed to accrue on the date when he should have discovered the alleged fraud." *Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir. 1987)*.

(46) Defendants acted in concert and collusion, one with the other, in an organized scheme wherein, from the beginning, one predicate act after another was committed against Plaintiff in order to establish trust, then use that trust to perpetrate fraud against Plaintiff by systematically making false claims to Plaintiff in order to induce Plaintiff into entering into an express contract that was based on fraud. Plaintiff acted in good faith in all things and with due diligence by only dealing with licensed professionals. In as much as all actors were professionals, duly licensed by the state and federal governments and all governed by the relevant consumer protection laws, Plaintiff had cause to expect good faith and fair dealings from said licensed professionals.

    c. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261 Cal. Rptr. 735 (1989); [*15] Rest.2d Contracts § 205.* A mortgage broker has fiduciary duties. *Wyatt v. Union Mortgage Co., (1979) 24 Cal. 3d. 773. Further, In Jonathan Neil & Associates, Inc. v Jones, (2004) 33 Cal. 4th 917.*

    d. "A person who provides brokerage services to a borrower in a covered loan transaction by soliciting lenders or otherwise negotiating a consumer loan secured by real property, is the fiduciary of the consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the broker may be acting as an agent for . . . The fiduciary duty of the broker is to deal with the consumer in good faith. If the broker knew or should have known that the Borrower will or has a likelihood of defaulting ... they have a fiduciary duty to the borrower not to place them in that loan." *(California Department of Real Estate, Section 8: Fiduciary Responsibility, www.dre.ca.gov)*.

(47) Plaintiff had no notice of wrong doing until the improprieties of the real estate market were finally made public in the popular media.

    e. Other courts have indicated the one-year limitations period commences when the plaintiff is placed on inquiry notice, unless the plaintiff can show the actual exercise of reasonable diligence to discover the fraud. If the plaintiff can show the exercise of such diligence, the

limitations period begins to run when the plaintiff actually discovers the facts underlying the alleged fraud. If, however, the plaintiff cannot show such actual diligence, constructive knowledge of the fraud is imputed to the plaintiff as of the date of inquiry notice. For example, in *Dodds v. Cigna Securities, Inc., 12 F.3d 346 (2d Cir. 1993),* the Second Circuit stated that "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Id. at 350.* The Dodds court further stated that the doctrine of "equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has exercised reasonable care and diligence in seeking to learn the facts which would disclose [**35] fraud." Id. (internal quotations omitted). *Sterlin v. Biomune Sys., 154 F.3d 1191, 1201.*

(48) When Plaintiff became aware of potential fraud by the licensed professionals Plaintiff had been induced to trust, Plaintiff made due diligent inquiry and discovered the fraud complained of herein.

    *f.* Plaintiff exercised due diligence and the time limitations in the Truth in Lending Act should be tolled so that the intent of the Legislature may be realized. The Seventh Circuit, essentially merging the inquiry notice and reasonable diligence standards into one governing standard, has indicated that a plaintiff is not put on inquiry notice until the plaintiff reasonably should have discovered the fraud. *See* Marks v. CDW Computer Ctrs., Inc., 122 F.3d 363, 368 (7th Cir. 1997) ("Inquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit."); *see also* Law v. Medco Research, Inc., 113 F.3d 781, 785 (7th Cir. 1997) ("The plaintiff gets a year after he learned or should have learned the facts that he must know to know that he has a claim."). An earlier Seventh Circuit case, however, rejected the plaintiff's argument that "in spite of reasonable diligence, it could not discover the facts underlying the defendants' fraud" and held that the one-year limitations period began to run once the plaintiff was placed on inquiry notice of the possibility of fraud. Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 610 & n.3 (7th Cir. 1995). Sterlin v. Biomune Sys., 154 F.3d 1191, 1201.

(49) In the alternative, the acts as alleged against Defendants amount to criminal fraud in that, in a scheme to deceive and mislead Plaintiff, Defendants, by sham and trickery, induced Plaintiff into entering into a predatory loan contract wherein Plaintiff was charged amounts not allowed by law. Defendants, in perpetrating the above referenced predicate acts toward their carefully crafted criminal conspiracy, relied on the trust engendered by the laws intended to protect Plaintiff and others similarly situated from just the sort of abuse visited on Plaintiff.

(50) Plaintiff alleges a scheme of fraud and, therefore, upon proof at trial, Plaintiff has a right to seek common law equitable recoupment.

### *TENDER BY SETOFF*

(51) Plaintiff has alleged a conspiracy on the part of all defendants which gives Plaintiff a claim against all defendants equally as coconspirators, Plaintiff has an equitable right to claim tender by setoff against the claims herein made against defendants.

### *LIEN IS VOID*

(52) Lender sold the security instrument immediately after closing and received consideration in an amount in excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the security instrument, Lender separated the lien from said security instrument, creating a fatal and irreparable flaw. When Lender received consideration while still holding the lien and said consideration was in excess of the amount of the lien, Lender was in a position such that he could not be harmed and could not gain standing to enforce the lien. The lien was, thereby, rendered void.

(53) Since the separation of the lien from the security instrument creates such a considerable concern, said separation certainly begs a question: "Why would the Lender retain the lien when selling the security instrument?" When you follow the money, the answer is clear. The Lender will hold the lien for three years, then file and IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct the full amount from Lender's tax liability, thereby, receiving consideration a second time. Later, in the expected eventuality of default by Plaintiff, Lender then claimed to transfer the lien to the holder of the security, however, the lien once satisfied, does not gain authority just because the holder, after receiving consideration, decides to transfer it to someone else.

### CLAIM TO QUIET TITLE.

(54) Plaintiff properly averred a claim to quiet title. Plaintiff has set forth facts concerning the title interests of the subject property. Moreover, as shown above, Plaintiff's claims for rescission and fraud are meritorious. As such, Plaintiff's bases for quiet title are meritorious as well.

(55) Any claim the lender has or would have are without any right, and Lenders have no title, estate, lien, or interest in the Subject Property in that purported power of sale contained in the Deed of Trust is of no force or effect because Lenders' security interest in the Subject Property has been rendered void and that the Lenders are not the holder in due course of the Promissory Note. Moreover, because Plaintiff properly pled all Lenders' involvement in a the fraudulent scheme, all Lenders are liable for the acts of its co-conspirators,

> "a Plaintiff is entitled to damages from those Lenders who concur in the tortious scheme with knowledge of its unlawful purpose." Wyatt v. Union Mortgage Co., 24 Cal. 3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d 27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal. Rptr. 2d 752 (2d Dist. 1995).

(56) If defendants are granted standing absent proof of a complete chain of custody of the security instrument and lien, the court will create a break in the chain of title that will render the property

uninsurable. This will create a level of insecurity in the real estate market that could well haunt the public and the courts for generations.

## CLAIMS TOO NUMEROUS TO INCLUDE IN COMPLAINT

(57) Plaintiff is prepared to produce evidence of fraudulent intent and specific violations of standing law too numerous to include in the complaint as Plaintiff is limited to a certain number of pages. After discovery, at trial, Plaintiff is prepared to produce further proof of the allegations made herein.

## CAUSES OF ACTION
### *BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING*

(58) Plaintiff properly pled Defendants violated the breach of implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261 Cal. Rptr. 735 (1989);* [*15] Rest.2d Contracts § 205. A mortgage broker has fiduciary duties. *Wyatt v. Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v Jones, (2004) 33 Cal. 4th 917,* the court stated:

> In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
> particular significance, in part because of the special relationship between the insurer and the insured.
> The insurer, when determining whether to settle a claim, must give at least as much consideration to
> the welfare of its insured as it gives to its own interests. . . The standard is premised on the insurer's
> obligation to protect the insured's interests . . . *Id. at 937.*

(59) Likewise, there is a special relationship between a broker and borrower. "A person who provides brokerage services to a borrower in a covered loan transaction by soliciting lenders or otherwise negotiating a consumer loan secured by real property, is the fiduciary of the consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the broker may be acting as an agent for . . . The fiduciary [*16] duty of the broker is to deal with the consumer in *good faith.* If the *broker knew or should have known that the Borrower will or has a likelihood of defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan." (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov). *[Emphasis Added]*.

(60) All Defendants willfully breached their implied covenant of good faith and fair dealing with Plaintiff when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to provide accurate Right to Cancel Notices; (3) Placed Plaintiff into the current loan product without regard for other more affordable products; (4) Placed Plaintiff into a loan without following proper underwriting standards; (5) Failed to disclose to Plaintiff that she was going to default because of the loan being unaffordable; (6) Failed to perform valid and /or properly documented substitutions and assignments so that Plaintiff could ascertain her rights and duties; and (7) Failed to respond in good faith to Plaintiff's request for documentation of the servicing of her loan and the existence and content of relevant documents. Additionally, Defendants breached their implied covenant of good faith and fair dealing with Plaintiff when Defendants initiated foreclosure proceedings even without the right under an alleged

power of sale because the purported assignment was not recorded and by willfully and knowingly financially profiting from their malfeasance. Under the Covenant of Good Faith and Fair Dealing, neither party is allowed to do anything which will injure the rights of the other party to receive benefits of the agreement. *(Andrews v. Mobile Aire Estates 125 Cal. App. 4th 578, 589 (2005), quoting Gruenberg v Aetna Ins. Co. 9 Cal. 3d 566, 573 (1973).)*

(61) Under the law, every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. *(Marsu, B.V. v Walt Disney Co., 185 F 3d. 932, 937 (9th Cir. 1999), quoting Carma Developers, Inc v Marathon Dev. Cal., Inc., 2 Cal 4th 342, 371 (1992).)* Plaintiff sufficiently placed Defendants on notice of Plaintiff's allegations.

### BREACH OF FIDUCIARY DUTY by Broker

(62) Plaintiff incorporates the above allegations as though fully restated herein. Broker was an agent of the Plaintiff, by express and implied contract and by operation of law. Plaintiff engaged Defendant as their agent for obtaining a loan to purchase their home. Pursuant to the previously mentioned settlement statement fees, Plaintiff paid Broker monies for services from the proceeds of the loan. As Plaintiff's agent Broker owed a fiduciary duty to Plaintiffs to act primarily for their benefit, to act with proper care and diligence, and not to make a personal profit from the agency at the expense of his principal, the Plaintiff. As Plaintiff's agent, the Broker owed a duty of loyalty to Plaintiffs and a duty to deal fairly with them at all times. Broker, willfully and intentionally breached his fiduciary duty of loyalty to Plaintiffs including but not limited to the following to wit:

**a.** Obtained mortgage loans with unfavorable terms; **b.** Misrepresenting the terms of the loan and the ability to refinance the loan at a later date to gain a profit from the sale of the loan in question; **c.** By accepting funds from Lender in the form of kickbacks in return for referring Plaintiff to the other Lender; **d.** By arranging loans at excessive interest rates and onerous terms as applied to the ability of this Plaintiffs to afford;

(63). Plaintiffs have been damaged because of Broker's breaches and as such are entitled to actual damages.

(64). The actions of Broker in deliberately committing a breach of fiduciary duty authorize the imposition of punitive damages in that they show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raise the presumption of a conscious indifference to consequences.

(65) WHEREFORE, Plaintiffs respectfully requests this honorable court enter judgment against Defendant for monetary and punitive damages together with actual attorney fees and costs so wrongfully sustained.

### *BREACH OF FIDUCIARY DUTY BY APPRAISER*

(66) Plaintiff incorporates the above allegations as though fully restated herein. Broker was an agent of the Plaintiff, by express and implied contract and by operation of law. Plaintiff engaged Appraiser as their agent for obtaining a loan to purchase their home. Pursuant to the previously mentioned settlement

statement fees, Plaintiff paid Appraiser monies for services from the proceeds of the loan. As Plaintiff's agent Appraiser owed a fiduciary duty to Plaintiffs to act primarily for their benefit, to act with proper care and diligence, and not to make a personal profit from the agency at the expense of his principal, the Plaintiff. As Plaintiff's agent, Appraiser owed a duty of loyalty to Plaintiffs and a duty to deal fairly with them at all times. Appraiser, willfully and intentionally breached his fiduciary duty of loyalty to Plaintiffs including but not limited to the following to wit:

**a.** Obtained mortgage loans with unfavorable terms; **b.** Misrepresenting the terms of the loan and the ability to refinance the loan at a later date to gain a profit from the sale of the loan in question; **c.** By accepting funds from Lender in the form of kickbacks in return for referring Plaintiff to the other Lender; **d.** By arranging loans at excessive interest rates and onerous terms as applied to the ability of this Plaintiffs to afford;

(67) Plaintiffs have been damaged because of Appraiser's breaches and as such are entitled to actual damages.

(68) The actions of Appraiser in deliberately committing a breach of fiduciary duty authorize the imposition of punitive damages in that they show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raise the presumption of a conscious indifference to consequences.

(69) WHEREFORE, Plaintiffs respectfully requests this honorable court enter judgment against Defendant for monetary and punitive damages together with actual attorney fees and costs so wrongfully sustained.

### *BREACH OF FIDUCIARY DUTY BY LENDER*

(70) Plaintiff incorporates the above allegations as though fully restated herein. Broker was an agent of the Plaintiff, by express and implied contract and by operation of law. Plaintiff engaged Lender as their agent for obtaining a loan to purchase their home. Pursuant to the previously mentioned settlement statement fees, Plaintiff paid Lender monies for services from the proceeds of the loan. As Plaintiff's agent Lender owed a fiduciary duty to Plaintiffs to act primarily for their benefit, to act with proper care and diligence, and not to make a personal profit from the agency at the expense of his principal, the Plaintiff. As Plaintiff's agent, Lender owed a duty of loyalty to Plaintiffs and a duty to deal fairly with them at all times. Lender, willfully and intentionally breached his fiduciary duty of loyalty to Plaintiffs including but not limited to the following to wit:

**a.** Obtained mortgage loans with unfavorable terms;**b.** Misrepresenting the terms of the loan and the ability to refinance the loan at a later date to gain a profit from the sale of the loan in question; **c.** By accepting funds from Lender in the form of kickbacks in return for referring Plaintiff to the other Lender; **d.** By arranging loans at excessive interest rates and onerous terms as applied to the ability of this Plaintiffs to afford;

(71) Plaintiffs have been damaged because of Lender's breaches and as such are entitled to actual damages.

(72) The actions of Lender in deliberately committing a breach of fiduciary duty authorize the imposition of punitive damages in that they show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raise the presumption of a conscious indifference to consequences.

(73) WHEREFORE, Plaintiffs respectfully requests this honorable court enter judgment against Defendant for monetary and punitive damages together with actual attorney fees and costs so wrongfully sustained.

## *BREACH OF FIDUCIARY DUTY BY CLOSING AGENT*

(74) Plaintiff incorporates the above allegations as though fully restated herein. Broker was an agent of the Plaintiff, by express and implied contract and by operation of law. Plaintiff engaged Closing Agent as their agent for obtaining a loan to purchase their home. Pursuant to the previously mentioned settlement statement fees, Plaintiff paid Closing Agent monies for services from the proceeds of the loan. As Plaintiffs agent Closing Agent owed a fiduciary duty to Plaintiffs to act primarily for their benefit, to act with proper care and diligence, and not to make a personal profit from the agency at the expense of his principal, the Plaintiff. As Plaintiff's agent, Closing Agent owed a duty of loyalty to Plaintiffs and a duty to deal fairly with them at all times. Closing Agent, willfully and intentionally breached his fiduciary duty of loyalty to Plaintiffs including but not limited to the following to wit:

**a.** Obtained mortgage loans with unfavorable terms; **b.** Misrepresenting the terms of the loan and the ability to refinance the loan at a later date to gain a profit from the sale of the loan in question; **c.** By accepting funds from Closing Agent in the form of kickbacks in return for referring Plaintiff to the other Closing Agent; **d.** By arranging loans at excessive interest rates and onerous terms as applied to the ability of this Plaintiffs to afford;

(75) Plaintiffs have been damaged because of Closing Agent's breaches and as such are entitled to actual damages.

(76) The actions of Closing Agent in deliberately committing a breach of fiduciary duty authorize the imposition of punitive damages in that they show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raise the presumption of a conscious indifference to consequences.

(77) WHEREFORE, Plaintiffs respectfully requests this honorable court enter judgment against Defendant for monetary and punitive damages together with actual attorney fees and costs so wrongfully sustained.

## *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

(78) Plaintiff hereby incorporates by reference, re-pleads and re-alleges each and every allegation contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of Action as though the same were set forth herein.

(79) Defendants owed a general duty of care with respect to Plaintiffs, particularly concerning their duty to properly perform due diligence as to the loans and related transactional issues described hereinabove.

(80) In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under to, among other things, provide proper disclosures concerning the terms and conditions of the loans they marketed, to refrain from marketing loans they knew or should have known that borrowers could not afford or maintain, and to avoid paying undue compensation such as "yield spread premiums" to mortgage Agents and loan officers.

(81) Defendants knew or in the exercise of reasonable care should have known, that the loan transactions involving Plaintiff and other persons similarly situated were defective, unlawful, violative of federal and state laws and regulations, and would subject Plaintiff to economic and non-economic harm and other detriment.

(82) Plaintiff is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under were intended and designed to protect, and the conduct alleged against Defendants, and each of them is the type of conduct and harm which the referenced statutes and regulations was designed to deter.

(83) As a direct and proximate result of Defendant's negligence, Plaintiff suffered economic and non-economic harm in an amount to be shown according to proof at trial.

(84) WHEREFORE, Plaintiffs respectfully requests this honorable court enter judgment against Defendant for monetary and punitive damages together with actual attorney fees and costs so wrongfully sustained.

### *COMMON LAW FRAUD*

(85) Plaintiff hereby incorporates by reference, re-pleads and re-alleges each and every allegation contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of Action as though the same were set forth herein.

(86) If any Defendants misrepresentations made herein were not intentional, said misrepresentations were negligent. When the Defendants made the representations alleged herein, he/she/it had no reasonable ground for believing them to be true. Defendants made these representations with the intention of inducing Plaintiff to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Plaintiff would so act.

(87) Plaintiff is informed and believes that Defendants et al, facilitated, aided and abetted various Defendants in their negligent misrepresentation, and that various Defendants was negligent in not implementing procedures such as underwriting standards oversight that would have prevented various Defendants from facilitating the irresponsible and wrongful misrepresentations of various Defendants.

(88) Plaintiff is informed and believes that Defendants acted in concert along with other others named herein in promulgating false representations to cause Plaintiff to enter into the LOAN without knowledge or understanding of the terms thereof.

(89) As a proximate result of the negligent misrepresentations of Defendants as herein alleged, the Plaintiff sustained damages, including monetary loss, emotional distress, loss of credit, loss of opportunities, attorney fees and costs, and other damages to be determined at trial. As a proximate result of Defendants' breach of duty and all other actions as alleged herein, Defendants has suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Plaintiff's damage in an amount to be established at trial in excess of $848,446.32.

(90) WHEREFORE, Plaintiffs respectfully requests this honorable court enter judgment against Defendant for monetary and punitive damages together with actual attorney fees and costs so wrongfully sustained.

### FRAUD BY NON-DISCLOSURE

(91) Plaintiff hereby incorporates by reference, re-pleads and re-alleges each and every allegation contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of Action as though the same were set forth herein.

(92) Defendants made proactive statements of fact to Plaintiff giving partial disclosure Defendants intended that Plaintiff would rely on in making a decision to enter into an express contract for the purchase of the property. By said proactive statements intended as partial disclosure, Defendants invoked a duty to full disclosure. Defendants failed to give full disclosure to Plaintiff. Plaintiff did not have equal access to, or equal opportunity to discover information upon which Defendants gave partial disclosure. Plaintiff relied on the disclosure given by Defendants as being complete. Plaintiff was harmed by the lack of full disclosure by Defendants.

(93) The elements of a fraudulent omissions claim are: (1) concealment or nondisclosure of a material fact, (2) knowledge of falsity (scienter), (3) intent to defraud, (4) justifiable reliance, and (5) resulting damages. *Charnay v. Cobert, 145 Cal. App. 4th 170, 184 (2006). See also Lazar v. Super. Ct., 12 Cal. 4th 631, 638 (1996).* [*48] While certain fraud claims are subject to Fed. R. Civ. P. 9(b), Plaintiffs need only plead their claim pursuant to Fed. R. Civ. P. 8(a). A fraud by omission claim does not need to meet the requirements of Rule 9(b) because it is based on the ***absence*** of representations, rather than on representations that were made and can be detailed in a pleading. *See, e.g., Falk v. GMC, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007)* ("plaintiff in a fraud by omission suit will not be able to specify the time, place and specific content of an omission as precisely as would a plaintiff in a false representation claim...

[A] fraud by omission claim can succeed without the same level of specificity required by a normal fraud claim."). Regardless, Plaintiffs have pled their fraudulent omissions claim with particularity.

(94) At this point, all Plaintiff is required to do is state the factual basis for his Fraud claim pursuant to Rule 9(b). To meet the requisite level of specificity, Rule 9(b) only requires identification of circumstances constituting fraud, including the time, place, and nature of the alleged fraudulent activities, such that a defendant can prepare adequate answer to allegations. *(Bosse v. Crowell Collier & MacMillan, 565 F.2d 602, 611 (9th Cir. 1977).)* A pleading is sufficient under Rule 9(b) if it identifies circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations. *(Neubronner v. Milken, 6 F.3d 666, 671-672 (9th Cir. 1993), quoting Gottreich v. SF Inv. Corp., 552 F.2nd 866 (9th Cir. 1977).)* However, Rule 9(b) does not require nor make legitimate pleading of detailed evidentiary matter. *(Walling v. Beverly Enterprises, 476 F.2d 393, 397 (9th Cir. 1973).)* Rule 9(b) may be relaxed with respect to matters within opposing party's knowledge. *Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993).)* Under Rule 9(b), it is also not necessary, once complaint adequately identified particular defendant with category of defendants allegedly responsible for some continuing course of conduct, to plead more than group conduct of defendants. *(In re Equity Funding Corp. of Am. Sec. Litig., 416 F.Supp. 161, 181 (C.D. Cal. 1976).)* Moreover, in cases where fraud was conducted over several years, a plaintiff is not required to allege each date of each defendant's fraudulent conduct since such requirement would defeat the purpose of Rule 8 requiring that pleading be short, plain, and in concise statements.

### *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET SEQ*

(95) Plaintiff hereby incorporates by reference, re-pleads and re-alleges each and every allegation contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of Action as though the same were set forth herein.

(96) This consumer credit transaction was subject to the Plaintiff's right of rescission as described by *15 U.S.C. § 1635*(a) and Regulation Z § 226.23 (12 C.F.R. § 226.23).

(97) More particularly, the same Defendants violated *15 U.S.C. § 1635*(a) and Regulation Z § 226.23(b) with regards to the purported Notice of Right to Cancel. As a consequence of this action, the Notice of Right to Cancel documentation was not provided to Plaintiff or if furnished, to Plaintiff it failed to: Correctly identify the transaction; Clearly and conspicuously disclose the Plaintiff's right to rescind the transaction three days after delivery of all required disclosures; Clearly and conspicuously disclose how to exercise the right to rescind the transaction, with a form for that purpose; Clearly and conspicuously disclose the effects of rescission; Clearly and conspicuously disclose the date the rescission period expired.

(98) Furthermore, Plaintiff is informed and believes that Defendants violated TILA at the time of origination because, among other things: Multiple GFE's used to mislead and confuse borrower about actual terms of Notes; over $550 in yield spread premium paid outside closing and additional unknown amounts in YSP/POC fees.

(99) Plaintiff is informed and believes that Defendant's violation of the provisions of law rendered the credit transaction null and void, invalidates Defendant's claimed interest in the Subject Property, and entitles Plaintiff to damages as proven at trial.

(100) Defendant BAC Home Loans Servicing, LP contends that Plaintiff's TILA damages and rescission claims are time barred. (MTD, 5:22). It is a well-established rule that the doctrine of equitable tolling suspends the statute of limitations until borrowers discover or had reasonable opportunity to discover the fraud or the non-disclosures that form the basis of a TILA action. (*King v. California, 784 F.2d 910, 915 (9th Cir. 1986);* see also, *Eubanks v. Liberty Mortgage Banking Ltd., 976 F. Supp. 171 (9th Cir. 2003)* (noting that TILA claims are subject to equitable tolling in instances of fraud).) District courts have discretion to adjust the limitations period in cases where the purpose of TILA would be frustrated otherwise. (See, *Pelayo v. Home Capital Funding, 2009 U.S. Dist. LEXIS 44453,* *14-16 (S.D. Cal. May 22, 2009).) "The motion [to dismiss] should be granted 'only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled.'" (*Plascencia v. Lending 1st Mortg., 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008),* [*19] citing *Durning v. First Boston Corp., 815 F.2d 1265, 1268 (9th Cir. 1987);* see also, *Huynh v. Chase Manhattan Bank, 465 F.3d 992, 1003-04 (9th Cir. 2006)* (holding that it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss if equitable tolling is at issue, given that the applicability of equitable tolling depends on matter outside of the pleadings and Court's review is limited to the complaint).) n1

> n1 The Plascencia court further held that the issue of equitable tolling must be considered when "the complaint, liberally construed in light of our 'notice pleading' system, adequately alleges facts showing the potential applicability of the equitable tolling doctrine." (Id., citing *Cervantes v. City of San Diego, 5 F.3d 1273, 1277 (9th Cir. 1993).)*

(101) Here, Plaintiffs pled that the facts surrounding the loan transaction subject to this litigation were purposefully hidden and continue to be hidden to this day. In California, the statute of limitation runs from actual discovery. (See, *Katz v. Bank of California, 640 F.2d 1024, 1025 (9th Cir. 1981)* citing *NLRB v. Don Burgess Constr. Corp., 596 F.2d 378, 382-383 (9th Cir. 1979).)* TILA does not permit constructive disclosure of terms, but specifically provides for actual, express disclosures to be made to the borrower by the creditor prior to and upon closing of the loan. (See, *15 U.S.C. § 1601* et seq.) Here, Defendants failed to provide the requisite TILA disclosures to the Plaintiffs at the inception of the loan. Plaintiff, by engaging licensed professionals to assist Plaintiff in the procurement of the note exercised

due diligence. It was only after news reports of predatory lending practices came to the attention of Plaintiff that Plaintiff discovered concealment of TILA violations by Defendants within the past year, when Plaintiff engaged the services of a professional to examine the loan for improprieties. As such, Plaintiff's allegations adequately state the applicability of the equitable tolling doctrine. Thus, Plaintiff's TILA claims [*21] are not barred. *2009 U.S. Dist. Ct. Motions 875682; 2010 U.S. Dist. Ct. Motions LEXIS 7191*

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(102) The conduct committed by Defendants, driven as it was by profit at the expense of increasingly highly leveraged and vulnerable consumers who placed their faith and trust in the superior knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by civilized society. Defendants either knew that their conduct would cause Plaintiff to suffer severe emotional distress, or acted in conscious and/or reckless disregard of the probability that such distress would occur.

(103) Plaintiff did in fact suffer severe emotional distress as an actual and proximate result of the conduct of Defendants as described hereinabove. As a result of such severe emotional distress, Plaintiff suffered economic and non economic harm and detriment, all to be shown according to proof at trial of this matter. Plaintiff demands that Defendants provide Plaintiff with release of lien on the lien signed by Plaintiff and secure to Plaintiff quiet title; Plaintiff demands Defendants disgorge themselves of all enrichment received from Plaintiff as payments to Defendants based on the fraudulently secured promissory note in an amount to be calculated by Defendants and verified to Plaintiff; Plaintiff further demands that Defendants pay to Plaintiff an amount equal to the amount Defendants intended to defraud Plaintiff of which amount Plaintiff calculated to be equal to $848,446.32

## CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES

(104) The UCL prohibits "any unlawful", "unfair" or "fraudulent" business practice. (815 ILCS 505/) Consumer Fraud and Deceptive Business Practices Act. A practice is unfair if the court determines that the impact of the practice or act on its alleged victim outweighs the reasons, justifications, and motives of the alleged wrongdoer. *(Podolsky v. First Healthcare Corp.., 50 Cal. App. 4th 632, 647 (1996).)* A practice is fraudulent if the members of the public are likely to be deceived by the practice. *(Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 1167 (2000).)* The statute "has a broad scope that allows for 'violations of other laws to be treated as unfair competition that is independently actionable' while also 'sweep[ing] within its scope acts and practices that specifically prescribed by any other law.'" *(Hauk v. JP Morgan Chase Bank USA, 552 F.3d 1114, 1122, [*23] (9th Cir. 2009), quoting Kasky v. Nike, Inc., 27 Cal. 4th 939, 949 (2002).)*

(105) Plaintiff sufficiently pled numerous violations of various consumer protection laws to establish a claim under (815 ILCS 505/) Consumer Fraud and Deceptive Business Practices Act.

## SUFFICIENCY OF PLEADING

(106) Plaintiff has sufficiently pled that relief can be granted on each and every one of the Complaint's causes of action. Federal Rule of Civ. Procedure 12(b)(6) provides for dismissal if a Plaintiff fails to state a claim upon which relief can be granted. A complaint should not be dismissed "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All allegations of material fact in the complaint are taken as true and construed in the light most favorable to Plaintiff." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

(107) The Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc. 8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal theories, and seeks remedies to which Plaintiff is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752 (9th Cir, 1994).* Lastly, Plaintiff's complaint contains claims and has a probable validity of proving a "set of facts" in support of their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore, relief as requested herein should be granted.

## PRAYER

(108) WHEREFORE, Plaintiff prays for judgment against the named Defendants, and each of them, as follows:

For quiet title to Property;

For rescission of the loan contract and restitution by Defendants to Plaintiff according to proof at trial;

For disgorgement of all amounts wrongfully acquired by Defendants according to proof at trial;

For actual monetary damages in the amount of $848,446.32;

For pain and suffering due to extreme mental anguish in an amount to be determined at trial.

For pre-judgment and post-judgment interest according to proof at trial;

For punitive damages according to proof at trial in an amount equal to $2,545,338.96;

For attorney's fees and costs as provided by statute; and,

For such other relief as the Court deems just and proper.

Restectfully,

Steven Olson

Lauren J Tratar

Original Complaint

OFFICIAL SEAL
BLANCA A SANCHEZ
Notary Public - State of Illinois
My Commission Expires Jun 27, 2011

Prepared by: TARA PASCH

# EXHIBIT A

LOAN #: 177759315

# INTEREST ONLY ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published In *The Wall Street Journal*)
### Rate Caps – 10 Year Interest Only Period)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

SEPTEMBER 07, 2007          CHICAGO          ILLINOIS
[Date]                      [City]           [State]

1021 ROYAL SAINT GEORGE DR, NAPERVILLE, IL 60563-2322
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,380,000.00      (this amount is called "Principal"), plus interest, to the order of Lender. Lender is
Countrywide Bank, FSB.
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      7.500 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment on the first day of every month, beginning on   NOVEMBER 01, 2007   . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its





LOAN #: 177759345

scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal. If, on OCTOBER 01, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 8,625.00 until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of OCTOBER, 2014 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO & ONE-QUARTER percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.500 % or less than 2.500 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

LOAN #: 177759345

(F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    FIFTEEN          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

LOAN #: 177759345

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

LOAN #: 177759345

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
STEVEN OLSON                                                 -Borrower

_____ (Seal)
                                                                      -Borrower

_____ (Seal)
                                                                      -Borrower

_____ (Seal)
                                                                      -Borrower

*[Sign Original Only]*

● MULTISTATE ARM, ONE-YEAR LIBOR, 10-Year Interest Only Period Note
1E452-XX (09/06)                      Page 5 of 5

EXHIBIT
B

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
TARA PASCH
COUNTRYWIDE HOME LOANS, INC.

2 MID AMERICA SUITE #450
OAKBROOK TERRACE
IL 60181

WE HEREBY CERTIFY THAT THIS
IS A TRUE AND ACCURATE COPY
OF THE ORIGINAL INSTRUMENT.

GREATER ILLINOIS TITLE COMPANY, INC.
BY:

--------------------- [Space Above This Line For Recording Data] ---------------------

271154                                          00017775934509007
[Escrow/Closing #]                              [Doc ID #]

# MORTGAGE
MIN 1001337-0002495683-4

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    SEPTEMBER 07, 2007    , together with all Riders to this document.
(B) "Borrower" is a single man        a married woman
STEVEN OLSON, AND LAUREN J TRATARA AS JOINT TENANTS

Borrower is the mortgagor under this Security Instrument.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

M Mortgage-IL
1006A-IL (08/07)(d/i)                      Page 1 of 12                      Form 3014  1/01





DOC ID #: 00017775934509007

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is
Countrywide Bank, FSB.
Lender is a FED SVGS BANK
organized and existing under the laws of THE UNITED STATES
Lender's address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314

(E) "Note" means the promissory note signed by Borrower and dated SEPTEMBER 07, 2007 . The Note states that Borrower owes Lender
ONE MILLION THREE HUNDRED EIGHTY THOUSAND and 00/100

Dollars (U.S. $ 1,380,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than OCTOBER 01, 2037 .

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [X] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and

DOC ID #: 00017775934509007

assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY                                    of                                    DUPAGE
[Type of Recording Jurisdiction]                        [Name of Recording Jurisdiction]

LOT 2 (EXCEPT THAT PART DESCRIBED AS FOLLOWS: BEGINNING AT THE MOST NORTHERLY CORNER OF
SAID LOT 2 AND RUNNING THENCE SOUTHWESTERLY ALONG THE NORTHWESTERLY LINE OF SAID LOT,
14.89 FEET; THENCE SOUTHEASTERLY 149.46 FEET TO THE SOUTHEAST CORNER OF SAID LOT;
THENCE NORTHWESTERLY ALONG THE NORTHWESTERLY LINE OF SAID LOT, 150.00 FEET TO THE PLACE
OF BEGINNING) IN BLOCK 6 IN CRESS CREEK, BEING A SUBDIVISION OF PART OF SECTION 11, 12
AND 14, TOWNSHIP 38 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO
THE PLAT THEREOF RECORDED APRIL 4, 1962 AS DOCUMENT R62-9660, IN DUPAGE COUNTY,
ILLINOIS.

Parcel ID Number: 0711406020                              which currently has the address of
1021 ROYAL SAINT GEORGE DR, NAPERVILLE
[Street/City]

Illinois 60563-2322 ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

ORDER NO.: 1301 - 000271154
ESCROW NO.: 1301 - 000271154          1

STREET ADDRESS: 1021 ROYAL ST. GEORGE DRIVE
CITY: NAPERVILLE          ZIP CODE: 60562          COUNTY: DUPAGE
TAX NUMBER: 07-11-406-020-0000

LEGAL DESCRIPTION:

LOT 2 (EXCEPT THAT PART DESCRIBED AS FOLLOWS: BEGINNING AT THE MOST NORTHERLY
CORNER OF SAID LOT 2 AND RUNNING THENCE SOUTHWESTERLY ALONG THE NORTHWESTERLY
LINE OF SAID LOT, 14.89 FEET; THENCE SOUTHEASTERLY 149.46 FEET TO THE SOUTHEAST
CORNER OF SAID LOT; THENCE NORTHWESTERLY ALONG THE NORTHEASTERLY LINE OF SAID
LOT, 150.00 FEET TO THE PLACE OF BEGINNING) IN BLOCK 6 IN CRESS CREEK, BEING A
SUBDIVISION OF PART OF SECTIONS 11, 12 AND 14, TOWNSHIP 38 NORTH, RANGE 9, EAST OF THE
THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED APRIL 4, 1962 AS
DOCUMENT R62-9660, IN DUPAGE COUNTY, ILLINOIS.



DOC ID #: 0001777593459007

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.



DOC ID #: 0001777593450 9007

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.



DOC ID #: 00017775934509007

6.   **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to:  (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written



DOC ID #: 00017775934509007

agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material



DOC ID #: 00017775931509007

impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

M Mortgage-IL
1006A-IL (08/07)                             Page 8 of 12                             Form 3014 1/01



DOC ID #: 00017775931509007

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the



DOC ID #: 00017775934509007

Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.