**EXHIBIT C**

**FILED**

SEP 1 7 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

1 Anthony Pendolino
2 615 N Brainard Street
3 Naperville IL 60563

4 **UNITED STATES DISTRICT COURT**
5 **NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **Anthony Pendolino** | Case # _____ |
| Plaintiff, | |
| vs. | **ORIGINAL PETITION** |
| **BAC Home Loans Servicing LP** | |
| Defendant | 10CV5916 |
| | JUDGE PALLMEYER |
| | MAG. JUDGE GILBERT |

6

7 Date: _____

8 Comes now Anthony Pendolino , hereinafter referred to as "Petitioner," and moves the court

9 for relief as herein requested:

10 **PARTIES**

11 Petitioner is Anthony Pendolino , 615 N Brainard Street Naperville IL 60563. Currently

12 Known Defendant(s) are/is: BAC Home Loans Servicing LP , PO Box 5170 , CA 93062, by and

13 through its attorney .

14 **STATEMENT OF CAUSE**

15 Petitioner, entered into a consumer contract for the refinance of a primary residence located at

16 615 N Brainard Street Naperville IL 60563, hereinafter referred to as the "property."

17 Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

18 predatory loan agreement with Defendant.

19 Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

20 crafted scheme intended to defraud Petitioner.

21 Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

22 of the types of tactics used by Defendants to defraud Petitioner.

23 Defendants charged false fees to Petitioner at settlement.

ORIGINAL PETITION

**EXHIBIT**

tabbies

C

24    Defendants used the above referenced false fees to compensate agents of Petitioner in order to

25    induce said agents to breach their fiduciary duty to Petitioner.

26    Defendant's attorney caused to be initiated collection procedures, knowing said collection

27    procedures in the instant action were frivolous as lender is estopped from collection procedures,

28    under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for

29    the production of the original promissory note alleged to create a debt.

30                                    **IN BRIEF**

31                        *(Non-factual Statement of Posture and Position)*

32     It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be

33    making a number of allegations that, outside the context of the current condition of the real

34    estate industry, may seem somewhat outrageous and counter-intuitive.

35    When Petitioner accuses ordinary individuals of acting in concert and collusion with an

36    ongoing criminal conspiracy, it tends to trigger an incredulous response as it is

37    unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary

38    people, just doing what they have been trained to do, are out to swindle the poor

39    unsuspecting borrower.

40    The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud

41    committed by people acting in concert and collusion, one with the other. Petitioner has no

42    reason to believe that the Agent, loan officer, appraiser, and others were consciously aware

43    that what they were doing was part of an ongoing criminal conspiracy, only that it was,

44    and they, at the very least, kept themselves negligently uninformed of the wrongs they

45    were perpetrating. Petitioner maintains the real culprit is the system itself, including the

46    courts, for failure to strictly enforce the consumer protection laws.

47                        **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**

48                              *(General State of the Real Estate Industry)*

49    ***THE BEST OF INTENTIONS***

50    Prior to the 1980's and 1990's ample government protections were in place to protect

51    consumers and the lending industry from precisely the disaster we now experience.

52    During President Clinton's administration, under the guise of making housing available to

53  the poor, primary protections were relaxed which had the effect of releasing the
54  unscrupulous on the unwary.

55  Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
56  the risk. Consequently, Americans were engaged in safe and stable home mortgages.
57  With the protections removed, the unscrupulous lenders swooped in and, instead of
58  making loans available to the poor, used the opportunity to convince the unsophisticated
59  American public to do something that had been traditionally taboo; home buyers were
60  convinced to speculate with their homes, their most important investment.

61  BAC Home Loans Servicing LP , Ameriquest, Countrywide, and many others swooped in
62  and convinced Americans to sell their homes, get out of their safe mortgage agreements,
63  and speculate with the equity they had gained by purchasing homes they could not afford.
64  Lenders created loans intended to fail as, under the newly crafted system, the Lender
65  profited more from a mortgage default than from a stable loan.

66  Companies cropped up who called themselves banks when, in fact, they were only either
67  subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
68  creating and selling promissory notes. As will be demonstrated, these companies then
69  profited from the failure of the underlying loans.

70  **HOW IT WORKS**

71  Briefly, how it works is this, the Lender would secure a large loan from a large bank,
72  convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
73  investor.

74  People would set up mortgage companies by securing a large loan from one of the major
75  banks, then convert that loan into 20 and 30 year mortgages. In order to accomplish this
76  an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
77  lender who would secure the title from the seller using the borrowed bank funds for that
78  purpose, and then trade the title to the buyer in exchange for a promissory note.

79  The lender then creates a 20 or 30 year mortgage with money the lender must repay within
80  6 months. As soon as the closing is consummated, the promissory note is sold to an
81  investor pool.

82  Using the instant case as an example, a 920,000.00 note at 6.9590% interest over 30 years
83  will produce $929,178.79 The lender can then offer to the investor the security instrument

ORIGINAL PETITION                                                    3 of 25

84 (promissory note) at say 50% of it's future value. The investor will, over the life of the

85 note, less approximately 3.00% servicing fees, realize $1,072,295.33 . The lender can then

86 pay back the bank and retain a handsome profit in the amount of $218,622.87. The lender,

87 however, is not done with the deal.

88 The lender signed over the promissory note to the investor at the time of the trade, but did

89 not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme

90 Court addressed this issue and stated that such a transaction was certainly legal. However,

91 it created a fatal flaw as the holder of the lien document, at time of sale of the security

92 instrument, received consideration in excess of the lien amount. Since the lien holder

93 received consideration, he could not be harmed. Therefore the lien became an

94 unenforceable document.

95 This begs the question: if keeping the lien would render it void, why would the lender not

96 simply transfer the lien with the promissory note? The reason is because the lender will

97 hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full

98 amount of the lien as abandoned funds, and deduct the full amount from the lender's tax

99 liability. The lender, by this maneuver, gets consideration a second time. And still the

100 lender is not done profiting from the deal.

101 After sale of the promissory note, the lender remains as the servicer for the investor. The

102 lender will receive 3% of each payment the lender collects and renders to the investor

103 pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep

104 that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the

105 foreclosure.

106 The lender stands to profit more from a note that is overly expensive, than from a good

107 stable loan. And where, you may ask, does all this profit come from? It comes from the

108 equity the borrower had built up in the home. And still the lender is not finished profiting

109 from the deal.

110 Another nail was driven in the American financial coffin when on the last day Congress

111 was in session in 2000 when restrictions that had been in place since the economic

112 collapse of 1907 were removed. Until 1907  investors were allowed to bet on stocks

113 without actually buying them. This unbridled speculation led directly to an economic

114 collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the

115 unscrupulous lenders got their way on the last day of the congressional session. Congress

ORIGINAL PETITION                                            4 of 25

116    removed the restriction banning derivatives and again allowed the practice, this time

117    taking only 8 years to crash the stock market.  This practice allowed the lender to profit

118    further from the loan by betting on the failure of the security instrument he had just sold to

119    the unwary investor, thus furthering the purpose of the lender to profit from both the

120    borrower (consumer) and the investor.

121    The failure of so many loans recently resulted in a seven hundred and fifty billion dollar

122    bailout at the expense of the taxpayer.  The unsuspecting consumer was lulled into

123    accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all

124    were acting under the guise of government regulation and, therefore, the borrower had

125    reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to

126    protect the consumer from just this kind of abuse were simply being ignored.

127    The loan origination fee from the HUD1 settlement statement is the finder's fee paid for

128    the referral of the client to the lender by a person acting as an agent for the borrower.

129    Hereinafter, the person or entity who receives any portion of the yield spread premium, or

130    a commission of any kind consequent to securing the loan agreement through from the

131    borrower will be referred to as "Agent."  The fee, authorized by the consumer protection

132    law is restricted to 1% of the principal of the note.  It was intended that the Agent, when

133    seeking out a lender for the borrower, would seek the best deal for his client rather than

134    who would pay him the most.  That was the intent, but not the reality.  The reality is that

135    Agents never come away from the table with less than 2% or 3% of the principal.  This is

136    accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his

137    fiduciary duty to the borrower and convince the borrower to accept a more expensive loan

138    product than the borrower qualifies for.  This will generate more profits for the lender and,

139    consequently, for the Agent.

140    It is a common practice for lenders to coerce appraisers to give a higher appraisal than is

141    the fair market price.  This allows the lender to increase the cost of the loan product and

142    give the impression that the borrower is justified in making the purchase.

143    The lender then charges the borrower an underwriting fee in order to convince the

144    borrower that someone with knowledge has gone over the conditions of the note and

145    certified that they meet all legal criteria.  The trustee, at closing, participates actively in the

146    deception of the borrower by placing undue stress on the borrower to sign the large stack

147    of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

ORIGINAL PETITION                                           5 of 25

148   insure the transaction. This trust is systematically violated for the purpose of taking unfair
149   advantage of the borrower. The entire loan process is a carefully crafted contrive
150   connivance designed and intended to induce the unsophisticated borrower into accepting a
151   loan product that is beyond the borrowers means <u>to repay</u>. With all this, it should be a
152   surprise to no one that this country is having a real estate crisis.

153                   **PETITIONER WILL PROVE THE FOLLOWING**
154   Petitioner is prepared to prove, by a preponderance of evidence that:

155     • Lender has no legal standing to bring collection or foreclosure claims against the
156       property;

157     • Lender is not a real party in interest in any contract which can claim a collateral
158       interest in the property;

159     • even if Lender were to prove up a contract to which Lender had standing to enforce
160       against Petitioner, no valid lien exists which would give Lender a claim against the
161       property;

162     • even if Lender were to prove up a contract to which Lender had standing to enforce
163       against Petitioner, said contract was fraudulent in its creation as endorsement was
164       secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
165       the inducement, fraud in the execution, usury, and breaches of contractual and
166       fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
167       Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
168       Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
169       "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
170       'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
171       bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
172       pooled together in a trust fund;

173     • Defendants have concocted a carefully crafted connivance wherein Lender
174       conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
175       by inducing Plaintiff to enter into a predatory loan inflated loan product;

176     • Lender received unjust enrichment in the amount of 5% of each payment made late
177       to Lender while Lender and Lender's assigns acted as servicer of the note;

ORIGINAL PETITION                                   6 of 25

178    • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
179        handling the foreclosure process on a contract Lender designed to have a high
180        probability of default;

181    • Lender intended to defraud Investor by converting the promissory note into a
182        security instrument and selling same to Investor;

183    • Lender intended to defraud Investor and the taxpayers of the United States by
184        withholding the lien document from the sale of the promissory note in order that
185        Lender could then hold the lien for three years, then prepare and file Internal
186        Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
187        and deduct same from Lender's income tax obligation;

188    • Lender defrauded backers of derivatives by betting on the failure of the promissory
189        note the lender designed to default;

190    • participant Defendants, et al, in the securitization scheme described herein have
191        devised business plans to reap millions of dollars in profits at the expense of
192        Petitioner and others similarly situated.

### PETITIONER SEEKS REMEDY

194  In addition to seeking compensatory, consequential and other damages, Petitioner seeks
195  declaratory relief as to what (if any) party, entity or individual or group thereof is the
196  owner of the promissory note executed at the time of the loan closing, and whether the
197  Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
198  Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
199  alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

### *PETITIONER HAS BEEN HARMED*

201  Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

202  Such harm and detriment includes economic and non-economic damages, and injuries to
203  Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

204  In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
205  equitable relief requested herein is granted.

ORIGINAL PETITION                              7 of 25

206        ## STATEMENT OF CLAIM

207    *DEFENDANTS LACK STANDING*

208        ### No evidence of Contractual Obligation

209    Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
210    produce said contract. Even if Defendants produced evidence of the existence of said contract in
211    the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
212    that a contract actually existed at one point in time. A copy, considering the present state of
213    technology, could be easily altered. As Lender only created one original and that original was
214    left in the custody of Lender, it was imperative that Lender protect said instrument.

215    In as much as the Lender is required to present the original on demand of Petitioner, there can be
216    no presumption of regularity when the original is not so produced. In as much as Lender has
217    refused Petitioner's request of the chain of custody of the security instrument in question by
218    refusing to identify all current and past real parties in interest, there is no way to follow said
219    chain of custody to insure, by verified testimony, that no alterations to the original provisions in
220    the contract have been made. Therefore, the alleged copy of the original is only hearsay
221    evidence that an original document at one time existed. Petitioner maintains that, absent
222    production of admissible evidence of a contractual obligation on the part of Petitioner,
223    Defendants are without standing to invoke the subject matter jurisdiction of the court.

224        ### No Proper Evidence of Agency

225    Defendants claim agency to represent the principal in a contractual agreement involving
226    Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
227    pronouncement that agency has been assigned by some person, the true identity and capacity of
228    whom has not been established. Defendants can hardly claim to be agents of a principal then
229    refuse to identify said principal. All claims of agency are made from the mouth of the agent with
230    no attempt to provide admissible evidence from the principal.

231    Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
232    court.

ORIGINAL PETITION

233      **Special Purpose Vehicle**

234      Since the entity now claiming agency to represent the holder of the security instrument is not the

235      original lender, Petitioner has reason to believe that the promissory note, upon consummation of

236      the contract, was converted to a security and sold into a special purpose vehicle and now resides

237      in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue

238      Code and as such, cannot be removed from the REMIC as such would be a prohibited

239      transaction.      If the mortgage was part of a special purpose vehicle and was removed on

240      consideration of foreclosure, the real party in interest would necessarily be the trustee of the

241      special purpose vehicle.   Nothing in the pleadings of Defendants indicates the existence of a

242      special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner

243      cause to believe defendant is not the proper agent of the real party in interest.

244      *CRIMINAL CONSPIRACY AND THEFT*

245      Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward

246      a criminal conspiracy to defraud Petitioner.   Said conspiracy but are not limited to acts of

247      negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous

248      acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to

249      Petitioner by Lender, which were then used to fund the improper payment of commission fees to

250      Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

251      *AGENT PRACTICED UP-SELLING*

252      By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so

253      doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact

254      that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose

255      Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to

256      Petitioner and the duty to provide fair and honest services, through a series of carefully crafted

257      connivances, wherein Agent proactively made knowingly false and misleading statements of

258      alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead

259      Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of

260      a loan product offered by the Lender.  Said loan product was more expensive than Petitioner

261      could legally afford. Agent acted with full knowledge that Petitioner would have made a

262      different decision had Agent given complete disclosure.

263   ### *FRAUDULENT INDUCEMENT*

264   Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
265   known, Petitioner could not afford in order to unjustly enrich Lender.

266   ### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

267   Said more expensive loan product was calculated to produce a higher return when sold as a
268   security to an investor who was already waiting to purchase the loan as soon as it could be
269   consummated.

270   #### **Extra Commission for Late Payments**

271   Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
272   that Lender intended Petitioner would have difficulty paying. The industry standard payment to
273   the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
274   borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
275   Thereby, the Lender stands to receive more than double the regular commission on collections if
276   the borrower pays late.

277   #### **Extra Income for Handling Foreclosure**

278   Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
279   on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
280   receives considerable funds for handling and executing the foreclosure process.

281   #### **Credit Default Swap Gambling**

282   Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
283   default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
284   designed the loan to fail, betting on said failure is essentially a sure thing.

285   ### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

286   Lender sold the security instrument after closing and received consideration in an amount in
287   excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
288   security instrument, Lender separated the lien from said security instrument, creating a fatal and
289   irreparable flaw.

ORIGINAL PETITION                                    10 of 25

290  When Lender received consideration while still holding the lien and said consideration was in

291  excess of the amount of the lien, Lender was in a position such that he could not be harmed and

292  could not gain standing to enforce the lien. The lien was, thereby, rendered void.

293  Since the separation of the lien from the security instrument creates such a considerable concern,

294  said separation certainly begs a question: "Why would the Lender retain the lien when selling the

295  security instrument?"

296  When you follow the money the answer is clear. The Lender will hold the lien for three years,

297  then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct

298  the full amount from Lender's tax liability, thereby, receiving consideration a second time.

299  Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the

300  lien to the holder of the security, however, the lien once satisfied, does not gain authority just

301  because the holder, after receiving consideration, decides to transfer it to someone else.

302  ### *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

303  Lender further stood to profit by credit default swaps in the derivatives market, by way of inside

304  information that Lender had as a result of creating the faulty loans sure to default. Lender was

305  then free to invest on the bet that said loan would default and stood to receive unjust enrichment

306  a third time. This credit default swap derivative market scheme is almost totally responsible for

307  the stock market disaster we now experience as it was responsible for the stock market crash in

308  1907.

309  ### *LENDER CHARGED FALSE FEES*

310  Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real

311  Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party

312  vendor.

313  Lender charged other fees that were a normal part of doing business and should have been

314  included in the finance charge.

315  Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time

316  did Lender or Trustee provide documentation to show that the fees herein listed were valid,

317  necessary, reasonable, and proper to charge Petitioner.

ORIGINAL PETITION

| 809 | Flood Cert Fee | $26.00 |
| 1201 | Recording Fee | $57.00 |
| 810 | Tax Service Fee | $60.00 |
| 1112 | Delivery Fee | $75.00 |
| 1111 | 24 Month Chain of Title Fee | $100.00 |
| 1307 | Plan Review Fee | $100.00 |
| 808 | Reinspection Fee | $150.00 |
| 803 | Appraisal Fee | $282.00 |
| 811 | Processing Fee | $425.00 |
| 1101 | Settlement Fee | $450.00 |
| 1113 | Construction Escrow Fee | $924.00 |
| 812 | Construction Admin Fee | $1,000.00 |
| 1108 | Title Insurance | $1,300.00 |
| 904 | Escrow & Impound Fees | $2,400.00 |
| 802 | Loan Discount | $9,200.00 |

318    Debtor is unable to determine whether or not the above fees are valid in accordance with the

319    restrictions provided by the various consumer protection laws. Therefore, please provide; a

320    complete billing from each vendor who provided the above listed services; the complete contact

321    information for each vendor who provided a billed service; clearly stipulate as to the specific

322    service performed; a showing that said service was necessary; a showing that the cost of said

323    service is reasonable; a showing of why said service is not a regular cost of doing business that

324    should rightly be included in the finance charge.

325    The above charges are hereby disputed and deemed unreasonable until such time as said charges

326    have been demonstrated to be reasonable, necessary, and in accordance with the limitations and

327    restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

328    In the event lender fails to properly document the above charges, borrower will consider same as

329    false charges. The effect of the above amounts that borrower would pay over the life of the note

330    will be an overpayment of $361,739.41  This amount will be reduced by the amount of items

331    above when said items are fully documented.

332    ***RESPA PENALTY***

333    From a cursory examination of the records, with the few available, the apparent RESPA

334    violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In

335    Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

336    presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,

337    No 1st Payment Letter.

338     The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal

339    Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure

ORIGINAL PETITION                                                                    12 of 25

340    statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
341    disclosure letter; loan discount fee disclosure; business insurance company arrangement
342    disclosure; notice of right to rescind.

343    The courts have held that the borrower does not have to show harm to claim a violation of the
344    Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
345    in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
346    no more than two thousand, considering the large number enumerated here, it is reasonable to
347    consider that the court will assess the maximum amount for each violation.

348    Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
349    the note, borrower has calculated that, the number of violations found in a cursory examination
350    of the note, if deducted from the principal, would result in an overpayment on the part of the
351    borrower, over the life of the note, of $427,834.13.

352    If the violation penalty amounts for each of the unsupported fees listed above are included, the
353    amount by which the borrower would be defrauded is $456,112.02

354    Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
355    variance, it appears that lender intended to defraud borrower in the amount of $1,606,350.81

356    *LENDER CONSPIRED WITH APPRAISER*

357    Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
358    purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
359    duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
360    inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
361    Petitioner.

362    *LENDER CONSPIRED WITH TRUSTEE*

363    Lender conspired with the trust Agent at closing to create a condition of stress for the specific
364    purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
365    fully understand what was being signed.

366    The above referenced closing procedure was a carefully crafted connivance, designed and
367    intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
368    to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner

ORIGINAL PETITION                       13 of 25

369   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure

370   as required by various consumer protection statutes.

### DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES

371

372   In the manner in which Defendants have carried on their business enterprises, they have engaged

373   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.

374   (Deceptive Practices Act).

375   Such conduct comprises a pattern of business activity within the meaning of such statutes, and

376   has directly and proximately caused Petitioner to suffer economic and non-economic harm and

377   detriment in an amount to be shown according to proof at trial of this matter.

### EQUITABLE TOLLING FOR TILA AND RESPA

378

379   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be

380   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

381   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*

382   *1601*, et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)

383   are subject to a one-year limitations period; however, such claims are subject to the equitable

384   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as

385   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held

386   that given the remedial purpose of TILA, the limitations period should run from the date of

387   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate

388   circumstances, suspend the limitations period until the borrower discovers or has reasonable

389   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*

390   *v. California, 784 F.2d 910, 915 9th Cir. 1986).*

391   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614*, the

392   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold

393   that such limitations period may be equitably tolled. The Court of Appeals for the District of

394   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

395   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the

396   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*

397   *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding

ORIGINAL PETITION

398  that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*

399  *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*

400  *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has

401  interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the

402  language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not

403  of precedential value, this Court has previously found both the TILA and **RESPA** limitations

404  periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*

405  *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

406  The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay

407  by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the

408  existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*

409  *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*

410  Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on

411  any wrongful conduct by the Defendants. *Santa Maria.* at 1178.

412  ## *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*

413  ## *STANDARDS*

414  Traditionally, Lenders required borrowers seeking mortgage loans to document their income and

415  assets by, for example, providing W-2 statements, tax returns, bank statements, documents

416  evidencing title, employment information, and other information and documentation that could

417  be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's

418  ability to repay a particular loan over both the short and long term. Defendants deviated from and

419  disregarded these standards, particularly with regard to its riskier and more profitable loan

420  products.

421  ### Low-Documentation/No-Documentation Loans.

422  Driven by its desire for market share and a perceived need to maintain competitiveness with the

423  likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no

424  documentation loan products, including the HARMs and HELOCs described hereinabove, and

425  began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

426  the already eased underwriting standards to the point of disregarding such standards. This

427  quickened the loan origination process, allowing for the generation of more and more loans

428  which could then be resold and/or securitized in the secondary market.

ORIGINAL PETITION

429    Defendants marketed no-documentation/low-documentation loan programs that included
430    HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
431    income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
432    confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
433    was to be roughly consistent with incomes in the types of jobs in which the borrower was
434    employed. When borrowers were requested to document their income, they were able to do so
435    through information that was less reliable than in a full-documentation loan.

436    For stated income loans, it became standard practice for loan processors, loan officers and
437    underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated
438    income loans, emphasizing loan origination from a profitability standpoint at the expense of
439    determining the ability of the borrower to repay the loan from an underwriting standpoint,
440    encouraged the overstating and/or fabrication of income.

441    **Easing of Underwriting Standards**

442    In order to produce more loans that could be resold in the secondary mortgage market,
443    Defendants also relaxed, and often disregarded, traditional underwriting standards used to
444    separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
445    the base FICO score needed for a SISA loan.

446    Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
447    used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
448    loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
449    income ratios (the amount of monthly income compared to monthly debt service payments and
450    other monthly payment obligations.

451    With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
452    term financial circumstances, approving the loan based on the initial fixed rate without taking
453    into account whether the borrower could afford the substantially higher payment that would
454    inevitably be required during the remaining term of the loan.

455    With respect to HELOCs, Defendants underwrote and approved such loans based only on the
456    borrower's ability to afford the interest-only payment during the initial draw period of the loan,
457    rather than on the borrower's ability to afford the subsequent, fully amortized principal and
458    interest payments.

ORIGINAL PETITION                                                                    16 of 25

459  As Defendants pushed to expand market share, they eased other basic underwriting standards.
460  For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
461  allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
462  eased underwriting standards the Defendants also were encouraging consumers to go further into
463  debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
464  underwriting standards created the aftermarket supply they needed. As a result, the Defendants
465  made it easy for the unwary consumer to take on more debt than he could afford by encouraging
466  unsound financial practices, all the while knowing defaults would occur more and more
467  frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
468  standards.

469  Defendants knew, or in the exercise of reasonable care should have known, from its own
470  underwriting guidelines industry standards that it was accumulating and selling/reselling risky
471  loans that were likely to end up in default. However, as the pressure mounted to increase market
472  share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
473  underwriting guidelines. Such was the environment that loan officers and underwriters were,
474  from time to time, placed in the position of having to justify why they did not approve a loan that
475  failed to meet underwriting criteria.

476  **Risk Layering**

477  Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
478  loans with one or more relaxed underwriting standards.

479  Defendants knew, or in the exercise of reasonable care should have known, that layered risk
480  would increase the likelihood of default. Among the risk layering Defendants engaged in were
481  approving HARM loans with little to no down payment, little to no documentation, and high
482  DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
483  the loans it promoted to borrowers.

484  Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
485  mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
486  believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
487  business ignored basic established underwriting standards and acted to mislead the borrower, all
488  to the detriment of the borrower and the consumer of loan products..

489    Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,

490    engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the

491    business practices described above in paragraphs 30-42 of this Complaint

492    ***UNJUST ENRICHMENT***

493    Petitioner is informed and believes that each and all of the Defendants received a benefit at

494    Petitioner's expense, including but not limited to the following: To the Agent, commissions,

495    yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to

496    be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,

497    surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

498    resale premiums, and high rates of return; To the servicers including EMS, servicing fees,

499    percentages of payment proceeds, charges, and other "back end" payments in amounts to be

500    proved at trial; To all participants, the expectation of future revenues from charges, penalties and

501    fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

502    By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,

503    and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly

504    deprived, and is entitled to restitution in the amount of $1,606,350.81

505    ***CLAIM TO QUIET TITLE.***

506    Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and

507    the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title

508    interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission

509    and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

510    Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

511    power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

512    interest in the Subject Property has been rendered void and that the Defendants are not the holder

513    in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

514    involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

515    "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

516    scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

517    *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

518    *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

ORIGINAL PETITION

519   27 (1st Dist. 2006); *Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
520   *Rptr. 2d 752 (2d Dist. 1995).*

### SUFFICIENCY OF PLEADING

522   Petitioner has sufficiently pled that relief can be granted on each and every one of the
523   Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
524   doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
525   entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
526   allegations of material fact in the complaint are taken as true and construed in the light most
527   favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

528   Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
529   8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
530   theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
531   *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
532   conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
533   should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
534   Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
535   their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
536   relief as requested herein should be granted.

537                                  **CAUSES OF ACTION**

538   ### BREACH OF FIDUCIARY DUTY

539   Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
540   duty of care with respect to the mortgage loan transactions and related title activities involving
541   the Trust Property.

542   Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
543   breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
544   all applicable laws governing the loan transactions in which they were involved, including but
545   not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

546   Defendant's breaches of said duties were a direct and proximate cause of economic and non-
547   economic harm and detriment to Petitioner(s).

ORIGINAL PETITION                                                    19 of 25

548  Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,

549  all to be shown according to proof at trial of this matter.

550  ### CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE

551  Defendants owed a general duty of care with respect to Petitioners, particularly concerning their

552  duty to properly perform due diligence as to the loans and related transactional issues described

553  hereinabove.

554  In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations

555  X and Z promulgated there under to, among other things, provide proper disclosures concerning

556  the terms and conditions of the loans they marketed, to refrain from marketing loans they knew

557  or should have known that borrowers could not afford or maintain, and to avoid paying undue

558  compensation such as "yield spread premiums" to mortgage Agents and loan officers.

559  Defendants knew or in the exercise of reasonable care should have known, that the loan

560  transactions involving Petitioner and other persons similarly situated were defective, unlawful,

561  violative of federal and state laws and regulations, and would subject Petitioner to economic and

562  non-economic harm and other detriment.

563  Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and

564  Z promulgated there under were intended and designed to protect, and the conduct alleged

565  against Defendants is the type of conduct and harm which the referenced statutes and regulations

566  were designed to deter.

567  As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and

568  non-economic harm in an amount to be shown according to proof at trial.

569  ### AGENT: COMMON LAW FRAUD

570  If any Agents' misrepresentations made herein were not intentional, said misrepresentations were

571  negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable

572  ground for believing them to be true.

573  Agents made these representations with the intention of inducing Petitioner to act in reliance on

574  these representations in the manner hereafter alleged, or with the expectation that Petitioner

575  would so act.

ORIGINAL PETITION

576   Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents

577   in their negligent misrepresentation, and that various Agents were negligent in not implementing

578   procedures such as underwriting standards oversight that would have prevented various Agents

579   from facilitating the irresponsible and wrongful misrepresentations of various Agents to

580   Defendants.

581   Petitioner is informed and believes that Agent acted in concert and collusion with others named

582   herein in promulgating false representations to cause Petitioner to enter into the LOAN without

583   knowledge or understanding of the terms thereof.

584   As a proximate result of the negligent misrepresentations of Agents as herein alleged, the

585   Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of

586   opportunities, attorney fees and costs, and other damages to be determined at trial. As a

587   proximate result of Agents' breach of duty and all other actions as alleged herein, Plaintiff has

588   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and

589   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established

590   at trial.

591   *PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED*

592   *COVENANT OF GOOD FAITH AND FAIR DEALING.*

593   Petitioner properly pled Defendants violated the breach of implied covenant of good faith and

594   fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its

595   performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*

596   *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

597   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*

598   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

599   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a

600   particular significance, in part because of the special relationship between the insurer and the

601   insured. The insurer, when determining whether to settle a claim, must give at least as much

602   consideration to the welfare of its insured as it gives to its own interests. . . The standard is

603   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

604   Likewise, there is a special relationship between an Agent and borrower. "A person who

605   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or

ORIGINAL PETITION                                                    21 of 25

606 otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
607 consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
608 be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
609 *good faith. If the Agent knew or should have known that the Borrower will or has a likelihood of*
610 *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
611 (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
612 [*Emphasis Added*].

613 All Defendants, willfully breached their implied covenant of good faith and fair dealing with
614 Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
615 provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
616 product without regard for other more affordable products; (4) Placed Petitioner into a loan
617 without following proper underwriting standards; (5) Failed to disclose to Petitioner that
618 Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
619 valid and /or properly documented substitutions and assignments so that Petitioner could
620 ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
621 request for documentation of the servicing of Petitioner's loan and the existence and content of
622 relevant documents. Additionally, Defendants breached their implied covenant of good faith and
623 fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
624 right under an alleged power of sale because the purported assignment was not recorded and by
625 willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
626 special relationship inherent in a real estate transaction between Agent and borrower, *and* all
627 Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

628 *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
629 *SEQ*

630 Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
631 contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
632 Action as though the same were set forth herein.

633 Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
634 the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
635 Property, and entitles Petitioner to damages as proven at trial.

ORIGINAL PETITION

636 ### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

637 The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
638 highly leveraged and vulnerable consumers who placed their faith and trust in the superior
639 knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
640 civilized society.

641 Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
642 distress, or acted in conscious and/or reckless disregard of the probability that such distress
643 would occur.

644 Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
645 conduct of Defendants as described hereinabove.

646 As a result of such severe emotional distress, Petitioner suffered economic and non economic
647 harm and detriment, all to be shown according to proof at trial of this matter.

648 Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
649 Petitioner and secure to Petitioner quite title;

650 Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
651 as payments to Defendants based on the fraudulently secured promissory note in an amount to be
652 calculated by Defendants and verified to Petitioner;

653 Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
654 amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
655 equal to $4,819,052.43

656 ### PRAYER

657 WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
658 as follows:

659     For an emergency restraining order enjoining lender and any successor in interest from
660     foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
661     herein;

662     For a permanent injunction enjoining Defendants from engaging in the fraudulent,
663     deceptive, predatory and negligent acts and practices alleged herein;

664     For quiet title to Property;

ORIGINAL PETITION

665      For rescission of the loan contract and restitution by Defendants to Petitioner according
666      to proof at trial;

667      For disgorgement of all amounts wrongfully acquired by Defendants according to proof
668      at trial;

669      For actual monetary damages in the amount $1,606,350.81;

670      For pain and suffering due to extreme mental anguish in an amount to be determined at
671      trial.

672      For pre-judgment and post-judgment interest according to proof at trial;

673      For punitive damages according to proof at trial in an amount equal to $4,819,052.43.

674      For attorney's fees and costs as provided by statute; and,

675      For such other relief as the Court deems just and proper.

676   **Respectfully Submitted,**
677
678
679   **Anthony Pendolino**
680
681
682
683
684
685
686
687
688
689
690
691
692
693
694
695
696
697
698
699
700
701
702
703
704
705
706
707
708

ORIGINAL PETITION                                   24 of 25

709    Anthony Pendolino
710    615 N Brainard Street
711    Naperville  IL 60563

712            UNITED STATES DISTRICT COURT
713            NORTHERN DISTRICT OF ILLINOIS

714

| | |
|---|---|
| **Anthony Pendolino** | Case # _____ |
| **Plaintiff,** | |
| vs. | **ORIGINAL PETITION** |
| **BAC Home Loans Servicing LP** | |
| **Defendant** | |

715
716            <u>PLAINTIFF'S DEMAND FOR JURY TRIAL</u>

717

718    Plaintiff, Anthony Pendolino asserts his rights under the Seventh Amendment to the U.S.

719    Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury

720    on all issues.

721    **Respectfully Submitted,**

722
723
724    **Anthony Pendolino**