## EXHIBIT E

1  Steven Segura
2  1643 South Millard
3  Chicago, Illinois 60623
4  (773) 996-0153/bistroinc@live.com

RECEIVED

OCT 28 2010

MICHAEL W. DOBBINS

5      UNITED STATES DISTRICT COURT CLERK, U.S. DISTRICT COURT

6          NORTHERN DISTRICT OF

7                                    **10 CV 6943**

JUDGE **ZAGEL**

**Steven Segura**                    Case   MAGISTRATE JUDGE **COX**

Plaintiff,

                                     **ORIGINAL PETITION**

vs.

**BAC HOME LOANS SERVICING**   Date: __10/28/2010_____

**L.P**

Defendant

8

9   Comes now Steven Segura, hereinafter referred to as "Petitioner," and moves the court for

10  relief as herein requested:

11                          **PARTIES**

12  Petitioner is Steven Segura, 1643 South Millard Avenue  Chicago IL 60623.  Currently Known

13  Defendant(s) are/is:  BAC Home Loans Servicing, LP, PO Box 5170,  CA  93062, by and

14  through its attorney .

15                      **STATEMENT OF CAUSE**

16  Petitioner, entered into a consumer contract for the refinance of a primary residence located at

17  1643 South Millard Avenue  Chicago IL 60623, hereinafter referred to as the "property."

18  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

19  predatory loan agreement with Defendant.

20  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

21  crafted scheme intended to defraud Petitioner.

┌─────────────────┐
│    **EXHIBIT**   │
│                 │
│  tabbies   *E*  │
│                 │
└─────────────────┘

ORIGINAL PETITION                                        1 of 25

22  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
23  of the types of tactics used by Defendants to defraud Petitioner.

24  Defendants charged false fees to Petitioner at settlement.

25  Defendants used the above referenced false fees to compensate agents of Petitioner in order to
26  induce said agents to breach their fiduciary duty to Petitioner.

27  Defendant's attorney caused to be initiated collection procedures, knowing said collection
28  procedures in the instant action were frivolous as lender is estopped from collection procedures,
29  under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
30  the production of the original promissory note alleged to create a debt.

31                                    **IN BRIEF**
32                        *(Non-factual Statement of Posture and Position)*

33  It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be
34  making a number of allegations that, outside the context of the current condition of the real
35  estate industry, may seem somewhat outrageous and counter-intuitive.

36  When Petitioner accuses ordinary individuals of acting in concert and collusion with an
37  ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
38  unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
39  people, just doing what they have been trained to do, are out to swindle the poor
40  unsuspecting borrower.

41  The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
42  committed by people acting in concert and collusion, one with the other. Petitioner has no
43  reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
44  that what they were doing was part of an ongoing criminal conspiracy, only that it was,
45  and they, at the very least, kept themselves negligently uninformed of the wrongs they
46  were perpetrating. Petitioner maintains the real culprit is the system itself, including the
47  courts, for failure to strictly enforce the consumer protection laws.

48                    **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
49                          *(General State of the Real Estate Industry)*

50     *THE BEST OF INTENTIONS*     .

51     Prior to the 1980's and 1990's ample government protections were in place to protect

52     consumers and the lending industry from precisely the disaster we now experience.

53     During President Clinton's administration, under the guise of making housing available to

54     the poor, primary protections were relaxed which had the effect of releasing the

55     unscrupulous on the unwary.

56     Prior to deregulation in the 1980's, lenders created loans for which they held and assumed

57     the risk. Consequently, Americans were engaged in safe and stable home mortgages.

58     With the protections removed, the unscrupulous lenders swooped in and, instead of

59     making loans available to the poor, used the opportunity to convince the unsophisticated

60     American public to do something that had been traditionally taboo; home buyers were

61     convinced to speculate with their homes, their most important investment.

62     BAC Home Loans Servicing, LP, Ameriquest, Countrywide, and many others swooped in

63     and convinced Americans to sell their homes, get out of their safe mortgage agreements,

64     and speculate with the equity they had gained by purchasing homes they could not afford.

65     Lenders created loans intended to fail as, under the newly crafted system, the Lender

66     profited more from a mortgage default than from a stable loan.

67     Companies cropped up who called themselves banks when, in fact, they were only either

68     subsidiaries of banks, or unaffiliated companies that were operated for the purpose of

69     creating and selling promissory notes. As will be demonstrated, these companies then

70     profited from the failure of the underlying loans.

71     *HOW IT WORKS*

72     Briefly, how it works is this, the Lender would secure a large loan from a large bank,

73     convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an

74     investor.

75     People would set up mortgage companies by securing a large loan from one of the major

76     banks, then convert that loan into 20 and 30 year mortgages. In order to accomplish this

77     an Agent would contract with a seller to find a buyer, bring both seller and buyer to a

78     lender who would secure the title from the seller using the borrowed bank funds for that

79     purpose, and then trade the title to the buyer in exchange for a promissory note.

80  The lender then creates a 20 or 30 year mortgage with money the lender must repay within
81  6 months. As soon as the closing is consummated, the promissory note is sold to an
82  investor pool.

83  Using the instant case as an example, a 371,326.00 note at 6.8639% interest over 30 years
84  will produce $299,505.44 The lender can then offer to the investor the security instrument
85  (promissory note) at say 50% of it's future value. The investor will, over the life of the
86  note, less approximately 3.00% servicing fees, realize $432,894.51 . The lender can then
87  pay back the bank and retain a handsome profit in the amount of $88,345.50. The lender,
88  however, is not done with the deal.

89  The lender signed over the promissory note to the investor at the time of the trade, but did
90  not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme
91  Court addressed this issue and stated that such a transaction was certainly legal. However,
92  it created a fatal flaw as the holder of the lien document, at time of sale of the security
93  instrument, received consideration in excess of the lien amount. Since the lien holder
94  received consideration, he could not be harmed. Therefore the lien became an
95  unenforceable document.

96  This begs the question: if keeping the lien would render it void, why would the lender not
97  simply transfer the lien with the promissory note? The reason is because the lender will
98  hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
99  amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
100 liability. The lender, by this maneuver, gets consideration a second time. And still the
101 lender is not done profiting from the deal.

102 After sale of the promissory note, the lender remains as the servicer for the investor. The
103 lender will receive 3% of each payment the lender collects and renders to the investor
104 pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
105 that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the
106 foreclosure.

107 The lender stands to profit more from a note that is overly expensive, than from a good
108 stable loan. And where, you may ask, does all this profit come from? It comes from the
109 equity the borrower had built up in the home. And still the lender is not finished profiting
110 from the deal.

ORIGINAL PETITION                                                    4 of 25

111 Another nail was driven in the American financial coffin when on the last day Congress
112 was in session in 2000 when restrictions that had been in place since the economic
113 collapse of 1907 were removed. Until 1907 investors were allowed to bet on stocks
114 without actually buying them. This unbridled speculation led directly to an economic
115 collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the
116 unscrupulous lenders got their way on the last day of the congressional session. Congress
117 removed the restriction banning derivatives and again allowed the practice, this time
118 taking only 8 years to crash the stock market. This practice allowed the lender to profit
119 further from the loan by betting on the failure of the security instrument he had just sold to
120 the unwary investor, thus furthering the purpose of the lender to profit from both the
121 borrower (consumer) and the investor.

122 The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
123 bailout at the expense of the taxpayer. The unsuspecting consumer was lulled into
124 accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
125 were acting under the guise of government regulation and, therefore, the borrower had
126 reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
127 protect the consumer from just this kind of abuse were simply being ignored.

128 The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
129 the referral of the client to the lender by a person acting as an agent for the borrower.
130 Hereinafter, the person or entity who receives any portion of the yield spread premium, or
131 a commission of any kind consequent to securing the loan agreement through from the
132 borrower will be referred to as "Agent." The fee, authorized by the consumer protection
133 law is restricted to 1% of the principal of the note. It was intended that the Agent, when
134 seeking out a lender for the borrower, would seek the best deal for his client rather than
135 who would pay him the most. That was the intent, but not the reality. The reality is that
136 Agents never come away from the table with less than 2% or 3% of the principal. This is
137 accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
138 fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
139 product than the borrower qualifies for. This will generate more profits for the lender and,
140 consequently, for the Agent.

141 It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
142 the fair market price. This allows the lender to increase the cost of the loan product and
143 give the impression that the borrower is justified in making the purchase.

ORIGINAL PETITION                                                                5 of 25

144  The lender then charges the borrower an underwriting fee in order to convince the
145  borrower that someone with knowledge has gone over the conditions of the note and
146  certified that they meet all legal criteria. The trustee, at closing, participates actively in the
147  deception of the borrower by placing undue stress on the borrower to sign the large stack
148  of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to
149  insure the transaction. This trust is systematically violated for the purpose of taking unfair
150  advantage of the borrower.    The entire loan process is a carefully crafted contrive
151  connivance designed and intended to induce the unsophisticated borrower into accepting a
152  loan product that is beyond the borrowers means to repay.  With all this, it should be a
153  surprise to no one that this country is having a real estate crisis.

154  ## PETITIONER WILL PROVE THE FOLLOWING

155  Petitioner is prepared to prove, by a preponderance of evidence that:

156  • Lender has no legal standing to bring collection or foreclosure claims against the
157    property;

158  • Lender is not a real party in interest in any contract which can claim a collateral
159    interest in the property;

160  • even if Lender were to prove up a contract to which Lender had standing to enforce
161    against Petitioner, no valid lien exists which would give Lender a claim against the
162    property;

163  • even if Lender were to prove up a contract to which Lender had standing to enforce
164    against Petitioner, said contract was fraudulent in its creation as endorsement was
165    secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
166    the inducement, fraud in the execution, usury, and breaches of contractual and
167    fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
168    Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
169    Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
170    "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
171    'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
172    bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
173    pooled together in a trust fund;

174 • Defendants have concocted a carefully crafted connivance wherein Lender
175 conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
176 by inducing Plaintiff to enter into a predatory loan inflated loan product;

177 • Lender received unjust enrichment in the amount of 5% of each payment made late
178 to Lender while Lender and Lender's assigns acted as servicer of the note;

179 • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
180 handling the foreclosure process on a contract Lender designed to have a high
181 probability of default;

182 • Lender intended to defraud Investor by converting the promissory note into a
183 security instrument and selling same to Investor;

184 • Lender intended to defraud Investor and the taxpayers of the United States by
185 withholding the lien document from the sale of the promissory note in order that
186 Lender could then hold the lien for three years, then prepare and file Internal
187 Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
188 and deduct same from Lender's income tax obligation;

189 • Lender defrauded backers of derivatives by betting on the failure of the promissory
190 note the lender designed to default;

191 • participant Defendants, et al, in the securitization scheme described herein have
192 devised business plans to reap millions of dollars in profits at the expense of
193 Petitioner and others similarly situated.

194 **PETITIONER SEEKS REMEDY**

195 In addition to seeking compensatory, consequential and other damages, Petitioner seeks
196 declaratory relief as to what (if any) party, entity or individual or group thereof is the
197 owner of the promissory note executed at the time of the loan closing, and whether the
198 Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
199 Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
200 alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

201 *PETITIONER HAS BEEN HARMED*

202 Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

ORIGINAL PETITION                                                7 of 25

203 Such harm and detriment includes economic and non-economic damages, and injuries to
204 Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

205 In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
206 equitable relief requested herein is granted.

207 **STATEMENT OF CLAIM**

208 *DEFENDANTS LACK STANDING*

209 **No evidence of Contractual Obligation**

210 Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
211 produce said contract. Even if Defendants produced evidence of the existence of said contract in
212 the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
213 that a contract actually existed at one point in time. A copy, considering the present state of
214 technology, could be easily altered. As Lender only created one original and that original was
215 left in the custody of Lender, it was imperative that Lender protect said instrument.

216 In as much as the Lender is required to present the original on demand of Petitioner, there can be
217 no presumption of regularity when the original is not so produced. In as much as Lender has
218 refused Petitioner's request of the chain of custody of the security instrument in question by
219 refusing to identify all current and past real parties in interest, there is no way to follow said
220 chain of custody to insure, by verified testimony, that no alterations to the original provisions in
221 the contract have been made. Therefore, the alleged copy of the original is only hearsay
222 evidence that an original document at one time existed. Petitioner maintains that, absent
223 production of admissible evidence of a contractual obligation on the part of Petitioner,
224 Defendants are without standing to invoke the subject matter jurisdiction of the court.

225 **No Proper Evidence of Agency**

226 Defendants claim agency to represent the principal in a contractual agreement involving
227 Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
228 pronouncement that agency has been assigned by some person, the true identity and capacity of
229 whom has not been established. Defendants can hardly claim to be agents of a principal then
230 refuse to identify said principal. All claims of agency are made from the mouth of the agent with
231 no attempt to provide admissible evidence from the principal.

232 Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
233 court.

### Special Purpose Vehicle

235 Since the entity now claiming agency to represent the holder of the security instrument is not the
236 original lender, Petitioner has reason to believe that the promissory note, upon consummation of
237 the contract, was converted to a security under C.U.S.I.P #315918375, called Fidelity Advisor
238 Electronics CLB, under Fund 118 and sold into a special purpose vehicle and now resides in a
239 Real Estate Mortgage Investment Conduit (REMIC)as defined by the Internal Revenue Code and
240 as such, cannot be removed from the REMIC as such would be a prohibited transaction. If the
241 mortgage was part of a special purpose vehicle and was removed on consideration of foreclosure,
242 the real party in interest would necessarily be the trustee of the special purpose vehicle. Nothing
243 in the pleadings of Defendants indicates the existence of a special purpose vehicle, and the lack
244 of a proper chain of custody documentation gives Petitioner cause to believe defendant is not the
245 proper agent of the real party in interest.

### CRIMINAL CONSPIRACY AND THEFT

247 Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
248 a criminal conspiracy to defraud Petitioner. Said conspiracy but are not limited to acts of
249 negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
250 acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
251 Petitioner by Lender, which were then used to fund the improper payment of commission fees to
252 Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

### AGENT PRACTICED UP-SELLING

254 By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner. In so
255 doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
256 that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
257 Agent's conspiratorial relationship to Lender, Agent violated Agent's fiduciary duty to
258 Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
259 connivances, wherein Agent proactively made knowingly false and misleading statements of
260 alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
261 Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of

ORIGINAL PETITION                                                                    9 of 25

262 a loan product offered by the Lender. Said loan product was more expensive than Petitioner
263 could legally afford. Agent acted with full knowledge that Petitioner would have made a
264 different decision had Agent given complete disclosure.

265 **FRAUDULENT INDUCEMENT**

266 Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
267 known, Petitioner could not afford in order to unjustly enrich Lender.

268 **EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT**

269 Said more expensive loan product was calculated to produce a higher return when sold as a
270 security to an investor who was already waiting to purchase the loan as soon as it could be
271 consummated.

272 **Extra Commission for Late Payments**

273 Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
274 that Lender intended Petitioner would have difficulty paying. The industry standard payment to
275 the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
276 borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
277 Thereby, the Lender stands to receive more than double the regular commission on collections if
278 the borrower pays late.

279 **Extra Income for Handling Foreclosure**

280 Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
281 on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
282 receives considerable funds for handling and executing the foreclosure process.

283 **Credit Default Swap Gambling**

284 Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
285 default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
286 designed the loan to fail, betting on said failure is essentially a sure thing.

287     *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

288     Lender sold the security instrument after closing and received consideration in an amount in
289     excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
290     security instrument, Lender separated the lien from said security instrument, creating a fatal and
291     irreparable flaw.

292     When Lender received consideration while still holding the lien and said consideration was in
293     excess of the amount of the lien, Lender was in a position such that he could not be harmed and
294     could not gain standing to enforce the lien. The lien was, thereby, rendered void.

295     Since the separation of the lien from the security instrument creates such a considerable concern,
296     said separation certainly begs a question: "Why would the Lender retain the lien when selling the
297     security instrument?"

298     When you follow the money the answer is clear. The Lender will hold the lien for three years,
299     then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
300     the full amount from Lender's tax liability, thereby, receiving consideration a second time.

301     Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
302     lien to the holder of the security, however, the lien once satisfied, does not gain authority just
303     because the holder, after receiving consideration, decides to transfer it to someone else.

304     *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

305     Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
306     information that Lender had as a result of creating the faulty loans sure to default. Lender was
307     then free to invest on the bet that said loan would default and stood to receive unjust enrichment
308     a third time. This credit default swap derivative market scheme is almost totally responsible for
309     the stock market disaster we now experience as it was responsible for the stock market crash in
310     1907.

311     *LENDER CHARGED FALSE FEES*

312     Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
313     Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
314     vendor.

ORIGINAL PETITION                          11 of 25

315 Lender charged other fees that were a normal part of doing business and should have been
316 included in the finance charge.

317 Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time
318 did Lender or Trustee provide documentation to show that the fees herein listed were valid,
319 necessary, reasonable, and proper to charge Petitioner.

| | | |
|------|----------------------------|------------|
| 801 | Loan Origination Fee | $3,657.50 |
| 804 | Credit Report Fee | $26.98 |
| 808 | Document Preparation Fee | $125.00 |
| 810 | Flood Zone Determination Fee | $35.00 |
| 901 | Interest | $1,308.30 |
| 902 | FHA/MIPNAFF-HUD | $5,486.25 |
| 1001 | Hazard Insurance | $234.60 |
| 1004 | County Property Taxes | $429.48 |
| 1101 | Settlement fee | $610.00 |
| 1108 | Title Insurance | $330.00 |
| 1112 | Environmental Protection | $115.00 |
| 1113 | Chain of Title Endorsement Fee | $50.00 |
| 1201 | Recording Fee | $78.00 |
| 1202 | City/county tax/stamp | $2,887.50 |
| 1206 | Rental Housing Support Program Fee | $20.00 |

320 Debtor is unable to determine whether or not the above fees are valid in accordance with the
321 restrictions provided by the various consumer protection laws. Therefore, please provide; a
322 complete billing from each vendor who provided the above listed services; the complete contact
323 information for each vendor who provided a billed service; clearly stipulate as to the specific
324 service performed; a showing that said service was necessary; a showing that the cost of said
325 service is reasonable; a showing of why said service is not a regular cost of doing business that
326 should rightly be included in the finance charge.

327 The above charges are hereby disputed and deemed unreasonable until such time as said charges
328 have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
329 restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

330 In the event lender fails to properly document the above charges, borrower will consider same as
331 false charges. The effect of the above amounts that borrower would pay over the life of the note
332 will be an overpayment of $221,734.57 This amount will be reduced by the amount of items
333 above when said items are fully documented.

334    *RESPA PENALTY*

335 From a cursory examination of the records, with the few available, the apparent RESPA

336 violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In

337 Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

338 presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,

339 No 1st Payment Letter.

340 The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal

341 Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure

342 statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing

343 disclosure letter; loan discount fee disclosure; business insurance company arrangement

344 disclosure; notice of right to rescind.

345 The courts have held that the borrower does not have to show harm to claim a violation of the

346 Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,

347 in as much as the courts are directed to assess a penalty of no less than two hundred dollars and

348 no more than two thousand, considering the large number enumerated here, it is reasonable to

349 consider that the court will assess the maximum amount for each violation.

350 Since the courts have held that the penalty for a violation of RESPA accrues at consummation of

351 the note, borrower has calculated that, the number of violations found in a cursory examination

352 of the note, if deducted from the principal, would result in an overpayment on the part of the

353 borrower, over the life of the note, of $275,861.65.

354 If the violation penalty amounts for each of the unsupported fees listed above are included, the

355 amount by which the borrower would be defrauded is $296,436.01

356 Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note

357 variance, it appears that lender intended to defraud borrower in the amount of $925,057.08

358    *LENDER CONSPIRED WITH APPRAISER*

359 Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the

360 purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary

361 duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of

362 inducing Petitioner to enter into a loan product that was fraudulent toward the interests of

363 Petitioner.

ORIGINAL PETITION                          

364  ### *LENDER CONSPIRED WITH TRUSTEE*

365  Lender conspired with the trust Agent at closing to create a condition of stress for the specific
366  purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
367  fully understand what was being signed.

368  The above referenced closing procedure was a carefully crafted connivance, designed and
369  intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
370  to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
371  did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
372  as required by various consumer protection statutes.

373  ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

374  In the manner in which Defendants have carried on their business enterprises, they have engaged
375  in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
376  (Deceptive Practices Act).

377  Such conduct comprises a pattern of business activity within the meaning of such statutes, and
378  has directly and proximately caused Petitioner to suffer economic and non-economic harm and
379  detriment in an amount to be shown according to proof at trial of this matter.

380  ### *EQUITABLE TOLLING FOR TILA AND RESPA*

381  The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
382  Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

383  Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
384  *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
385  are subject to a one-year limitations period; however, such claims are subject to the equitable
386  tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
387  subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
388  that given the remedial purpose of TILA, the limitations period should run from the date of
389  consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
390  circumstances, suspend the limitations period until the borrower discovers or has reasonable
391  opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
392  *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

ORIGINAL PETITION

393    Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614*, the

394    anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold

395    that such limitations period may be equitably tolled. The Court of Appeals for the District of

396    Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

397    *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the

398    opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*

399    *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding

400    that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*

401    *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*

402    *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has

403    interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the

404    language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not

405    of precedential value, this Court has previously found both the TILA and **RESPA** limitations

406    periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*

407    *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

408    The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay

409    by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the

410    existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*

411    *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*

412    Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on

413    any wrongful conduct by the Defendants. Santa Maria. at 1178.

414    ***BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING***

415    ***STANDARDS***

416    Traditionally, Lenders required borrowers seeking mortgage loans to document their income and

417    assets by, for example, providing W-2 statements, tax returns, bank statements, documents

418    evidencing title, employment information, and other information and documentation that could

419    be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's

420    ability to repay a particular loan over both the short and long term. Defendants deviated from and

421    disregarded these standards, particularly with regard to its riskier and more profitable loan

422    products.

423    **Low-Documentation/No-Documentation Loans.**

ORIGINAL PETITION               15 of 25

424  Driven by its desire for market share and a perceived need to maintain competitiveness with the
425  likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
426  documentation loan products, including the HARMs and HELOCs described hereinabove, and
427  began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
428  the already eased underwriting standards to the point of disregarding such standards. This
429  quickened the loan origination process, allowing for the generation of more and more loans
430  which could then be resold and/or securitized in the secondary market.

431  Defendants marketed no-documentation/low-documentation loan programs that included
432  HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
433  income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
434  confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
435  was to be roughly consistent with incomes in the types of jobs in which the borrower was
436  employed. When borrowers were requested to document their income, they were able to do so
437  through information that was less reliable than in a full-documentation loan.

438  For stated income loans, it became standard practice for loan processors, loan officers and
439  underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated
440  income loans, emphasizing loan origination from a profitability standpoint at the expense of
441  determining the ability of the borrower to repay the loan from an underwriting standpoint,
442  encouraged the overstating and/or fabrication of income.

443  **Easing of Underwriting Standards**

444  In order to produce more loans that could be resold in the secondary mortgage market,
445  Defendants also relaxed, and often disregarded, traditional underwriting standards used to
446  separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
447  the base FICO score needed for a SISA loan.

448  Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
449  used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
450  loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
451  income ratios (the amount of monthly income compared to monthly debt service payments and
452  other monthly payment obligations.

453  With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
454  term financial circumstances, approving the loan based on the initial fixed rate without taking
455  into account whether the borrower could afford the substantially higher payment that would
456  inevitably be required during the remaining term of the loan.

457  With respect to HELOCs, Defendants underwrote and approved such loans based only on the
458  borrower's ability to afford the interest-only payment during the initial draw period of the loan,
459  rather than on the borrower's ability to afford the subsequent, fully amortized principal and
460  interest payments.

461  As Defendants pushed to expand market share, they eased other basic underwriting standards.
462  For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
463  allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
464  eased underwriting standards the Defendants also were encouraging consumers to go further into
465  debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
466  underwriting standards created the aftermarket supply they needed. As a result, the Defendants
467  made it easy for the unwary consumer to take on more debt than he could afford by encouraging
468  unsound financial practices, all the while knowing defaults would occur more and more
469  frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
470  standards.

471  Defendants knew, or in the exercise of reasonable care should have known, from its own
472  underwriting guidelines industry standards that it was accumulating and selling/reselling risky
473  loans that were likely to end up in default. However, as the pressure mounted to increase market
474  share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
475  underwriting guidelines. Such was the environment that loan officers and underwriters were,
476  from time to time, placed in the position of having to justify why they did not approve a loan that
477  failed to meet underwriting criteria.

478  **Risk Layering**

479  Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
480  loans with one or more relaxed underwriting standards.

481  Defendants knew, or in the exercise of reasonable care should have known, that layered risk
482  would increase the likelihood of default. Among the risk layering Defendants engaged in were

ORIGINAL PETITION                                                            17 of 25

483 approving HARM loans with little to no down payment, little to no documentation, and high
484 DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
485 the loans it promoted to borrowers.

486 Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
487 mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
488 believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
489 business ignored basic established underwriting standards and acted to mislead the borrower, all
490 to the detriment of the borrower and the consumer of loan products..

491 Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
492 engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
493 business practices described above in paragraphs 30-42 of this Complaint

494 *UNJUST ENRICHMENT*

495 Petitioner is informed and believes that each and all of the Defendants received a benefit at
496 Petitioner's expense, including but not limited to the following: To the Agent, commissions,
497 yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
498 be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
499 surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
500 resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
501 percentages of payment proceeds, charges, and other "back end" payments in amounts to be
502 proved at trial; To all participants, the expectation of future revenues from charges, penalties and
503 fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

504 By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
505 and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
506 deprived, and is entitled to restitution in the amount of $925,057.08

507 *CLAIM TO QUIET TITLE.*

508 Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
509 the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
510 interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
511 and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

ORIGINAL PETITION

512    Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

513    power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

514    . interest in the Subject Property has been rendered void and that the Defendants are not the holder

515    in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

516    involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

517    "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

518    scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

519    *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

520    *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

521    *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*

522    *Rptr. 2d 752 (2d Dist. 1995).*

523    ## SUFFICIENCY OF PLEADING

524    Petitioner has sufficiently pled that relief can be granted on each and every one of the

525    Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond

526    doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would

527    entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All

528    allegations of material fact in the complaint are taken as true and construed in the light most

529    favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

530    Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.

531    8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal

532    theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*

533    *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal

534    conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court

535    should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752 (9th Cir, 1994).* Lastly,

536    Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of

537    their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,

538    relief as requested herein should be granted.

ORIGINAL PETITION                                                                      19 of 25

539 **CAUSES OF ACTION**

540 **BREACH OF FIDUCIARY DUTY**

541 Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
542 duty of care with respect to the mortgage loan transactions and related title activities involving
543 the Trust Property.

544 Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
545 breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
546 all applicable laws governing the loan transactions in which they were involved, including but
547 not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

548 Defendant's breaches of said duties were a direct and proximate cause of economic and non-
549 economic harm and detriment to Petitioner(s).

550 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
551 all to be shown according to proof at trial of this matter.

552 **CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE**

553 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
554 duty to properly perform due diligence as to the loans and related transactional issues described
555 hereinabove.

556 In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
557 X and Z promulgated there under to, among other things, provide proper disclosures concerning
558 the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
559 or should have known that borrowers could not afford or maintain, and to avoid paying undue
560 compensation such as "yield spread premiums" to mortgage Agents and loan officers.

561 Defendants knew or in the exercise of reasonable care should have known, that the loan
562 transactions involving Petitioner and other persons similarly situated were defective, unlawful,
563 violative of federal and state laws and regulations, and would subject Petitioner to economic and
564 non-economic harm and other detriment.

565 Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
566 Z promulgated there under were intended and designed to protect, and the conduct alleged

ORIGINAL PETITION

567   against Defendants is the type of conduct and harm which the referenced statutes and regulations
568   were designed to deter.

569   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
570   non-economic harm in an amount to be shown according to proof at trial.

571   ### *AGENT: COMMON LAW FRAUD*

572   If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
573   negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
574   ground for believing them to be true.

575   Agents made these representations with the intention of inducing Petitioner to act in reliance on
576   these representations in the manner hereafter alleged, or with the expectation that Petitioner
577   would so act.

578   Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
579   in their negligent misrepresentation, and that various Agents were negligent in not implementing
580   procedures such as underwriting standards oversight that would have prevented various Agents
581   from facilitating the irresponsible and wrongful misrepresentations of various Agents to
582   Defendants.

583   Petitioner is informed and believes that Agent acted in concert and collusion with others named
584   herein in promulgating false representations to cause Petitioner to enter into the LOAN without
585   knowledge or understanding of the terms thereof.

586   As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
587   Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
588   opportunities, attorney fees and costs, and other damages to be determined at trial. As a
589   proximate result of Agents' breach of duty and all other actions as alleged herein, Plaintiff has
590   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
591   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
592   at trial.

593  ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
594  ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

595  Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
596  fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
597  performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
598  *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
599  *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
600  *Jones, (2004) 33 Cal. 4th 917,* the court stated:

601  In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
602  particular significance, in part because of the special relationship between the insurer and the
603  insured. The insurer, when determining whether to settle a claim, must give at least as much
604  consideration to the welfare of its insured as it gives to its own interests. . . The standard is
605  premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

606  Likewise, there is a special relationship between an Agent and borrower. "A person who
607  provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
608  otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
609  consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
610  be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
611  *good faith.* If *the Agent knew or should have known that the Borrower will or has a likelihood of*
612  *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
613  (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
614  *[Emphasis Added].*

615  All Defendants, willfully breached their implied covenant of good faith and fair dealing with
616  Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
617  provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
618  product without regard for other more affordable products; (4) Placed Petitioner into a loan
619  without following proper underwriting standards; (5) Failed to disclose to Petitioner that
620  Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
621  valid and /or properly documented substitutions and assignments so that Petitioner could
622  ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
623  request for documentation of the servicing of Petitioner's loan and the existence and content of

624 relevant documents. Additionally, Defendants breached their implied covenant of good faith and
625 fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
626 right under an alleged power of sale because the purported assignment was not recorded and by
627 willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
628 special relationship inherent in a real estate transaction between Agent and borrower, *and* all
629 Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

630 ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
631 ***SEQ***

632 Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
633 contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
634 Action as though the same were set forth herein.

635 Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
636 the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
637 Property, and entitles Petitioner to damages as proven at trial.

638 ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

639 The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
640 highly leveraged and vulnerable consumers who placed their faith and trust in the superior
641 knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
642 civilized society.

643 Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
644 distress, or acted in conscious and/or reckless disregard of the probability that such distress
645 would occur.

646 Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
647 conduct of Defendants as described hereinabove.

648 As a result of such severe emotional distress, Petitioner suffered economic and non economic
649 harm and detriment, all to be shown according to proof at trial of this matter.

650 Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
651 Petitioner and secure to Petitioner quite title;

ORIGINAL PETITION                                                    23 of 25

652  Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
653  as payments to Defendants based on the fraudulently secured promissory note in an amount to be
654  calculated by Defendants and verified to Petitioner;

655  Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
656  amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
657  equal to $2,775,171.24

## PRAYER

659  WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
660  as follows:

661  For an emergency restraining order enjoining lender and any successor in interest from
662  foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
663  herein;

664  For a permanent injunction enjoining Defendants from engaging in the fraudulent,
665  deceptive, predatory and negligent acts and practices alleged herein;

666  For quiet title to Property;

667  For rescission of the loan contract and restitution by Defendants to Petitioner according
668  to proof at trial;

669  For disgorgement of all amounts wrongfully acquired by Defendants according to proof
670  at trial;

671  For actual monetary damages in the amount $925,057.08;

672  For pain and suffering due to extreme mental anguish in an amount to be determined at
673  trial;

674  For pre-judgment and post-judgment interest according to proof at trial;

675  For punitive damages according to proof at trial in an amount equal to $2,775,171.24.

676  For attorney's fees and costs as provided by statute; and,

677  For such other relief as the Court deems just and proper.

678  **Respectfully Submitted,**
679
680  _____
681  Steven Segura U.C.C 1-308
682

ORIGINAL PETITION                                                                24 of 25

683   Steven Segura
684   1643 South Millard
685   Chicago, Illinois 60623
686   (773)996-0153/Bistroinc@live.com

687        UNITED STATES DISTRICT COURT

688        NORTHERN DISTRICT OF ILLINOIS

689

| | |
|---|---|
| **Steven Segura** | Case # _____ |
| Plaintiff, | |
| | **PLAINTIFF'S DEMAND FOR JURY TRIAL** |
| vs. | |
| **BAC HOME LOANS SERVICING L.P** | Date: _____10/28/2010_____ |
| Defendant | |

690
691
692
693                PLAINTIFF'S DEMAND FOR JURY TRIAL

694

695   Plaintiff, Steven Segura asserts his rights under the Seventh Amendment to the U.S.

696   Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury

697   on all issues.

698   **Respectfully Submitted,**

699
700   _(signature)_
701   Steven Segura U.C.C 1-308

ORIGINAL PETITION                                    25 of 25