**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

# FILED

JAN 11 2011 TG
Jan 11, 2011
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

|  |  |  |
|---|---|---|
| STEVEN T. OLSON and | ) | |
| LAUREN J. TRATAR, | ) | |
| PRO-SE | ) | |
|  | ) | Case No. 10-cv-7063 |
| Plaintiffs, | ) | |
|  | ) | |
|  | ) | Judge Lefkow |
| v. | ) | Mag. Judge Finnegan |
|  | ) | |
| BAC HOME LOANS SERVICING, LP, | ) | |
|  | ) | |
| Defendant. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

January 11, 2011

Plaintiffs ask the court to deny Defendant's Motion to Dismiss based on F.R.C.P. 12(b)(6), failure to state a claim upon which relief can be granted. Plaintiffs have stated claims upon which relief can be granted with specificity and clarity.

### Background

1.      Plaintiffs, in their Original Complaint, plead that Defendant charged false fees as stipulated to Plaintiffs as listed on the HUD 1 Settlement Statement, included as Exhibit 1. Plaintiffs specifically plead that Defendant, at the time of settlement of the contract, failed to provide documentation to establish that said fees were not included in those fees expressly addressed by the Real Estate Settlement Procedures Act as forbidden to be charged to Plaintiffs settlement.

2.      Plaintiffs stipulated each fee charged with particularity.  Plaintiffs calculated the precise amount that Plaintiffs would have overpaid the note had Plaintiffs paid off the note as stipulated by the Truth In Lending Statement provided by Defendant (see Exhibit 2).  Plaintiffs specifically alleged that said fees were fraudulent.  Plaintiffs alleged that Defendant failed to provide full disclosure by failing to provide documentation to prove that the above fees were authorized by law, that the services alleged provided were necessary, that the amount charged for each service was necessary, and that Defendant did not take an undisclosed markup on said fees.

3.      Plaintiffs further alleged that Defendant, acting in concert and collusion with the loan broker, toward the perpetration of a carefully contrived connivance, provided the amounts listed in the HUD 1 Settlement Statement, to the loan broker as an undisclosed yield spread premium.  Said undisclosed yield spread premium is alleged to be in addition to the one percent loan origination fee, charged to Plaintiffs, as allowed by law.  Plaintiffs alleged that said payment to the broker of undisclosed yield spread premium was a predicate act intended to improperly influence loan broker to misrepresent facts to Plaintiffs, to give partial disclosure of those facts which would appear favorable to the intent of the loan broker, while failing to give full disclosure of other facts that would not seem favorable to the contract.

4.      By the above, Plaintiffs stated a claim for which recovery could be had, and therefore, Defendant's motion to dismiss is frivolous. Plaintiffs moves the court to deny Defendant's pleading, or, in the alternative, treat Defendant's pleading as a request for more definite statement, in which case, Plaintiffs will provide a more definite statement as requested.

5.      Further, Plaintiffs move the court to order sanctions against Defendant for filing a frivolous pleading and for failing to speak with candor to the court as if Defendant is totally inept or acted with deliberate intent to improperly influence the court with false pleadings.

## ALL POSSIBLE PARTIES NOT NAMED

6.    Plaintiffs have alleged that Lenders together, in a "conspiratorial nature",
undertook the misdeeds herein.  Lenders named herein are indeed liable to the extent that they
acted as agents, servants and/or employees of the remaining Lenders and for each other. The
Ninth Circuit has held that averments of agency are not required in a complaint. (See, *Greenberg
v. Sala, 822* F.2d 882, 886 (9th Cir. 1987) (holding that "[a] person legally responsible for an act
may be alleged to have committed it without going into the theories which support that ultimate
fact").) As such, the "civil conspiracy" as alleged and incorporated into all subsequent Causes of
Action sufficiently provides the threshold legal and factual basis for several causes of action that
at first blush may seem inappropriate for a particular Lender. The overview to this "shell" game
is that all who participated in this scheme cannot now claim that they are somehow an innocent,
unrelated third party.


7.    Since all actors in a conspiracy act *in pari delicto,* and, thereby, are equally
culpable for the acts of each, Plaintiffs did not name Agent, Appraiser, Underwriter, Closing
Agent, et, as said actors are not necessary parties.  In the interest of judicial economy, Plaintiffs
only specifically named the party (parties) presently claiming agency and standing to enforce the
note. If said Lender has reason to believe that others are liable, Lender is certainly free to cross-
complain in order to lessen the potential financial burden on Lender.).

## STATUTE OF LIMITATIONS/ EQUITABLE TOLLING

8.    Plaintiffs acted with due diligence by dealing only with licensed professionals.
Plaintiffs, by so doing had cause to trust in the proactive statements of Defendants concerning
the true value of the property, the condition of the real estate market, and the propriety of the fees
charged to Plaintiffs at closing.  Defendants acted with deliberate malice toward Plaintiffs in that
Defendants by making proactive statements to Plaintiffs that revealed certain facts which would

give a reasonable person of ordinary prudence cause to believe the current loan was properly priced and that said loan was the only loan Plaintiffs qualified for while withholding facts which would have given Plaintiffs full disclosure. Defendants actively concealed the complete truth from Plaintiffs with the intent of defrauding Plaintiffs.

    a. The Eleventh Circuit stated that "in deciding whether the statute should be tolled, it must be determined whether a 'reasonably diligent plaintiff' would have discovered the fraud." Id. ( *Sterlin v. Biomune Systems, 154 F.3d 1191, 1201 (10th Cir. 1998))*.

9.    Once Plaintiff learned of the pervasive fraud affecting the mortgage industry in July of 2010 - that financial institutions were blatantly breaking the law such as not giving proper disclosures, forging documents, creating false documents for submission to the courts and other information from applicants, which are all concealed from the borrower at closing – Plaintiffs acted with due diligence to attempt to learn if their loan may be one that included such improprieties.

    a. The First Circuit, based on the same rationale as the Seventh Circuit, has stated that while "'storm warnings' of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner, . . . his cause of action is deemed to accrue on the date when he should have discovered the alleged fraud." *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir. 1987).

10. On July 2, 2010 Attorneys for Defendant, Fisher and Shapiro, sent a NOTICE REQUIRED BY THE FAIR DEBT COLLECTIONS PRACTICES ACT, 15 USC 1692, ET SEQ. informing plaintiff of debt amount, servicer name, and gave Plaintiffs a 30 day notice to dispute debt. EXHIBIT A

11.     On July 22, 2010 Plaintiffs sent a Qualified Written Request, Demand For Validation of the alleged debt (per FDCPA) and Demand for audits of the entire account to Defendants (Countrywide Bank, FSB, MERS, BAC Home Loans Servicing) via registered mail #7009 2250 0001 4546 2685 (BAC) which Defendant received on July 27, 2010. (EXHIBIT B-QWR & EXHIBIT C- PROOF OF MAILING).

12.     On August 6, 2010, Defendant attorneys, Fisher and Shapiro, deficiently responded to QWR answering only 2 questions/concerns out of the many Plaintiffs posed. (EXHIBIT D)

13.     On August 26, 2010 Defendants new attorneys, Dilworth and Paxson, responded to QWR stating that BAC was *"under no obligation to respond to the majority of the inquiries"*, but fails to cite law to support that statement. (EXHIBIT E ). Nowhere in RESPA Sec. 6 and U.S.C. 1635(b) does the law limit how many questions we are allowed to ask? Nowhere does the law limit only questions that are backed by legal citation. Further, the Defendant attorneys stated that *"the letter was overly broad, unduly burdensome and not in conformity with 12 USC 2605"* , but fails to cite law that corroborates that statement. However, the attorneys did respond to those inquiries which they deemed a required response among them: 1) RE: Demand for Original note and chain of transfer. Defendant's attorneys stated that Plaintiffs cite "no authority that supports the claim that Plaintiffs are entitled to the info/documents we requested and BAC is not aware of the existence of such authority." However, under UCC 3-501, in order to establish that Lender/Servicer has the authority to foreclose in a lawsuit, they must produce the original wet ink unaltered promissory note by law. It has become known that many large known

predatory Lenders, such Defendant Countrywide FSB, now BAC, sold the note to Investors as MBS's and Plaintiffs have ordered a securitzation audit to determine the rightful owner of the promissory note in question.

8.     On August 27, 2010 defendant attorneys, Dilworth and Paxson, sent a letter via certified mail stating that they "had reviewed the loan files and that if required notices or material disclosures were not delivered to consumer, the right to rescind shall expire 3 years after the consummation of the loan. The right of recission does not apply to loans secured by property that are not the borrower's principle dwelling, that this home is a secondary residence. Thus, recission is denied and matter closed." (see EXHIBIT F). Plaintiff Lauren Tratar and her family are indeed living in this home and have used it as their principle dwelling since July 2007 in an attempt to save money, support her family and care for her terminally ill husband. She has paid all payments since the inception of the loan. Furthermore, Defendant's argument is wrong according to the Federal Reserve Board TILA Regulation Z requirements to determine if TILA REG Z is applicable:

http://www.federalreserve.gov/boarddocs/caletters/2008/0805/08-05_attachment1.pdf

a. Is the purpose of the credit for personal, family, or household use?  Yes- PERSONAL, Mr. Olson and Lauren Tratar originally intended this home to be used for second/vacation home but when the real estate market began to soften, Plaintiff Lauren Tratar and her family moved into home.

b. Is the consumer credit extended to a consumer?  Yes.

c. Is the consumer credit extended by a creditor?  Yes.

d. Does institution extend credit regularly?  Yes.

e. Is obligation initially payable to that institution? Yes.

f. Is obligation payable by written agreement in more than 4 installments or is subject to a finance charge? Yes.

g. Is the loan or credit plan secured by real property *OR* the consumers primary dwelling? YES.

Hence, TILA REG Z applies if loan is secured by REAL property that meets the above criteria.

9.   Plaintiffs sent a Notice To of Right To Cancel (see EXHIBIT G) on 11-17-2010 to

Countrywide Bank FSB, MERS, BAC, and BAC attorneys Fisher and Shapiro via registered

mail (BAC) #7010 0780 0001 9578 2137 which Defendant received on 11-22-2010. (see

EXHIBIT H ) The Documents mailed to Defendant contained the Notice "NOTICE TO AGENT

IS NOTICE TO PRINCIPAL" conspicuously.

10. The Notice of Right To Cancel has a twenty day time limit for response and action

and the time has elapsed, though failure to respond/deficient response is a violation.

> Pursuant to FDIC Law And Regulations Section 6500-Consumer Protection- RESPA
> § 3500.21 (e) (1) Response to the Qualified Written Request is required to be
> acknowledged with 20 days *of receipt* and concerns are to be addressed within 60 days *of*
> *receipt*. TILA REGULATION Z STATES: (6) *"Business day"* means a day on which
> the creditor's offices are open to the public for carrying on substantially all of its business
> functions. However, for purposes of rescission under §§ 226.15 and 226.23, and for
> purposes of § 226.19(a)(1)(ii), § 226.19(a)(2), and § 226.31, and § 226.46(d)(4), the term
> means all calendar days  except Sundays nd the legal public holidays specified in 5 U.S.C.
> 6103 (a).

11.   Defendant has not complied with U.S.C. § 1635(b); Reg. Z. §§ 226.15(d)(2),

226.23(d)(2) . Notice Of Right To Cancel requires that Defendants;  a.) cancel all security

interest in the subject property, b.) return all money given to anyone even third parties c.) file for

Declaratory Judgment in the appropriate court if the Defendant disagrees with the rescission within 20 days of receipt of the Notice of Right To Cancel. U.S.C. § 1635(b); Reg. Z. §§ 226.15(d)(2), 226.23(d)(2).

12.     The statute and regulation specify that the security interest, promissory note or lien arising by operation of law on the property becomes automatically void upon mailing of the Notice of Right To Cancel. (15 U.S.C. § 1635(b); Reg. Z §§ 226.15(d)(1), 226.23(d)(1). As noted by the Official Staff Commentary, the creditor's interest in the property is "automatically negated regardless of its status and whether or not it was recorded or perfected." (Official Staff Commentary §§ 226.15(d)(1)-1, 226.23(d)(1)-1.). Also, the security interest is void and of no legal effect irrespective *of whether the creditor makes any affirmative response to the notice*. Also, strict construction of Regulation Z would dictate that the voiding be considered absolute and not subject to judicial modification. This requires any and all of the Defendants who are claiming interest to submit canceling documents creating the security interest and filing release or termination statements in the public record. (Official Staff Commentary §§ 226.15(d)(2)-3, 226.23(d)(2)-3.) The statute and Regulation Z make it clear that if Plaintiff has the extended right and chooses to exercise it, the security interest and obligation to pay charges are automatically voided. (Cf. Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 704-05 (9th Cir.1986) (courts do not have equitable discretion to alter substantive provisions of TILA, so cases on equitable modification are irrelevant). The statute, section 1635(b) states: "When an obligor exercises his right to cancel…, any security interest given by the obligor… becomes void upon such rescission". Also, it is clear from the statutory language that the court's modification authority extends only to the procedures specified by section 1625(b). The voiding of the

security interest is not a procedure, in the sense of a step to be followed or an action to be taken.

Neither case law nor statute give courts equitable discretion to alter TILA's substantive

provisions. Since the rescission process was intended to be self-enforcing, failure to comply with

the rescission obligations subjects the Defendants to potential liability.

13.     Non-compliance is a violation of the act which gives rise to a claim for actual and

statutory damages under 15 USC 1640. TILA rescission does not only cancel a security interest

in the property but it also cancels any liability for the Plaintiff to pay finance and other charges,

including accrued interest, points, broker fees, closing costs and that the lender must refund to

Plaintiff, all finance charges and fees paid. Since Defendants did not respond or responded

deficiently, they are in default, thus Plaintiff, has the option of enforcing the rescission right in

the federal, bankruptcy or state court (See S. Rep. No. 368, 96th Cong. 2 Sess. 28 at 32 reprinted

in 1980 U.S.C.A.N. 236, 268 ("The bill also makes explicit that a consumer may institute suit

under section 130 [15 U.S.C., 1640] to enforce the right of rescission and recover costs and

attorney fees"). TILA rescission does not only cancel a security interest in the property but it also

cancels any liability for Plaintiff to pay finance and other charges, including accrued interest,

points, broker fees, closing costs and the lender must refund to Plaintiff, all finance charges and

fees paid.  Thus, Defendant(s) are obligated to return those charges to Plaintiff, (Pulphus v.

Sullivan, 2003 WL 1964333, at *17 (N.D.Apr. 28, 2003) (citing lender's duty to return

consumer's money as reason for allowing rescission of refinanced loan); *McIntosh v. Irwing*

*Union Bank & Trust Co.*, 215 F.R.D. 26 (D. Mass. 2003) (citing borrower's right to be

reimbursed for prepayment penalty as reason for allowing rescission of paid-off loan).

14.     When the creditors interest is made void by the above mandate, that voiding is absolute. That notwithstanding, it appears to be the industry standard to ignore the consumer's Notice and proceed to sale with properties that creditors no longer hold an interest in. Plaintiff's review of cases listed on Pacer as well as reading of articles written by consumer advocates and attorneys, over the past twelve months indicates that large numbers of creditors are ignoring the law which amounts to stealing properties. The Defendants 20 day time frame to cancel interest and return funds has expired and the preponderance of evidence in the media alone, that creditors in general are not complying with the law, offers no reasonable assurance to Plaintiff that Defendant will comply accordingly. Defendants have failed or refused to comply with Federal Law already as if they are somehow above the law and allowed to ignore the consumer and proceed as they wish.

> "If any part of the consideration for a promise be illegal, or if there are several considerations for an un-severable promise one of which is illegal, the promise, whether written or oral, is wholly void, as it is impossible to say what part or which one of the considerations induced the promise." *Menominee River Co. v. Augustus Spies L & C Co.*,147 Wis. 559 at p. 572; 132 NW 1118 (1912)."The contract is void if it is only in part connected with the illegal transaction and the promise single or entire." *Guardian Agency v. Guardian Mut. Savings Bank,* 227 Wis. 550, 279 NW 79 (1938).

15.     Plaintiff has no choice but to anticipate that Defendants intend to sell Plaintiffs property at a foreclosure sale despite the lack of a legal interest in same, leaving Plaintiff irreparably damaged.


16.     Plaintiff is among the class of persons that TILA, and Regulation Z promulgated there under was intended and designed to protect, and the conduct alleged against Defendant, is the type of conduct and harm which the referenced statutes and regulations was designed to deter.

17.    Defendant owed a duty of care under TILA, and Regulation Z promulgated there under to, among other things, to provide proper disclosures concerning the terms and conditions of the loan.

> There must be clear, conspicuous, and accurate disclosures of loan terms as set forth in 12 C.F.R. 226.18 ("Content of Disclosures"). *In re Ralls*, 230 B.R. 508 (Bankr. E.D.Pa. 1999); *In re Cook*, 76 B.R. 661 (Bankr. C.D.Ill. 1987).
> Every loan charge must be properly disclosed as either part of the "amount financed," which represents "the amount of credit provided to you or on your behalf," 12 C.F.R. 226.18(b), or as part of the "finance charge," which represents "the dollar amount the credit will cost you," 12 C.F.R. 226.18(d). The "annual percentage rate" (APR) combines the interest rate and additional up-front (prepaid) finance charges to yield the total "cost of your credit as a yearly rate." 12 C.F.R. 226.18(e). *In re Hill*, 213 B.R. 934 (Bankr. D.Md. 1997).

18.    Defendants void interest cannot be ignored even though Plaintiff is untrained in law and without assistance of counsel and may not have the ability to plead artfully or skillfully. The fact that the interest held by Defendants is now void is automatic pursuant to the law.


19.    TILA does not require Plaintiff to notify Defendants of specific violations. Under the Federal Rules of Civil Procedures, it may be sufficient to plead that the TILA has been violated. (Fed.R. Civ. P. 8(a)). Specific violations do not necessarily have to be alleged with particularity, (*Brown v. Mortgagestar*, 194 F. Supp. 2d 473 (S.D. W. Va. 2002) (notice pleading is all that is required in TILA case); *Herrara v. North & Kimball Group, Inc.*, 2002 WL 253019 (N.D. Ill. Feb.. 20, 2002) (notice pleading sufficient; response to motion to dismiss can supplement complaint by alleging facts re specific documents assigned); *Staley v. Americorp. Credit Corp.*, 164 F. Supp. 2d 578 (D. Md. 2001) (John Henry Doe, Pro Se need not specify specific statute or regulations that entitle him to relief; court will examine complaint for relief on

any possible legal theory); *Hill v. GFC Loan Co.*, 2000 U.S. Dist. Lexis 4345 (N.D. Ill. Feb. 15, 2000).

20. Except where Congress has explicitly relieved lenders of liability for noncompliance, TILA is a **strict liability statute**. (Truth-In-Lending, 5th Edition, National Consumer Law Center, 1.4.2.3.2, page 11).

    (a)    *Solis v. Fidelity Consumer Discount Co.,* 58 B.R. 983 (Pa. 1986). Any misgivings creditors may have about the technical nature of the requirements should be addressed to Congress or the Federal Reserve Board, not the courts.

Disclosure requirements for credit sales are governed by 15 *U.S.C.S.* § 1638 12 *CFR* § 226.8(b), (c). Disclosure requirements for consumer loans are governed by 15 *U.S.C.S.* § 1639 12 *CFR* § 226.8(b), (d). A violator of the disclosure requirements is held to a standard of strict liability. Therefore, a plaintiff need not show that the creditor in fact deceived him by making substandard disclosures. *Rowland v. Magna Millikin Bank of Decatur,* N.A., 812 F.Supp. 875 (1992)

(a) *Wright v. Mid-Penn Consumer Discount Co.,* 133 B.R. 704 (E.D. Pa. 1991) Holding that creditor failed to make material disclosures in connection with one loan.

(b) *Dixon v. S & S Loan Service of Waycross, Inc.,* 754 F.Supp. 1567 (1990); TILA is a remedial statute, and, hence, is liberally construed in favor of borrowers. The remedial objectives of TILA are achieved by imposing a system of strict liability in favor of consumers when mandated disclosures have not been made. Thus, liability will flow from even minute deviations from the requirements of the statute and the regulations promulgated under it.

(c) *Cervantes v. General Electric Mortgage Co.,* 67 B.R. 816 (Pa. 1986). Creditor failed to meet disclosure requirements under the Truth in Lending Act, 15 U.S.C.S. § 1601-1667c and Regulation Z of the Federal Reserve Board, 12 CFR §226.1
(d) *McCausland v. GMAC Mortgage Co.,* 63 B.R. 665, (Pa. 1986). GMAC failed to provide information which must be disclosed as defined in the TILA and Regulation Z, 12 CFR §226.1
(e) *Perry v. Federal National Mortgage Corp.,* 59 B.R. 947 (Pa. 1986) the disclosure statement was deficient under the Truth In Lending Act, 15 U.S.C.S. § 1638(a)(9). Defendant Mortgage Co. failed to reveal clearly what security interest was retained.
(f) A violation such as not responding to the TILA rescission letter, no matter how technical, it has no discretion with respect to liability. Holding that creditor failed to make material

disclosures in connection with loan. Title 15 USCS §1605(c) *Wright v. Mid-Penn Consumer Discount Co.*, 133 B.R. 704 (Pa. 1991).

21.     The Congress of the United States intended to make rescission remedy available in all instances where prohibited conduct occurs in the course of the credit transaction. Rescission is applicable in this case because the property in question is a refinance Reg. Z. § 226.2(a)(11).

22.     Defendants acted in concert and collusion, one with the other, in an organized scheme wherein, from the beginning, one predicate act after another was committed against Plaintiffs in order to establish trust, then used that trust to perpetrate fraud against Plaintiffs by systematically making false claims to Plaintiffs in order to induce Plaintiffs into entering into an express contract that was based on fraud. Plaintiffs acted in good faith in all things and with due diligence by only dealing with licensed professionals. In as much as all actors were professionals, duly licensed by the state and federal governments and all governed by the relevant consumer protection laws, Plaintiffs had cause to expect good faith and fair dealings from said licensed professionals.

a.   "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261 Cal. Rptr. 735 (1989); [*15]  Rest.2d Contracts § 205.* A mortgage broker has fiduciary duties. *Wyatt v. Union Mortgage Co., (1979) 24 Cal. 3d. 773. Further, In Jonathan Neil & Associates, Inc. v Jones, (2004) 33 Cal. 4th 917.*

a.   "A person who provides brokerage services to a borrower in a covered loan transaction by soliciting lenders or otherwise negotiating a consumer loan secured by real property, is the fiduciary of the consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the broker may be acting as an agent for . . . The fiduciary duty of the broker is to deal with the consumer in good faith. If the broker knew or should have known that the Borrower will or has a likelihood of defaulting ... they have a fiduciary duty to the borrower not to place them in that loan." *(California Department of Real Estate, Section 8: Fiduciary Responsibility, www.dre.ca.gov).*

23.     Plaintiffs had no notice of wrong doing until the improprieties of the real estate market were finally made public in the popular media.

      a.     Other courts have indicated the one-year limitations period commences when the plaintiff is placed on inquiry notice, unless the plaintiff can show the actual exercise of reasonable diligence to discover the fraud. If the plaintiff can show the exercise of such diligence, the limitations period begins to run when the plaintiff actually discovers the facts underlying the alleged fraud. If, however, the plaintiff cannot show such actual diligence, constructive knowledge of the fraud is imputed to the plaintiff as of the date of inquiry notice. For example, in *Dodds v. Cigna Securities, Inc., 12 F.3d 346 (2d Cir. 1993)*, the Second Circuit stated that "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Id. at 350*. The Dodds court further stated that the doctrine of "equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has exercised reasonable care and diligence in seeking to learn the facts which would disclose [**35] fraud." Id. (internal quotations omitted). *Sterlin v. Biomune Sys., 154 F.3d 1191, 1201*.

24.     When Plaintiffs became aware of potential fraud by the licensed professionals Plaintiffs had been induced to trust, Plaintiffs made due diligent inquiry and discovered the fraud complained of herein.

      a.     Plaintiffs exercised due diligence and the time limitations in the Truth in Lending Act should be tolled so that the intent of the Legislature may be realized. The Seventh Circuit, essentially merging the inquiry notice and reasonable diligence standards into one governing standard, has indicated that a plaintiff is not put on inquiry notice until the plaintiff reasonably should have discovered the fraud. See *Marks v. CDW Computer Ctrs., Inc., 122 F.3d 363, 368 (7th Cir. 1997)* ("Inquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit."); see also *Law v. Medco Research, Inc., 113 F.3d 781, 785 (7th Cir. 1997)* ("The plaintiff gets a year after he learned or should have learned the facts that he must know to know that he has a claim."). An earlier Seventh Circuit case, however, rejected the plaintiff's argument that "in spite of reasonable diligence, it could not discover the facts underlying the defendants' fraud" and held that the one-year limitations period began to run once the plaintiff was placed on inquiry notice of the possibility of fraud. *Whirlpool*

*Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 610 & n.3 (7th Cir. 1995). Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201.

25.     In the alternative, the acts as alleged against Defendants amount to criminal fraud in that, in a scheme to deceive and mislead Plaintiffs, Defendants, by sham and trickery, induced Plaintiffs into entering into a predatory loan contract wherein Plaintiffs were charged amounts not allowed by law.  Defendants, in perpetrating the above referenced predicate acts toward their carefully crafted criminal conspiracy, relied on the trust engendered by the laws intended to protect Plaintiffs and others similarly situated from just the sort of abuse visited on Plaintiffs.  Plaintiffs allege a scheme of fraud and, therefore, upon proof at trial, Plaintiffs have a right to seek common law equitable recoupment.

## PLAINTIFFS MADE CLAIMS WITH SPECIFICITY AND PARTICULARITY

26.     Plaintiffs alleged that the original lender overpaid the loan originator, with fees improperly charged to Plaintiffs at closing in order to induce the originator of the loan to breach his fiduciary duty to Plaintiffs. By doing this, they committed common law fraud by making false statements to Plaintiffs in order to convince Plaintiffs that Plaintiffs only qualified for a more expensive loan product than Plaintiffs actually qualified for.  Plaintiffs are prepared to prove up said claims after discovery, at a trial on the merits.

27.     Plaintiffs alleged that Defendant(s) made partial disclosure of alleged facts concerning the conditions of the loan which is the basis for the issuance of the security instrument and lien document at issue.  Plaintiffs are prepared to prove at trial, after complete discovery that Defendant(s) failed to give full disclosure of facts that, if disclosed would have caused Plaintiffs to make a different decision than the one made.

28.     Plaintiffs alleged that the trustee, at closing, executed a carefully contrived connivance intended to apply undue pressure on Plaintiffs in an effort to effect lack of full disclosure to Plaintiffs and induce Plaintiffs to enter into a contract without said full disclosure. Plaintiffs are prepared to provide proof, at trial, sufficient to convince a jury.

29.     Plaintiffs allege that, at closing, false fees were charged to Plaintiffs by lender. Said allegations are reiterated below with specificity.  Plaintiffs alleged that the original lender sold the security instrument immediately after closing, but failed to transfer the lien document to the purchaser of said security instrument.  Plaintiffs are prepared to prove, subsequent to discovery, that the lender, while still holding the security instrument, received consideration and, therefore, could not be harmed rendering the lien unenforceable.

30.     Plaintiffs alleged, and are prepared to prove at trial, that the lender maintained possession of the lien document in order to be able to file an IRS Form 1099a and write the entire amount of the original note off lender's capital gains tax and, thereby, receive consideration a second time.

31.     Plaintiffs alleged, and are prepared to prove at trial that, the original security instrument, if said instrument still exists, may give the holder a claim against the signator, but have no claim against the property.

32.     Plaintiffs alleged, and are prepared to prove at trial that, Defendant(s), and the attorneys claiming to represent same, have committed fraud by representing to the court that Defendant(s) is a real party in interest in the contract of sale and has standing to take said property from defendant when no such claim exists.

33.     Plaintiffs have alleged, and are prepared to prove at trial, that the defendant(s), by claiming standing to express the provisions of the contract of sale and lien, claim to be real parties in interest and, therefore, under the Federal Trade Commission Holder Rule 16 CFR 433, are subject to any claim Plaintiffs may have against the original lender.

## LENDER CHARGED FALSE FEES

34.     Lender charged fees to Plaintiffs that were in violation of the limitations imposed by the Real Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party vendor.

35.     Lender charged other fees that were a normal part of doing business and should have been included in the finance charge.

36.     Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time did Lender or Trustee provide documentation to show that the fees herein listed were valid, necessary, reasonable, and proper to charge Petitioner.

| | | |
|---|---|---|
| 803 | Appraisal Fee | $222.00 |
| 804 | Credit Report Fee | $35.00 |
| 808 | Lender Fee | $585.00 |
| 809 | Tax Service Fee | $90.00 |
| 810 | Flood Check Fee | $26.00 |
| 901 | Interest from 9-07-07 to 10/01/07 @283.56 /day 24 | $5805.40 |
| 1001 | Hazard Insurance | $430.77 |
| 1004 | County Property Taxes | $1265.45 |
| 1008 | Aggregate Accounting Adjustment | $500.00 |
| 1101 | Settlement Fee | $200.00 |
| 1108 | Title Insurance | $765.00 |
| 1111 | Construction Escrow Fee | $200.00 |
| 1112 | Email and Delivery Fee | $112.00 |
| 1113 | State of Illinois policy Fee | $3.00 |

1201    Recording Fee                                    $57.00

37.    Debtor is unable to determine whether or not the above fees are valid in accordance with the restrictions provided by the various consumer protection laws. Therefore it was demanded to please provide;
    a.  a complete billing from each vendor who provided the above listed services;
    b.  the complete contact information for each vendor who provided a billed service;
    c.  clearly stipulate as to the specific service performed;
    d.  a showing that said service was necessary;
    e.  a showing that the cost of said service is reasonable;
    f.  a showing of why said service is not a regular cost of doing business that should rightly be included in the finance charge.

38.    The above charges have been disputed and deemed unreasonable until such time as said charges have been demonstrated to be reasonable, necessary, and in accordance with the limitations and restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

39.    In the event lender fails to properly document the above charges, borrower will consider same as false charges. The effect of the above amounts that borrower would pay over the life of the note will be an overpayment of $162,127.37. This amount will be reduced by the amount of items above when said items are fully documented.

## RESPA PENALTIES

40.    From a cursory examination of the records, with the few available, the apparent RESPA violations are as follows:
    a.    Good  Faith Estimate not within limits
    b.    No HUD-1 Booklet
    c.    Truth In Lending Statement not within limits compared to Note
    d.    Truth in Lending Statement not timely presented
    e.    HUD-1 not presented at least one day before closing
    f.    No Holder Rule Notice in Note
    g.    No 1st Payment Letter

1. Not signed and dated;
2. Financial Privacy Act Disclosure;
3. Equal Credit Reporting Act Disclosure;
4. Notice of right to receive appraisal report;
5. Servicing disclosure statement;
6. Borrower's Certification of Authorization;
7. Notice of credit score;
8. RESPA servicing disclosure letter;
9. Loan discount fee disclosure;
10. Business insurance company arrangement disclosure;
11. Notice of right to rescind.

41.     The courts have held that the borrower does not have to show harm to claim a violation of the Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And, in as much as the courts are directed to assess a penalty of no less than two hundred dollars and no more than two thousand, considering the large number enumerated here, it is reasonable to consider that the court will assess the maximum amount for each violation.

42.     Since the courts have held that the penalty for a violation of RESPA accrues at consummation of the note, borrower has calculated that, the number of violations found in a cursory examination of the note, if deducted from the principal, would result in an overpayment on the part of the borrower, over the life of the note, of $320,558.14.

43.     If the violation penalty amounts for each of the unsupported fees listed above are included, the amount by which the borrower would be defrauded is $365,760.81.

44.     Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note variance, it appears that lender intended to defraud borrower in the amount of $848,446.32.

## PLAINTIFFS PROPERLY PLEAD CLAIM TO QUIET TITLE

45.     Plaintiffs incorporate the above allegations as though fully restated herein. Plaintiffs properly averred a claim to quiet title. Plaintiffs have set forth facts concerning the title interests of the subject property.  Moreover, as shown above, Plaintiffs' claims for rescission and fraud are meritorious. As such, Plaintiffs' bases for quiet title are meritorious as well.

46.     Any claim the lender has or would have are without any right, and Lenders have no title, estate, lien, or interest in the Subject Property in that purported power of sale contained in the Deed of Trust is of no force or effect because Lenders' security interest in the Subject Property has been rendered void and that the Lenders are not the holder in due course of the Promissory Note. Moreover, because Plaintiffs properly pled all Lenders' involvement in a the fraudulent scheme, all Lenders are liable for the acts of its co-conspirators,

> "a Plaintiff is entitled to damages from those Lenders who concur in the tortious scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); *Novartis Vaccines and Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d 27 (1st Dist. 2006); *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 47 Cal. Rptr. 2d 752 (2d Dist. 1995).

47.     If defendants are granted standing absent proof of a complete chain of custody of the security instrument and lien, the court will create a break in the chain of title that will render the property uninsurable.  This will create a level of insecurity in the real estate market that could well haunt the public and the courts for generations.

## PLAINTIFFS PROPERLY PLEAD BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

48.     Plaintiffs incorporate the above allegations as though fully restated herein. Plaintiffs properly pled that Defendants violated the breach of implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261 Cal. Rptr. 735 (1989);* [*15] Rest.2d Contracts § 205. A mortgage broker has fiduciary duties. *Wyatt v. Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v Jones, (2004) 33 Cal. 4th 917,* the court stated: In the area of insurance contracts the covenant of good faith and fair dealing has taken on a particular significance, in part because of the special relationship between the insurer and the insured. The insurer, when determining whether to settle a claim, must give at least as much consideration to the welfare of its insured as it gives to its own interests. . . The standard is premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

49.     Likewise, there is a special relationship between a broker and borrower. "A person who provides brokerage services to a borrower in a covered loan transaction by soliciting lenders or otherwise negotiating a consumer loan secured by real property, is the fiduciary of the consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the broker may be acting as an agent for . . . The fiduciary [*16] duty of the broker is to deal with the consumer in *good faith.* If the *broker knew or should have known that the Borrower will or has a likelihood of defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan." (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov). [*Emphasis Added*].

50.     All Defendants willfully breached their implied covenant of good faith and fair dealing with Plaintiffs when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to provide accurate Right to Cancel Notices; (3) Placed Plaintiffs into the current loan product without regard for other more affordable products; (4) Placed Plaintiffs into a loan without following proper underwriting standards; (5) Failed to disclose to Plaintiffs that they were going to default because of the loan being unaffordable; (6) Failed to perform valid and /or properly documented substitutions and assignments so that Plaintiffs could ascertain their rights and duties; and (7) Failed to respond in good faith to Plaintiffs' request for documentation of the servicing of their loan and the existence and content of relevant documents. Additionally, Defendants breached their implied covenant of good faith and fair dealing with Plaintiffs when Defendants initiated foreclosure proceedings even without the right under an alleged power of sale because the purported assignment was not recorded and by willfully and knowingly financially profiting from their malfeasance. Under the Covenant of Good Faith and Fair Dealing, neither party is allowed to do anything which will injure the rights of the other party to receive benefits of the agreement. *(Andrews v. Mobile Aire Estates 125 Cal. App. 4th 578, 589 (2005), quoting Gruenberg v Aetna Ins. Co. 9 Cal. 3d 566, 573 (1973).)*

51.     Under the law, every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. *(Marsu, B.V. v Walt Disney Co., 185 F 3d. 932, 937 (9th Cir. 1999), quoting Carma Developers, Inc v Marathon Dev. Cal., Inc., 2 Cal 4th 342, 371 (1992).)* Plaintiffs sufficiently placed Defendants on notice of Plaintiffs' allegations.

## PLAINTIFFS PROPERLY PLEAD BREACH OF FIDUCIARY

52.     Plaintiffs incorporate the above allegations as though fully restated herein. Parties were agents of the Plaintiffs.  Broker was an agent of the Plaintiffs, by express and implied contract and by operation of law.  Plaintiffs engaged Lender as their agent for obtaining

a loan to refinance their home. Pursuant to the previously mentioned settlement statement fees, Plaintiffs paid Lender monies for services from the proceeds of the loan. As Plaintiffs' agent Lender owed a fiduciary duty to Plaintiffs to act primarily for their benefit, to act with proper care and diligence, and not to make a personal profit from the agency at the expense of his principal, the Plaintiffs. As Plaintiffs' agent, Lender owed a duty of loyalty to Plaintiffs and a duty to deal fairly with them at all times. Lender, willfully and intentionally breached his fiduciary duty of loyalty to Plaintiffs including but not limited to the following to wit:

    a. Obtained mortgage loans with unfavorable terms;
    b. Misrepresenting the terms of the loan and the ability to refinance the loan at a later date to gain a profit from the sale of the loan in question;
    c. By accepting funds from Lender in the form of kickbacks in return for referring Plaintiffs to the other Lender;
    d. By arranging loans at excessive interest rates and onerous terms as applied to the ability of this Plaintiffs to afford;

53.    Plaintiffs have been damaged because of Lender's breaches and as such are entitled to actual damages.

54.    The actions of Lender in deliberately committing a breach of fiduciary duty authorize the imposition of punitive damages in that they show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raise the presumption of a conscious indifference to consequences.

## PLAINTIFFS PROPERLY PLEAD NEGLIGENCE/NEGLIGENCE PER SE

55.    Plaintiffs incorporate the above allegations as though fully restated herein. Defendants owed a general duty of care with respect to Plaintiffs, particularly concerning their

duty to properly perform due diligence as to the loans and related transactional issues described hereinabove.

56.     In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under to, among other things, provide proper disclosures concerning the terms and conditions of the loans they marketed, to refrain from marketing loans they knew or should have known that borrowers could not afford or maintain, and to avoid paying undue compensation such as "yield spread premiums" to mortgage Agents and loan officers.

57.     Defendants knew or in the exercise of reasonable care should have known, that the loan transactions involving Plaintiffs and other persons similarly situated were defective, unlawful, violative of federal and state laws and regulations, and would subject Plaintiffs to economic and non-economic harm and other detriment.

58.     Plaintiffs are among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under were intended and designed to protect, and the conduct alleged against Defendants, and each of them is the type of conduct and harm which the referenced statutes and regulations was designed to deter.

59.     As a direct and proximate result of Defendant's negligence, Plaintiffs suffered economic and non-economic harm in an amount to be shown according to proof at trial.

**PLAINTIFFS PROPERLY PLEAD COMMON LAW FRAUD**

60.     Plaintiffs incorporate the above allegations as though fully restated herein.  If any Defendants misrepresentations made herein were not intentional, said misrepresentations were negligent. When the Defendants made the representations alleged herein, he/she/it had no reasonable ground for believing them to be true. Defendants made these representations with the intention of inducing Plaintiffs to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Plaintiffs would so act.

61.     Plaintiffs are informed and believe that Defendants et al, facilitated, aided and abetted various Defendants  in their negligent misrepresentation, and that various Defendants were  negligent in not implementing procedures such as underwriting standards oversight that would have prevented various Defendants  from facilitating the irresponsible and wrongful misrepresentations of various Defendants.

62.     Plaintiffs are informed and believe that Defendants acted in concert along with other others named herein in promulgating false representations to cause Plaintiffs to enter into the LOAN without knowledge or understanding of the terms thereof.

63.     As a proximate result of the negligent misrepresentations of Defendants as herein alleged, the Plaintiffs sustained damages, including monetary loss, emotional distress, loss of credit, loss of opportunities, attorney fees and costs, and other damages to be determined at trial. As a proximate result of Defendants' breach of duty and all other actions as alleged herein, Defendants has suffered severe emotional distress, loss of business, mental anguish, harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Plaintiffs' damage in an amount to be established at trial in excess of $848,446.32.

**PLAINTIFFS PROPERLY PLEAD FRAUD BY NON-DISCLOSURE**

64.     Plaintiffs incorporate the above allegations as though fully restated herein. Defendants made proactive statements of fact to Plaintiffs giving partial disclosure Defendants intended that Plaintiffs would rely on in making a decision to enter into an express contract for the refinance of the property.  By said proactive statements intended as partial disclosure, Defendants invoked a duty to full disclosure.  Defendants failed to give full disclosure to Plaintiffs.  Plaintiffs did not have equal access to, or equal opportunity to discover information upon which Defendants gave partial disclosure.  Plaintiffs relied on the disclosure given by Defendants as being complete.  Plaintiffs were harmed by the lack of full disclosure by Defendants.

65.     The elements of a fraudulent omissions claim are: (1) concealment or nondisclosure of a material fact, (2) knowledge of falsity (scienter), (3) intent to defraud, (4) justifiable reliance, and (5) resulting damages. *Charnay v. Cobert, 145 Cal. App. 4th 170, 184 (2006). See also Lazar v. Super. Ct., 12 Cal. 4th 631, 638 (1996).* [*48]  While certain fraud claims are subject to Fed. R. Civ. P. 9(b), Plaintiffs need only plead their claim pursuant to Fed. R. Civ. P. 8(a). A fraud by omission claim does not need to meet the requirements of Rule 9(b) because it is based on the *absence* of representations, rather than on representations that were made and can be detailed in a pleading. *See, e.g., Falk v. GMC, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007)* ("plaintiff in a fraud by omission suit will not be able to specify the time, place and specific content of an omission as precisely as would a plaintiff in a false representation claim... [A] fraud by omission claim can succeed without the same level of specificity required by a normal fraud claim."). Regardless, Plaintiffs has pled their fraudulent omissions claim with particularity.

66.     At this point, all Plaintiffs are required to do is state the factual basis for their Fraud claim pursuant to Rule 9(b). To meet the requisite level of specificity, Rule 9(b) only requires identification of circumstances constituting fraud, including the time, place, and nature

of the alleged fraudulent activities, such that a defendant can prepare adequate answer to allegations. *(Bosse v. Crowell Collier & MacMillan, 565 F.2d 602, 611 (9th Cir. 1977).)* A pleading is sufficient under Rule 9(b) if it identifies circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations. *(Neubronner v. Milken, 6 F.3d 666, 671-672 (9th Cir. 1993), quoting Gottreich v. SF Inv. Corp., 552 F.2nd 866 (9th Cir. 1977).)* However, Rule 9(b) does not require nor make legitimate pleading of detailed evidentiary matter. *(Walling v. Beverly Enterprises, 476 F.2d 393, 397 (9th Cir. 1973).)* Rule 9(b) may be relaxed with respect to matters within opposing party's knowledge. *Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993).)* Under Rule 9(b), it is also not necessary, once complaint adequately identified particular defendant with category of defendants allegedly responsible for some continuing course of conduct, to plead more than group conduct of defendants. *(In re Equity Funding Corp. of Am. Sec. Litig., 416 F.Supp. 161, 181 (C.D. Cal. 1976).)* Moreover, in cases where fraud was conducted over several years, a plaintiff is not required to allege each date of each defendant's fraudulent conduct since such requirement would defeat the purpose of Rule 8 requiring that pleading be short, plain, and in concise statements.

## PLAINTIFFS PROPERLY PLEAD VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET SEQ

67.    Plaintiffs incorporate the above allegations as though fully restated herein. This consumer credit transaction was subject to the Plaintiffs' right of rescission as described by *15 U.S.C. § 1635*(a) and Regulation Z § 226.23 (12 C.F.R. § 226.23.) More particularly, the same Defendants violated *15 U.S.C. § 1635*(a) and Regulation Z § 226.23(b) with regards to the purported Notice of Right to Cancel. As a consequence of this action, the Notice of Right to Cancel documentation was not provided to Plaintiffs therefore Defendant did not: Correctly identify the transaction; Clearly and conspicuously disclose the Plaintiffs' right to rescind the

transaction three days after delivery of all required disclosures; Clearly and conspicuously disclose how to exercise the right to rescind the transaction, with a form for that purpose; Clearly and conspicuously disclose the effects of rescission; Clearly and conspicuously disclose the date the rescission period expired.

68.     Furthermore, Plaintiffs is informed and believes that Defendants violated TILA at the time of origination because, among other things: Multiple Good Faith Estimate's used to mislead and confuse borrower about actual terms of Notes; i.e. yield spread premium paid outside closing and additional unknown amounts in YSP/POC fees.

69.     Plaintiffs are informed and believe that Defendant's violation of the provisions of law rendered the credit transaction null and void, invalidates Defendant's claimed interest in the Subject Property, and entitles Plaintiffs to damages as proven at trial.

70.     Defendant contends that Plaintiffs' TILA damages and rescission claims are time barred. It is a well-established rule that the doctrine of equitable tolling suspends the statute of limitations until borrowers discover or had reasonable opportunity to discover the fraud or the non-disclosures that form the basis of a TILA action. (*King v. California, 784 F.2d 910, 915 (9th Cir. 1986); see also, Eubanks v. Liberty Mortgage Banking Ltd., 976 F. Supp. 171 (9th Cir. 2003)* (noting that TILA claims are subject to equitable tolling in instances of fraud).) District courts have discretion to adjust the limitations period in cases where the purpose of TILA would be frustrated otherwise. (See, *Pelayo v. Home Capital Funding, 2009 U.S. Dist. LEXIS 44453,* *14-16 (S.D. Cal. May 22, 2009).) "The motion [to dismiss] should be granted 'only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled.'" (*Plascencia v. Lending 1st Mortg., 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008),* [*19] citing *Durning v. First Boston Corp., 815 F.2d 1265, 1268 (9th Cir. 1987); see also, Huynh v. Chase Manhattan Bank, 465 F.3d 992, 1003-04 (9th Cir. 2006)*

(holding that it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss if equitable tolling is at issue, given that the applicability of equitable tolling depends on matter outside of the pleadings and Court's review is limited to the complaint).) n1

        a.  n1: The Plascencia court further held that the issue of equitable tolling must be considered when "the complaint, liberally construed in light of our 'notice pleading' system, adequately alleges facts showing the potential applicability of the equitable tolling doctrine." (Id., citing *Cervantes v. City of San Diego, 5 F.3d 1273, 1277 (9th Cir. 1993).*)

## REGARDING DEFENDANTS MOTION TO DISMISS

71.     It is recognized that a motion to dismiss pursuant to Rule 12(b)(6) is proper only in "extraordinary" cases. *Tina v. Countrywide, 2008 U.S. Dist. LEXIS 88302,* citing *United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).* "In evaluating a 12(b)(6) motion, the court must accept the complaint's allegations as true and construe them in the light most favorable to Plaintiff." *Id.,* citing *Concha v. London, 62 F.3d 1493, 1500 (9th Cir. 1995),* cert. dismissed, *517 U.S. 1183, 116 S. Ct. 1710, 134 L. Ed. 2d 772 (1996).* Below, Plaintiff opposes each of the arguments Defendant makes in support of their Motion to Dismiss.

72.     Plaintiffs pled that the facts surrounding loan transaction subject to this litigation were purposefully hidden and continue to be hidden to this day. In California, the statute of limitation runs from actual discovery. (See, *Katz v. Bank of California, 640 F.2d 1024, 1025 (9th Cir. 1981)* citing *NLRB v. Don Burgess Constr. Corp., 596 F.2d 378, 382-383 (9th Cir. 1979).)* TILA does not permit constructive disclosure of terms, but specifically provides for actual, express disclosures to be made to the borrower by the creditor prior to and upon closing of the loan. (See, *15 U.S.C. § 1601* et seq.) Here, Defendants failed to provide the requisite TILA disclosures to the Plaintiffs at the inception of the loan. Plaintiffs, by engaging licensed professionals to assist Plaintiffs in the procurement of the note exercised due diligence. It was

only after news reports of predatory lending practices came to the attention of Plaintiffs that Plaintiffs discovered concealment of TILA violations by Defendants within the past year, when Plaintiffs engaged the services of a professional to examine the loan for improprieties. As such, Plaintiffs' allegations adequately state the applicability of the equitable tolling doctrine. Thus, Plaintiffs' TILA claims are not barred. *2009 U.S. Dist. Ct. Motions 875682; 2010 U.S. Dist. Ct. Motions LEXIS 7191.*

## PLAINTIFFS PROPERLY PLEAD INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

73.     The conduct committed by Defendants, driven as it was by profit and greed at the expense of increasingly highly leveraged and vulnerable consumers who placed their faith and trust in the superior knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by civilized society. Defendants either knew that their conduct would cause Plaintiffs to suffer severe emotional distress, or acted in conscious and/or reckless disregard of the probability that such distress would occur.

74.     Plaintiffs did in fact suffer severe emotional distress as an actual and proximate result of the conduct of Defendants as described hereinabove. As a result of such severe emotional distress, Plaintiffs suffered economic and non economic harm and detriment, all to be shown according to proof at trial of this matter. Plaintiffs demand that Defendants provide Plaintiffs with release of lien on the lien signed by Plaintiffs and secure to Plaintiffs quiet title; Plaintiffs demand that Defendants disgorge themselves of all enrichment received from Plaintiffs as payments to Defendants based on the fraudulently secured promissory note in an amount to be calculated by Defendants and verified to Plaintiffs; Plaintiffs further demands that Defendants pay to Plaintiffs an amount equal to the amount Defendants intended to defraud Plaintiffs of which amount Plaintiffs calculated to be equal to $848,446.32.

## SUFFICIENCY OF PLEADING

75.     Plaintiffs has sufficiently pled that relief can be granted on each and every one of

the Complaint's causes of action. Federal Rule of Civ. Procedure 12(b)(6) provides for dismissal

if a Plaintiffs fails to state a claim upon which relief can be granted. A complaint should not be

dismissed "unless it appears beyond doubt that the Plaintiffs can prove no set of facts in support

of their claim which would entitle them to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d*

*400, 401.* "All allegations of material fact in the complaint are taken as true and construed in the

light most favorable to Plaintiff." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir.*

*1996).*

The Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.

8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable

legal theories, and seeks remedies to which Plaintiffs are entitled.   *Balistreri v. Pacifica Police*

*Dept., 901 F.2d 696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).*

Moreover, the legal conclusions in the Complaint can and should be drawn from the facts

alleged, and, in turn, the court should accept them as such. *Clegg v. Cult Awareness Network, 18*

*F.3d 752* (9th Cir, 1994). Lastly, Plaintiffs' complaint contains claims and has a probable validity

of proving a "set of facts" in support of their claim entitling them to relief. *Housley v. U.S. (9th*

*Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore, relief as requested herein should be granted.

## HEIGHTENED PLEADING STANDARDS

76.     It is offered to this court the very well known cases *Bell Atlantic Corp. v.*

*Twombly and Ashcroft v. Iqbal.* Is the position of the Defendant and the Judge that a plaintiff

must fully adjudicate his case in the original pleadings?

77.     In regards to a Pro Se Plaintiff, it is maintained by the Plaintiffs that *Bell Atlantic*

*Corp. v. Twombly and Ashcroft v. Iqbal* standards do not apply. The heightened pleading

standards only apply to learned counsel.

78.     *Ashcroft & Twombly* overruled *Conley v. Gibson.* The issues within *Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal* address the heightened pleading standards of learned counsel. In *Kerns v. United States*, the case addresses pro se litigants specifically. Kerns also addresses *Conley v Gibson, and Kerns v. United States* has not been overturned.

79.     It is also maintained by Plaintiffs that absolute proof is not needed at the initial stages of this case, and only requires prima facia evidence.

## MORE DEFINITE STATEMENT

80.     Plaintiffs are willing to prepare a more definite statement for the court. Subsequent to the filing of the original complaint, Plaintiffs has made inquiry and found evidence of knowing and deliberate criminal acts by lenders intended to defraud Plaintiffs of Plaintiffs' property and are prepared to file a more definite statement with the court.

## CONCLUSION

81.     Plaintiffs maintains that Defendant(s) motion of dismissal is without merit, and that counsel, in making said claim, has failed to speak with candor with the court.

Respectfully Submitted,


STEVEN T. OLSON                              LAUREN J. TRATAR

## VERIFICATION

I, Steven T. Olson and Lauren J. Tratar, do swear and affirm that all statements made herein are true and accurate, in all respects, to the best of my knowledge.


STEVEN T. OLSON
LAUREN J. TRATAR

1021 Royal Saint George Dr.

Naperville, Illinois  60563


_____                    _____
STEVEN T. OLSON                              LAUREN J. TRATAR


The Persons above, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this document and acknowledged to me that he/she executed the same in his authorized capacity and that by his signature on this instrument who is the person who executed this instrument.

I certify under PENALTY OF PERJURY under the laws of this State that the foregoing paragraph is true and correct.

**OFFICIAL SEAL**
**CONNIE J WETZEL**
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/16/11

Witness my hand and official seal.


_____  01 / 11 / 2011  _____   NOTARY PUBLIC
IN AND FOR            Notary Seal

THE STATE OF ILLINOIS

## CERTIFICATE OF SERVICE

I, Lauren J. Tratar, Pro-Se, certify that I filed the foregoing document at the Clerk's office of the U.S. District Court and caused a copy of same to be served to the following individuals below via Mail, on this the 11th day of January, 2011:

Steven R. Smith #312823
Michael J. Werich, #6294060
BRYAN CAVE, LLP
161 North Clark Street, Suite 4300
Chicago, Illinois 60601

The United States District Court for the
Northern District of Illinois Eastern Division
Clerk's Office, U.S. District Court
219 South Dearborn
Chicago, Illinois 60604

(312) 602-5000 (tel)
(312) 6025050 (fax)

Lauren J. Tratar
1-11-2011

Respectfully,

Lauren J. Tratar



Kenneth H. Fisher
Barry M. Fisher
Gerald M. Shapiro
  Also licensed in Florida
David S. Kreisman

# FISHER and SHAPIRO, LLC

July 2, 2010

Steven Olson a/k/a Steven T. Olson
1021 Royal Saint George Drive
Naperville, IL 60563

| | |
|---|---|
| Our Client: | BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing LP |
| Loan Number: | 177759345 |
| Property Address: | 1021 Royal Saint George Drive, Naperville, IL 60563 |
| FS File Number: | 09-027899 |

## NOTICE REQUIRED BY THE FAIR DEBT COLLECTIONS PRACTICES ACT, 15 USC 1692, ET SEQ.

The following information is provided as required by the Federal Fair Debt Collections Practices Act:

1.       As of June 22, 2010 our client has advised that the amount of the debt is $1,615,195.72.

2.       The creditor to whom the debt is owed is: BAC Home Loans Servicing, LP.

3.       The Fair Debt Collection Practices Act entitles you to dispute the debt, or any portion thereof, within thirty (30) days of your receipt of this letter. If you do not dispute the debt within this period, it will be assumed to be valid by this office.

4.       If you notify us in writing within thirty (30) days of the date you receive this letter that you are disputing the debt or any portion thereof, then this office will obtain and mail to you verification of the debt.

5.       If you notify us in writing within thirty (30) days of the date you receive this letter, and you request the name of the original creditor if that creditor is different from our client, BAC Home Loans Servicing, LP, then we will obtain and mail to you the name and address of the original creditor.

6.       The Fair Debt Collection Practices Act does not require that we wait until thirty (30) days from the date you receive this letter before filing a lawsuit to foreclose your mortgage. In the event we do file a lawsuit to foreclose your mortgage, within thirty (30) days from the date you receive this letter, you will still retain the right to dispute the debt, or any portion thereof and you also retain the right to request the name of the original creditor if the original creditor is different from the current creditor, our client BAC Home Loans Servicing, LP.

7.       If you request proof of the debt or any portion thereof or if you request the name of the original creditor within thirty (30) days from the date you receive this letter, the Fair Debt Collection Practices Act requires us to suspend our efforts to foreclose the mortgage on your property, even if we have already filed the lawsuit until we mail you the information validating the debt and/or until we provide you with the name of the original creditor.

EXHIBIT A

Because of interest, late charges and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check for collection. For further information, call (866) 780-5526, or write to the Fair Debt Attorney at the address provided below.

Any written request should be addressed to:

FISHER AND SHAPIRO, LLC
2121 Waukegan Road, Suite 301
Bannockburn, IL 60015
Attention: Fair Debt Attorney

**PLEASE BE ADVISED THAT IF YOUR PERSONAL LIABILITY FOR THIS DEBT HAS BEEN EXTINGUISHED BY A DISCHARGE IN BANKRUPTCY OR BY AN ORDER GRANTING IN REM RELIEF FROM STAY, THIS NOTICE IS PROVIDED SOLELY TO FORECLOSE THE MORTGAGE REMAINING ON YOUR PROPERTY AND IS NOT AN ATTEMPT TO COLLECT THE DISCHARGED PERSONAL OBLIGATION.**

**THIS OFFICE IS DEEMED TO BE A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE**

Very truly yours,

FISHER AND SHAPIRO, LLC

By: _____
     Fair Debt Attorney

EXHIBIT A

**Scanned**

Date: _July 22_, 2010

To: Chief Financial Officer
COUNTRYWIDE BANK, FSB
1199 NORTH FAIRFAX STREET STE 500
ALEXANDRIA, VA 22314

BAC HOME LOANS SERVICING, LP
P.O. BOX 6500 70
DALLAS, TX 75265-0070

**NOTICE:**

**WARNING!** Exigent conditions are contained in the attached document that renders the matter contained therein as COMMERCIALLY URGENT. Please read carefully.

It is recognized that **you may be busy at the moment**, and you may not have time to respond immediately. If you feel you have competent grounds for doing so, you may ask for additional time to respond to the attached notice by faxing a request to the number below. No reasonable request for additional time for responding will be denied. If you do not ask for more time, then you must respond by giving your evidentiary reasons as to why this process should not continue to issue forth.

**Your reasons must be substantial** to impede the process proposed. A simple showing or claiming of possession of either the Promissory Note or its accompanying Security Instrument (Deed of Trust/Mortgage Note) will not be considered as grounds for either stopping or impeding this urgently required process. You are required to give evidence and reasons above these aforementioned items.

It is also recognized that you may not be the proper party to whom this Notice should be addressed. In the event that this is the case, you are hereby authorized to forward this Notice to the proper party, and to request an extension of not greater than five (5) business days to get these documents to such party.

Failure to do either of these things will result in the procedures commenced in the attached documents being carried out in full.

**This is a declaration of commercially urgent conditions involving suspected breaches of contracts between parties.** This is an attempt to begin a procedure to correct those breaches. Please be advised of that, and conduct yourself accordingly.

Sincerely,

Steven Thomas Olson

Fax #: _630 778 8008_

EXHIBIT
B

STEVEN THOMAS OLSON
1021 Royal Saint George Drive
Naperville, IL 60563

DATE: _July 22_____, 2010

Loan #271154/177759345
APN #07-11-406-020
Legal Description: See Attached Exhibit A

---

## QUALIFIED WRITTEN REQUEST
## TRUTH IN LENDING ACT DEMAND
## DEBT VALIDATION DEMAND

**Real Estate Settlement Procedures Act (RESPA) 12 U.S.C. § 2605(e);**
**Regulation X at 24 C.F.R. § 3500 et seq.**
**Truth-In-Lending-Act (TILA) § 1604(e), 15 U.S.C. §§ 1601 et seq. (1968) and 1692 et seq.**
**Fair Debt Collection Practices Act (FDCPA) 15 U.S.C. §1692c**

---

**GRANTOR(S):** **STEVEN THOMAS OLSON and LAUREN JOAN TRATAR**
        1021 Royal Saint George Drive
        Naperville, IL 60563

**GRANTEE(S): COUNTRYWIDE BANK, FSB**
        1199 NORTH FAIRFAX STREET STE 500
        ALEXANDRIA, VA 22314
        USPS Certified Mail # 7009 0001 4546 2739

        BAC HOME LOANS SERVICING, LP / Servicer
        P.O. BOX 6500 70
        DALLAS, TX 75265-0070
        USPS Certified Mail # 7009 2250 0001 4546 2685

        FISHER AND SHAPIRO, LLC
        2121 WAUKEGAN ROAD ,SUITE 301
        BANNOCKBURN, IL 60015
        USPS Certified Mail # 7009 2250 00014546 2692

You are now in receipt of this NOTICE under the authority of the Truth-In-Lending-Act (TILA)
§ 1604(e), 15 U.S.C. §§ 1601 et seq. (1968) and 1692 et seq., and the Fair Debt Collection
Practices Act (FDCPA) 15 U.S.C. §1692c, and the Real Estate Settlement Procedures Act
(RESPA) 12 U.S.C. § 2605(e) and Regulation X at 24 C.F.R. § 3500 regarding loan number
271154 / 177759345. I dispute the alleged mortgage debt in its entirety for being inaccurate and
firmly believe that I have had fraud in the factum committed against me for lack of full
disclosure by the alleged Lender.

EXHIBIT B

# EXHIBIT A

LOT 2 (EXCEPT THAT PART DESCRIBED AS FOLLOWS: BEGINNING AT THE MOST NORTHERLY CORNER OF SAID LOT 2 AND RUNNING THENCE SOUTHWESTERLY ALONG THE NORTHWESTERLY LINE OF SAID LOT 14.89 FEET; THENCE SOUTHEASTERLY 149.46 TO THE SOUTHEAST CORNER OF SAID LOT; THENCE NORTHWESTERLY ALONG THE NORTHEASTERLY LINE OF SAID LOT 150.00 FEET TO PLACE OF BEGINNING;) IN BLOCK 6 IN CRESS CREEK, BEING A SUBDIVISION OF PART OF SECTIONS 11, 12 AND 14, TOWNSHIP 38 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPLE MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED APRIL 4, 1962 AS DOCUMENT R62-9660, IN DUPAGE COUNTY, ILLINOIS .

EXHIBIT
B

**NOTICE TO THE PRINCIPAL IS NOTICE TO THE AGENT,**
**NOTICE TO THE AGENT IS NOTICE TO THE PRINCIPAL.**

**THIS IS MY "QUALIFIED WRITTEN REQUEST": TILA REQUEST, RESPA REQUEST, COMPLAINT OF PROBABLE FRAUD IN THE FACTUM, DISPUTE OF DEBT & VALIDATION OF DEBT**

Reference:     Alleged Mortgage Loan # 271154 / 177759345
               Private Land & Chattel Property located at
               1021 ROYAL SAINT GEORGE DRIVE
               NAPERVILLE, ILLINOIS

Attention Authorized Representative for the Above Referenced Companies / Corporations:

After several consultation meetings with Legal Counsel and knowledgeable accountants regarding this matter, I am writing to formally complain about intentional accounting omissions and probable fraud in the factum that took place at the closing in the purchase of my home. I need a clear understanding and clarification (**FULL DISCLOSURE**) of the transactions that occurred at my signing of the initial documents, the funding source, legal and beneficial ownership, charges, credits, debits, transactions, reversals, actions, payments, analyses and records related to the servicing of this account from its origination to the present date.

With our nation's mortgage default crisis and the mortgage scams that have occurred against millions of American families, I am most concerned that potential fraudulent and deceptive practices have been committed against me in the intentional omission of due consideration in the exchange of my promissory note, my signing of the mortgage note and security agreement; including deceptive and fraudulent servicing practices to enhance balance sheets; deceptive, abusive and fraudulent accounting tricks.

I hereby **DEMAND** absolute first-hand evidence from you and/or your legal department with regard to the original signed promissory note and an uncertificated or certificated security concerning account numbers 271154 / 177759345. In the event you refuse or fail to supply me with these documents it will be positive confirmation on your part that COUNTRYWIDE BANK, FSB never really created and owned a security. I also hereby **DEMAND** that a chain of transfer from you to wherever the security is now be promptly sent to me as well. Absent the actual evidence of the security, I have no choice but to dispute the validity of your lawful ownership, funding, entitlement right, and the current debt you allege I owe. By debt, I am referring to the principal balance you claim I owe; the calculated monthly payment, calculated escrow payment and any fees claimed to be owed by you or any trust or entity you may service or subservice for.

**To independently validate this debt, I need to conduct a complete exam, audit, review and accounting of this mortgage account from its inception through the present date. Upon receipt of this QUALIFIED WRITTEN REQUEST, please refrain from reporting any negative credit information [if any] to any credit reporting agency until you respond to each of the requests.**

I also request that you conduct your own investigation and audit of this account since its inception to validate the debt you currently claim I owe. Upon receipt of your answers and production of documents, I will contract with my CPA to do another audit for a secondary validation. I **DEMAND** that you validate this debt so that it is accurate to the penny!

I firmly request that you do not rely on previous servicers or originators records, assurances or indemnity agreements and refuse to conduct a full audit and investigation of this account. I understand that potential abuses by you or previous servicers could have deceptively, wrongfully, unlawfully, and/or illegally:

◊     Increased the amounts of monthly payments.
◊     Increased the principal balance I owe;

EXHIBIT
B

◊     Increased escrow payments;
◊     Increased the amounts applied and attributed toward interest on this account;
◊     Decreased the proper amounts applied and attributed toward principal on this account;
◊     Assessed, charged and/or collected fees, expenses and misc. charges I am not legally obligated to pay under this mortgage, note and/or Mortgage.

I **DEMAND** that you demonstrate that I have not been the victim of such predatory, fraudulent servicing or lending practices that have occurred throughout the nation.

To ensure this, I have authorized a thorough review, examination, accounting and audit of mortgage account # 271154 / 177759345 by mortgage auditing and predatory servicing or lending experts. These exam and audit experts will review this mortgage account file from the date of initial contact with the mortgage provider, COUNTRYWIDE BANK, FSB, their applications and the origination of this account to the present date.

Again this is a **Qualified Written Request** under the Truth In Lending Act [TILA] 15 U.S.C. § 1601, et seq., the Fair Debt Collection Practices Act (FDCPA) and the Real Estate Settlement Procedures Act ("RESPA"), codified as Title 12 § 2605 (e)(1)(B) (e) and Reg. X § 3500.21(f)2 of the United States Code. TAKE NOTICE that RESPA provides substantial penalties and fines for non-compliance or failure to answer my questions & production of documents as requested in this letter within twenty [20] business days of its receipt.

In order to conduct the examination and audit of this loan, I need to have full and immediate disclosure including copies of all pertinent information regarding this loan. The documents requested and answers to my questions are needed for me and my audit experts to insure that this loan:

1. Was originated in lawful compliance with all federal and state laws, regulations including, but not limited to TILA, FDCPA, RESPA, HOEPA and other laws;

2. That any sale or transfer of this account or monetary instrument, was conducted in accordance with proper laws and was a lawful sale with complete disclosure to all parties with an interest;

3. That the claimed holder in due course of the monetary instrument/Mortgage/asset is holding such note in compliance with statutes, State and Federal laws and is entitled to the benefits of payments;

4. That all good faith and reasonable disclosures of transfers, sales, Power of Attorney, monetary instrument ownership, entitlements, full disclosure of actual funding source, terms, costs, commissions, rebates, kickbacks, fees etc., were and still are properly disclosed to me;

5. That each servicer and/or sub-servicers of this mortgage have serviced this mortgage in accordance with statute, laws and the terms of mortgage, monetary instrument/Mortgage;

6. That each servicer and sub-servicers of this mortgage have serviced this mortgage in compliance with local, state and federal statutes, laws and regulations;

7. That this mortgage account has properly been credited, debited, adjusted, amortized and charged correctly;

8. That interest and principal have been properly calculated and applied to this loan;

9. That any principal balance has been properly calculated, amortized and accounted for; that no charges, fees or expenses, not obligated by me in any agreement, have been charged, assessed or collected from this account;

In order to validate this debt and audit this account, I need copies of pertinent documents to be provided to me. I also need answers, certified, in writing, to various servicing questions. For each record kept on computer or in any other electronic file or format, please provide a paper copy of all information in each

EXHIBIT B

field or record in each computer system, program or database used by you that contains any information on this account number or my name.

As such, please mail to me, at the address above, copies of the documents requested below as soon as possible. Please provide copies of:

10. Any certificated or uncertificated security, front and back, used for the funding of account # 271154.

11. Any and all "Pool Agreement(s)" including account # 271154 between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP account # 177759345 and any government sponsored entity, hereinafter (GSE).

12. Any and all "Deposit Agreement(s)" regarding account # 271154 or the "Pool Agreement" including account # 271154 between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP account # 177759345 and any GSE.

13. Any and all "Servicing Agreement(s)" between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP and any GSE.

14. Any and all "Custodial Agreement(s)" between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP and any GSE.

15. Any and all "Master Purchasing Agreement(s)" between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP and any GSE.

16. Any and all "Issuer Agreement(s)" between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP and any GSE.

17. Any and all "Commitment to Guarantee" agreement(s) between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP and any GSE.

18. Any and all "Release of Document agreements" between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP and any GSE.

19. Any and all "Master Agreement(s) for servicer's Principle and Interest Custodial Account(s)" between COUNTRYWIDE BANK, FSB and any GSE.

20. Any and all "Servicers Escrow Custodial Account" between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP and any GSE.

21. Any and all "Release of Interest" agreements between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP and any GSE.

22. Any Mortgagee agreement(s) between COUNTRYWIDE BANK, FSB and BAC HOME LOANS SERVICING, LP Mortgagee regarding account # 271154 and or # 177759345 or pool accounts with any GSE.

23. Please send to the requester a copy of any documentation evidencing any trust relationship regarding the Mortgage **and** any Note in this matter.

24. Please send to the requester a copy of any and all document(s) establishing any Mortgagee of record for the Mortgage **and** any Note.

25. Please send to the requester a copy of any and all document(s) establishing the date of any appointment of Mortgagee for this Mortgage **and** any Note. Please also include any and all assignments or transfers or nominees of any substitute Mortgagee(s).

26. Please send to the requester a copy of any and all document(s) establishing any Grantor for this Mortgage **and** any Note.

EXHIBIT B

27. Please send to the requester a copy of any and all document(s) establishing any Grantee for this Mortgage **and** any Note.

28. Please send to the requester a copy of any and all document(s) establishing any Beneficiary for this Mortgage **and** any Note.

29. Please send to the requester any documentation evidencing the Mortgage is **not** a constructive trust or any other form of trust.

30. Please send to the requester a certified copy of the signed promissory note showing the front and back of the document.

31. All data, information, notations, text, figures and information contained in your mortgage servicing and accounting computer systems including, but not limited to Alltel or Fidelity CPI system, or any other similar mortgage servicing software used by you, any servicers, or sub-servicers of this mortgage account from the inception of this account to the date written above.

32. All descriptions and legends of all Codes used in your mortgage servicing and accounting system so that the examiners, auditors and experts retained to audit and review this mortgage account may properly conduct their work.

33. All assignments, transfers, allonges, or other document evidencing a transfer, sale or assignment of this mortgage, monetary instrument or other document that secures payment by me to this obligation in this account from the inception of this account to the present date including any such assignments on MERS.

34. All records, electronic or otherwise, of assignments of this mortgage, monetary instrument or servicing rights to this mortgage including any such assignments on MERS.

35. All deeds in lieu, modifications to this mortgage, monetary instrument or Mortgage from the inception of this account to the present date.

36. The front and back of each and every canceled check, money order, draft, debit or credit notice issued to any servicers of this account for payment of any monthly payment, other payment, escrow charge, fee or expense on this account.

37. All escrow analyses conducted on this account from the inception of this account until the date of this letter;

38. The front and back of each and every canceled check, draft or debit notice issued for payment of closing costs, fees and expenses listed on any and all disclosure statement(s) including, but not limited to, appraisal fees, inspection fees, title searches, title insurance fees, credit life insurance premiums, hazard insurance premiums, commissions, attorney fees, points, etc.

39. Front and back copies of all payment receipts, checks, money orders, drafts, automatic debits and written evidence of payments made by others or me on this account.

40. All letters, statements and documents sent to me by your company;

41. All letters, statements and documents sent to me by agents, attorneys or representatives of your company;

42. All letters, statements and documents sent to me by previous servicers, sub-servicers or others in your account file or in your control or possession or in the control or possession of any affiliate, parent company, agent, sub-servicers, servicers, attorney or other representative of your company.

43. All letters, statements and documents contained in this account file or imaged by you, any servicers or sub-servicers of this mortgage from the inception of this account to present date.

EXHIBIT
B

44. All electronic transfers, assignments, sales of the note/asset, mortgage, Mortgage or other security instrument.

45. All copies of my property inspection reports, appraisals, BPOs and reports done on the property.

46. All invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense, which has been charged to this mortgage account from the inception of this account to the present date.

47. All checks used to pay invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense which has been charged to this mortgage account from the inception of this account to the present date.

48. All agreements, contracts and understandings with vendors that have been paid for any charge on this account from the inception of this account to the present date.

49. All account servicing records, payment payoffs, payoff calculations, ARM audits, interest rate adjustments, payment records, transaction histories, account histories, accounting records, ledgers, and documents that relate to the accounting of this account from the inception of this account until the date of this RESPA request.

50. All account servicing transaction records, ledgers, registers and similar items detailing how this account has been serviced from the from the inception of this account until the date of this RESPA request.

Further, in order to conduct the audit and review of this account, and to determine all proper amounts due, I need the following answers to questions concerning the servicing and accounting of this mortgage account from its inception to the present date. Accordingly, please provide me, in writing, the answers to the following questions listed below.

## ACCOUNT ACCOUNTING & SERVICING SYSTEMS

51. Please identify for me each account accounting and servicing system used by you and any sub-servicers or previous servicers from the inception of this account to the present date so that the experts can decipher the data provided. I demand a certified Transaction Chart (T Chart) showing the GAAP journal entries made at the inception.

52. For each account accounting and servicing system identified by you and any sub-servicers or previous servicers from the inception of this account to the present date, please provide the name and address of the company or party that designed and sold the system.

53. For each account accounting and servicing system used by you and any sub-servicers or previous servicers from the inception of this account to the present date, please provide the complete transaction code list for each system so that I, and others can adequately audit this account.

## DEBITS & CREDITS

54. Pursuant to banking law 12 USCA § 1813, please provide me the deposit slip for the alleged borrower's promissory note(s) that were issued to COUNTRYWIDE BANK, FSB for processing through the Federal Reserve Bank in exchange for borrower's credit on September 7, 2007 and deposited on or around October 7, 2007.

55. In a spreadsheet form or in letter form in a columnar format, please detail for me each and every credit on this account and the date such credit was posted to this account as well as the date any credit was received.

56. Please provide the order authorizing the withdrawal of funds from the borrower's promissory note deposit account.

EXHIBIT
B

57. In a spreadsheet form or in letter form in a columnar format, please detail for me each and every debit on this account and the date debit was posted to this account as well as the date any debit was received.

58. For each debit or credit listed, please provide me with the definition for each corresponding transaction code you utilize?

59. For each transaction code, please provide us with the master transaction code list used by you or previous servicers.

## MORTGAGE & ASSIGNMENTS

60. Has each sale, transfer or assignment of this mortgage, monetary instrument, Mortgage or any other instrument I executed to secure this debt been recorded in the parish/county property records in the parish/county and state in which my land and chattel property is located from the inception of this account to the present date? Yes or No?

61. If not, why?

62. Is your company the servicers of this mortgage account or the holder in due course and beneficial owner of this mortgage and/or monetary instrument?

63. Have any sales, transfers or assignments of this mortgage, monetary instrument, or any other instrument I executed to secure this debt been recorded in any electronic fashion such as MERS or other internal or external recording system from the inception of this account to the present date? Yes or No?

64. If yes, please detail for me the names of each seller, purchaser, assignor, assignee or any holder in due course to any right or obligation of any note, mortgage, deed or security instrument I executed securing the obligation on this account that was not recorded in the county records where my property is located whether they be mortgage servicing rights or the beneficial interest in the principal and interest payments.

## ATTORNEY FEES

65. For purposes of my questions below dealing with attorney fees, please consider the terms attorney fees and legal fees to be one in the same.

66. Have attorney fees ever been assessed to this account from the inception of this account to the present date?

67. If yes, please detail each separate assessment, charge and collection of attorney fees to this account from the inception of this account to the present date and the date of such assessment to this account?

68. Have attorney fees ever been charged to this account from the inception of this account to the present date?

69. If yes, please detail each separate charge of attorney fees to this account from the inception of this account to the present date and the date of such charge to this account?

70. Have attorney fees ever been collected from this account from the inception of this account to the present date?

71. If yes, please detail each separate collection of attorney fees from this account from the inception of this account to the present date and the date of such collection from this account?

72. Please provide for me the name and address of each attorney or law firm that has been paid any fees or expenses related to this account from the inception of this account to the present date?

EXHIBIT
B

73. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, or any agreement I signed which authorized the assessment, charge or collection of attorney fees.

74. Please detail and list for me in writing each separate attorney fee assessed to this account and for which corresponding payment period or month such fee was assessed from the inception of this account to present date.

75. Please detail and list for me in writing each separate attorney fee collected from this account and for which corresponding payment period or month such fee was collected from the inception of this account to present date.

76. Please detail and list for me in writing any adjustments in attorney fees assessed and on what date such adjustment was made and the reasons for such adjustment.

77. Please detail and list for me in writing any adjustments in attorney fees collected and on what date such adjustment(s) were made and the reasons for such adjustment(s).

78. Has interest been charged on any attorney fee assessed or charged to this account? Yes or No?

79. Is interest allowed to be assessed or charged on attorney fees charged or assessed to this account? Yes or No?

80. How much in total attorney fees have been assessed to this account from the inception of this account until present date? $_____

81. How much in total attorney fees have been collected on this account from the inception of this account until present date? $_____

82. How much in total attorney fees have been charged to this account from the inception of this account until present date? $_____

83. Please send to me copies of all invoices and detailed billing statements from any law firm or attorney that has billed such fees that have been assessed or collected from this account.

## SUSPENSE/UNAPPLIED ACCOUNTS

For purposes of this section, please treat the term suspense account and unapplied account as one and the same.

84. Have there been any suspense or unapplied account transactions on this account from the inception of this account until present date?

85. If yes, please explain the reason for each and every suspense transaction that occurred on this account? If no, please skip the questions in this section dealing with suspense and unapplied accounts.

86. In a spreadsheet or in letter form in a columnar format, please detail for me each and every suspense or unapplied transaction, both debits and credits that have occurred on this account from the inception of this account until present date.

## LATE FEES

For purposes of my questions below dealing with late fees, please consider the terms late fees and late charges to be one in the same.

87. Have you reported the collection of late fees on this account as interest in any statement to me or to the IRS? Yes or No?

88. Has any previous servicers or sub-servicers of this mortgage reported the collection of late fees on this account as interest in any statement to me or to the IRS? Yes or No?

EXHIBIT
G

89. Do you consider the payment of late fees as liquidated damages to you for not receiving payment on time? Yes or No?

90. Are late fees considered interest? Yes or No?

91. Please detail for me in writing what expenses and damages you incurred for any payment I made that was late.

92. Were any of these expenses or damages charged or assessed to this account in any other way? Yes or No?

93. If yes, please describe what expenses or charges were charged or assessed to this account.

94. Please describe for me in writing what expenses you or others undertook due to any payment I made, which was late.

95. Please describe for me in writing what damages you or others undertook due to any payment I made which was late.

96. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, or any agreement I signed which authorized the assessment or collection of late fees.

97. Please detail and list for me in writing each separate late fee assessed to this account and for which corresponding payment period or month such late fee was assessed from the inception of this account to present date.

98. Please detail and list for me in writing each separate late fee collected from this account and for which corresponding payment period or month such late fee was collected from the inception of this account to present date.

99. Please detail and list for me in writing any adjustments in late fees assessed and on what date such adjustment was made and the reasons for such adjustment.

100. Has interest been charged on any late fee assessed or charged to this account? Yes or No?

101. Is interest allowed to be assessed or charged on late fees charged or assessed to this account? Yes or No?

102. Have any late charges been assessed to this account? Yes or No?

103. If yes, how much in total late charges have been assessed to this account from the inception of this account until present date? $_____

104. Please provide me with the exact months or payment dates you or other previous servicers of this account claim I have been late with a payment from the inception of this account to the present date.

105. Have late charges been collected on this account from the inception of this account until present date? Yes or No?

106. If yes, how much in total late charges have been collected on this account from the inception of this account until present date? $_____

## LAND & CHATTEL PROPERTY INSPECTIONS

107. For purposes of this section property inspection and inspection fee refer to any inspection of property by any source and any related fee or expense charged, assessed or collected for such inspection.

108. Have any property inspections been conducted on my land and chattel property from the inception of this account until the present date?

EXHIBIT
D

109. If your answer is no, you can skip the rest of these questions in this section concerning property inspections.

110. If yes, please tell me the date of each property inspection conducted on my land & chattel property that is the secured interest for this mortgage, deed or note?

111. Please tell me the price charged for each property inspection.

112. Please tell me the date of each property inspection.

113. Please tell me the name and address of each company and person who conducted each property inspection on my land & chattel property.

114. Please tell me why property inspections were conducted on my property.

115. Please tell me how property inspections are beneficial to me.

116. Please tell me how property inspections are protective of my land & chattel property.

117. Please explain to me your policy on property inspections.

118. Do you consider the payment of inspection fees as a cost of collection? Yes or No?

119. If yes, why?

120. Do you use property inspections to collect debts? Yes or No?

121. Have you used any portion of the property inspection process on my land & chattel property to collect a debt or inform me of a debt, payment or obligation I owe?

122. If yes, please answer when and why?

123. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, Mortgage or any agreement I signed that authorized the assessment or collection of property inspection fees?

124. Have you labeled in any record or document sent to me a property inspection as a miscellaneous advance? Yes or No?

125. If yes, why?

126. Have you labeled in any record or document sent to me a property inspection as a legal fee or attorney fee? Yes or No?

127. If yes, why?

128. Please detail and list for me in writing each separate inspection fee assessed to this account and for which corresponding payment period or month such fee was assessed from the inception of this account to present date.

129. Please detail and list for me in writing each separate inspection fee collected from this account and for which corresponding payment period or month such fee was collected from the inception of this account to present date.

130. Please detail and list for me in writing any adjustments in inspection fees assessed and on what date such adjustment was made and the reasons for such adjustment.

131. Please detail and list for me in writing any adjustments in inspection fees collected and on what date such adjustment was made and the reasons for such adjustment.

132. Has interest been charged on any inspection fees assessed or charged to this account? Yes or No?

133. If yes, when and how much was charged?

EXHIBIT
B

134. Is interest allowed to be assessed or charged on inspection fees or assessed to this account? Yes or No?

135. How much in total inspection fees have been assessed to this account from the inception of this account until present date? $_____

136. How much in total inspection fees have been collected on this account from the inception of this account until present date? $_____

137. Please forward to me copies of all property inspections made on my property in this mortgage account file.

138. Has any fee charged or assessed for property inspections been placed into escrow account? Yes or no?

## BPO FEES

139. Have any BPOs [Broker Price Opinions] been conducted on my land & chattel property?

140. If yes, please tell me the date of each BPO conducted on my land & chattel property that is the secured interest for this mortgage, deed or note?

141. Please tell me the price of each BPO.

142. Please tell me who conducted each BPO.

143. Please tell me why BPOs were conducted on my land & chattel property.

144. Please tell me how BPOs are beneficial to me.

145. Please tell me how BPOs are protective of my land & chattel property.

146. Please explain to me your policy on BPOs.

147. Have any BPO fees been assessed to this account? Yes or No?

148. If yes, how much in total BPO fees have been assessed to this account? $_____

149. Have any BPO fees been charged to this account? Yes or No?

150. If yes, how much in total BPO fees have been charged to this account? $_____

151. Please tell me specifically what clause, paragraph and sentence in the note, mortgage or Mortgage or any agreement I have executed allows you to assess, charge or collect a BPO fee from me.

152. Please send to me copies of all BPO reports that have been done on my land & chattel property.

153. Has any fee charged or assessed for a BPO been placed into escrow? Yes or no?

## FORCED-PLACED INSURANCE

154. Have you placed or ordered any forced-placed insurance polices on my land & chattel property?

155. If yes, please tell me the date of each policy ordered or placed on my property that is the secured interest for this mortgage, deed or note.

156. Please tell me the price of each policy.

157. Please tell me the agent for each policy.

158. Please tell me why each policy was placed on my land & chattel property.

159. Please tell me how the policies are beneficial to me.

160. Please tell me how policies are protective of my land & chattel property.

EXHIBIT B

161. Please explain to me your policy on forced-placed insurance.

162. Have any forced-placed insurance fees been assessed to this mortgage or escrow account? Yes or No?

163. If yes, how much in total forced-placed policy fees have been assessed to this account? $_____

164. Have any forced-placed insurance fees been charged to this mortgage or escrow account? Yes or No?

165. If yes, how much in total forced-placed insurance fees have been charged to this mortgage or escrow account? $_____

166. Please tell me specifically what clause, paragraph and sentence in the note, mortgage or Mortgage or any agreement I have executed allows you to assess, charge or collect forced-placed insurance fees from me.

167. Do you have any relationship with the agent or agency that placed any policies on my land and chattel property? If yes, please describe.

168. Do you have any relationship with the carrier that issued any policies on my land & chattel property? If yes, please describe.

169. Has the agency or carrier you used to place a forced-placed insurance policy on my land & chattel property provided you any service, computer system, discount on policies, commissions, rebates or any form of consideration? If yes, please describe.

170. Do you maintain a blanket insurance policy to protect your properties when customer policies have expired? If yes, please send me a copy of each such policy.

171. Please send to me copies of all forced-placed insurance policies that have been ordered on my land & chattel property.

## SERVICING RELATED QUESTIONS

For each of the following questions listed below, please provide me with a detailed explanation in writing that answers each question. In addition, I need the following answers to questions concerning the servicing of this mortgage account from its inception to the present date. Accordingly, can you please provide me, in writing, the answers to the questions listed below:

172. Did the originator or previous servicers of this account have any financing agreements or contracts with your company or an affiliate of your company?

173. Did the originator of this account or previous servicers of this account have a warehouse account agreement or contract with your company?

174. Did the originator of this account or previous servicers of this account receive any compensation, fee, commission, payment, rebate or other financial consideration from your company or any affiliate of your company for handling, processing, originating or administering this loan? If yes, please describe and itemize each and every form of compensation, fee, commission, payment, rebate or other financial consideration paid to the originator of this account by your company or any affiliate.

175. Please identify for me where the originals of this entire account file are currently located and how they are being stored, kept and protected?

176. Where is the original monetary instrument (*promissory note*) or mortgage I signed located? Please describe its physical location and anyone holding this note as a custodian or Mortgagee if applicable.



177. Where is the original Mortgage or mortgage and note I signed located? Please describe its physical location and anyone holding this note as a custodian or Mortgagee if applicable.

178. Since the inception of this loan, has there been any assignment of my monetary instrument/asset to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignment.

179. Since the inception of this loan, has there been any assignment of the Mortgage or mortgage and note to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignment.

180. Since the inception of this loan, has there been any sale or assignment of servicing rights to this mortgage account to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignment or sale.

181. Since the inception of this loan, have any sub-servicers serviced any portion of this mortgage loan? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that have sub-serviced this mortgage loan.

182. Has this mortgage account been made a part of any mortgage pool since the inception of this loan? If yes, identify for me each and every account mortgage pool that this mortgage has been a part of from the inception of this account to the present date.

183. Has each and every assignment of my asset/monetary instrument been recorded in the parish/county land records where the property associated with this mortgage account is located?

184. Has there been any electronic assignment of this mortgage with MERS [Mortgage Electronic Registration System] or any other computer mortgage registry service or computer program? If yes, identify the name and address of each and every individual, entity, party, bank, trust or organization or servicers that have been assigned the mortgage servicing rights to this account as well as the beneficial interest to the payments of principal and interest on this loan.

185. Have there been any investors [as defined in your industry] who have participated in any mortgage-backed security, collateral mortgage obligation or other mortgage security instrument that this mortgage account has ever been a part of from the inception of this mortgage to the present date? If yes, identify the name and address of each and every individual, entity, organization and/or trust involved.

186. Please identify for me the parties and their addresses to all sales contracts, servicing agreements, assignments, allonges, transfers, indemnification agreements, recourse agreements and any agreement related to this account from its inception to the current date written above.

187. Please provide me with copies of all sales contracts, servicing agreements, assignments, allonges, transfers, indemnification agreements, recourse agreements and any agreement related to this account from its inception to the current date written above.

188. How much was paid for this individual mortgage account by you?

189. If part of a mortgage pool, what was the principal balance used by you to determine payment for this individual mortgage loan.

190. If part of a mortgage pool, what was the percentage paid by you of the principal balance above used to determine purchase of this individual mortgage loan.

191. Who did you issue a check or payment to for this mortgage loan?

192. Please provide me copies with the front and back of canceled check.

193. Did any investor approve the foreclosure of my property?

EXHIBIT
B

194. Has HUD assigned or transferred foreclosure rights to you as required by 12 USC 3754?

195. Please identify all persons who approved the foreclosure of my property!

196. Has COUNTRYWIDE BANK, FSB and/or BAC HOME LOANS SERVICING, LP been paid any insurance claim based on requester's alleged default of mortgage agreement?

197. If so, provide the amount of insurance payment collect by COUNTRYWIDE BANK, FSB and/or BAC HOME LOANS SERVICING, LP $_____

198. If insurance has been paid, please provide document signed under the penalty of perjury showing where there is still alleged debt owed by Steven Thomas Olson and Lauren Joan Tratar.

Under the Truth In Lending Act [TILA] 15 U.S.C. § 1601, et seq., the Fair Debt Collection Practices Act (FDCPA) and the Real Estate Settlement Procedures Act ("RESPA"), codified as Title 12 § 2605 (e)(1)(B) (e) and Reg. X § 3500.21(f)2 of the United States Code it is mandatory that you provide me full disclosure of the alleged debt that is said to be owed before proceeding any further with your collection action from twenty (20) days of receipt of this QUALIFIED WRITTEN REQUEST. If you do not provide all answers and production of documents requested in this Notice, you will be in fault, admitting no lawful claim and a default will be in order. Your admission of no lawful claim will be the basis for our Right to Cancel. A Notice of Right to Cancel will be issued twenty (20) days from the date of receipt of this CONSTRUCTIVE LEGAL NOTICE.

---

## AFFIDAVIT OF FACT

### 1021 ROYAL SAINT GEORGE DRIVE
### NAPERVILLE, ILLINOIS

STATE OF ILLINOIS      )
COUNTY OF DU PAGE    ) *ss.*

I, Steven Thomas Olson, hereafter Affiant, being of sound mind, competent and able to testify to the accuracy of this Affidavit, hereby confirms that all the facts stated and affirmed herein are true, correct, complete, and not misleading, admissible as evidence, and if testifying shall so state under the penalty of perjury:

1. That, Affiant makes this Affidavit based on first hand knowledge of all the facts stated herein, including the research of federal and state laws and public policy documents that govern monetary instruments related to banking and financial institutions.

2. That, Affiant and his sister, Lauren Joan Tratar did sign alleged loan documents with COUNTRYWIDE BANK, FSB at GREATER ILLINOIS TITLE COMPANY, INC. office in CHICAGO, ILLINOIS on September 7, 2007 concerning property located at 1021 ROYAL SAINT GEORGE DRIVE, NAPERVILLE, ILLINOIS.

3. That, Affiant ~~and Affiant's sister Lauren Joan Tratar~~ *so* did sign a promissory note and issued to COUNTRYWIDE BANK, FSB for processing on September 7, 2007; the promissory note was for the sum of $1,380,000.

4. That, Affiant was rushed by COUNTRYWIDE BANK, FSB representatives to sign other alleged closing documents and was not provided time to review or provided a clear understanding of the terms and conditions of these documents that he was requested to sign.

5. That, since the above events and the exposure of this nation's mortgage default crisis, Affiant has recently learned that there has been possible fraud committed against him by COUNTRYWIDE BANK, FSB representatives in withholding FULL DISCLOSURE at the signing of closing documents and that it appears fraud in the factum has been committed against him regarding his signing the mortgage note and Mortgage.



EXHIBIT B

6. That, Affiant confirms that attorney firm FISHER AND SHAPIRO, LLC allegedly hired by BAC HOME LOANS SERVICING, LP has issued a Notice of Intent to Foreclose to Affiant dated July 2, 2010.

7. That, Affiant affirms hereby that FISHER AND SHAPIRO, LLC does not have first hand knowledge of the probable fraud in the factum committed by their alleged client, BAC HOME LOANS SERVICING, LP.

8. That, Affiant confirms and re-affirms his lawful and timely dispute and demands full compliance in providing FULL DISCLOSURE to all requested questions and provide all request for documentation per the LAWFUL DEBT VALIDATION DEMAND annexed hereto and made a part hereof.

9. That, COUNTRYWIDE BANK, FSB registered agent and BAC HOME LOANS SERVICING, LP acting as servicer are being served this Affidavit and LAWFUL DEBT VALIDATION DEMAND.

I hereby state that the above is true to the best of my knowledge and understanding.

Date: _July 22_, 2010          BY: _____
                                    STEVEN THOMAS OLSON
                                    1021 ROYAL SAINT GEORGE DRIVE
                                    NAPERVILLE, IL 60563
                                    TEL: (630) 778-8011

## Jurat

State of ILLINOIS

County of _Cook_

Subscribed and sworn to (or affirmed) before me on this _22nd_ day of

_July_ , 2010 by _Steven Thomas Olson_ , proved

to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____                    (Seal)
Signature of Notary Public

OFFICIAL SEAL
CONNIE J WETZEL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/16/11

EXHIBIT
B

## CERTIFICATE OF MAILING

I, Steven Thomas Olson do hereby solemnly declare, that on _July 22_ ,
2010, I did cause to be delivered by Federal Express private courier and/or first class
Certified US Mail, a true and correct copy of the CONSTRUCTIVE LEGAL NOTICE
OF LAWFUL DEBT VALIDATION DEMAND, including true and correct copies of
all/any documents referenced therein as "attached hereto", to the parties and locations
listed below:


Date: _July 22_ , 2010           _Steven Thomas Olson_

                                  Steven Thomas Olson


**COUNTRYWIDE BANK, FSB**
**1199 NORTH FAIRFAX STREET STE 500**
**ALEXANDRIA, VA 22314**
**US Certified Mail Tracking No.** 7009 2250 0001 4546 2739


**BAC HOME LOANS SERVICING, LP**
**P.O. BOX 6500 70**
**DALLAS, TX 75265-0070**
**US Certified Mail Tracking No.** 7009 2250 0001 4546 2686

**"MERS"**
**3300 S.W. 34th Avenue, Suite 101**
**Ocala, FL 34474**
**US Certified Mail Tracking No.** 7009 2250 0001 4546 2678

**FISHER AND SHAPIRO, LLC**
**2121 WAUKEGAN ROAD ,SUITE 301**
**BANNOCKBURN, IL 60015**
**US Certified Mail Tracking No.** 7009 2250 0001 4546 2692

EXHIBIT
B

*Carbon Copied:*

**FEDERAL TRADE COMMISSION**
**CONSUMER RESPONSE CENTER**
600 Pennsylvania Avenue NW,
Washington, DC. 20580
Certified Mail # 7009 2250 0001 4546 2708

**OFFICE OF RESPA AND**
**INTERSTATE LAND SALES**
Office of Housing, Room # 9146
Department of Housing and Urban Development
451 Seventh Street, SW,
Washington. D.C. 20410
Certified Mail # 7009 2250 0001 4546 2715

**US DEPARTMENT OF THE TREASURY**
**OFFICE OF COMPTROLLER OF THE**
**CURRENCY**
Customer Assistance Group,
1301 McKinney Street, Suite 3450
Houston, TX 77010
Certified Mail # 7009 2250 0001 4546 2753

**OFFICE OF HOUSING ENTERPRISE**
**OVERSIGHT (OFHEO)**
1700 G Street, NW, 4th Floor
Washington, DC 20552
Certified Mail # 7009 2250 0001 4546 2722

**ILLINOIS STATE ATTORNEY GENERAL**
**LISA MADIGAN**
Office of the Attorney General
500 South Second Street
Springfield, IL 62706
Certified Mail # 7009 2250 0001 4546 2746

EXHIBIT
B

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
TARA P
COUNT

009500001     OLSON     S

2 MII
OAKB      610  177759345  D2  001  001
IL 60___

NON HOMESTEAD PROPERTY

**FRED BUCHOLZ**
DUPAGE COUNTY RECORDER
SEP.14,2007          RHSP    11:23 AM
OTHER                07-11-406-020
**019 PAGES     R2007-170861**

271154  '/1

─────────── [Space Above This Line For Recording Data] ───────────

271154                    00017775934509007
[Escrow/Closing #]              [Doc ID #]

## GIT        MORTGAGE

MIN  1001337-0002495683-4

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated   SEPTEMBER 07, 2007   , together with all Riders to this document.
**(B)** "Borrower" is *a single man*          *a married woman*
STEVEN OLSON, AND LAUREN J TRATARA AS JOINT TENANTS

Borrower is the mortgagor under this Security Instrument.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

M Mortgage-IL
1006A-IL (08/07)(d/I)              Page 1 of 12              Form 3014 1/01





EXHIBIT
B

DOC ID #: 00017775934509007

**(C)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D)** **"Lender"** is
Countrywide Bank, FSB.
Lender is a FED SVGS BANK
organized and existing under the laws of THE UNITED STATES
Lender's address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314

**(E)** **"Note"** means the promissory note signed by Borrower and dated   SEPTEMBER 07, 2007    . The Note states that Borrower owes Lender
ONE MILLION THREE HUNDRED EIGHTY THOUSAND and 00/100

Dollars (U.S. $ 1,380,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   OCTOBER 01, 2037          .

**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [X] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and

M Mortgage-IL
1006A-IL (05/07)

Form 3014 1/01

EXHIBIT
B

DOC ID #: 00017775934509007

assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY           of           DUPAGE              :
[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]

LOT 2 (EXCEPT THAT PART DESCRIBED AS FOLLOWS: BEGINNING AT THE MOST NORTHERLY CORNER OF
SAID LOT 2 AND RUNNING THENCE SOUTHWESTERLY ALONG THE NORTHWESTERLY LINE OF SAID LOT,
14.89 FEET; THENCE SOUTHEASTERLY 149.46 FEET TO THE SOUTHEAST CORNER OF SAID LOT;
THENCE NORTHWESTERLY ALONG THE NORTHEASTERLY LINE OF SAID LOT, 150.00 FEET TO THE PLACE
OF BEGINNING) IN BLOCK 6 IN CRESS CREEK, BEING A SUBDIVISION OF PART OF SECTION 11, 12
AND 14, TOWNSHIP 38 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO
THE PLAT THEREOF RECORDED APRIL 4, 1962 AS DOCUMENT R62-9660, IN DUPAGE COUNTY,
ILLINOIS.

Parcel ID Number:   0711406020                   which currently has the address of
1021 ROYAL SAINT GEORGE DR, NAPERVILLE
[Street/City]

Illinois 60563-2322   ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

M Mortgage-IL
1006A-IL (08/07)                               Page 3 of 12                             Form 3014 1/01

EXHIBIT
B

DOC ID #: 00017775934509007

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

EXHIBIT B

DOC ID #: 00017775934509007

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

EXHIBIT B

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written

EXHIBIT B

DOC ID #: 0001777593450907

agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b)  Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material

EXHIBIT B

DOC ID #: 00017775934509007

impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

EXHIBIT B

DOC ID #: 00017775934509007

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the

DOC ID #: 00017775934509007

Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

EXHIBIT B

DOC ID #: 00017775934509007

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
STEVEN OLSON                    -Borrower

_____ (Seal)
LAUREN J. TRATAR                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

EXHIBIT B

STATE OF ILLINOIS,

I, _Lauren M. Callahan_     DOC ID #: 00017775934509007

County ss: COOK

and state do hereby certify that _Steven DiSanti, a single man and Lauren J. Tratar,_ a Notary Public in and for said county

_a married woman_

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this _7th_ day of _September, 2007_

My Commission Expires: 11/06/10

_Lauren M. Cull_

Notary Public

```
*******************************
*       "OFFICIAL SEAL"        *
*     LAUREN M. CALLAHAN       *
*  Notary Public, State of Illinois  *
*  My Commission Expires 11/06/10  *
*******************************
```

M Mortgage-IL
1006A-IL (06/07)

Page 12 of 12

Form 3014 1/01

EXHIBIT B

# SECOND HOME RIDER

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
PARCEL ID #:
0711406020
Prepared By:
TARA PASCH
COUNTRYWIDE HOME LOANS, INC.


2 MID AMERICA SUITE #450
OAKBROOK TERRACE
IL 60181


271154                      00017775934509007
[Escrow/Closing #]              [Doc ID #]

THIS SECOND HOME RIDER is made this SEVENTH                day of
SEPTEMBER, 2007  , and is incorporated into and shall be deemed to amend and supplement the Mortgage,
Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower" whether there are one or more persons undersigned) to secure Borrower's Note to
Countrywide Bank, FSB.

(the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"),
which is located at:
1021 ROYAL SAINT GEORGE DR, NAPERVILLE, IL 60563-2322

[Property Address]

MULTISTATE SECOND HOME RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
♦ CONV/VA Second Home Rider
1365R-XX (02/07)(d/l)                    Page 1 of 2                    Form 3890 1/01





*EXHIBIT B*

DOC ID #: 0001777593450007

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

_____ (Seal)
STEVEN OLSON                                — Borrower

_____ (Seal)
LAUREN J. TRATAR                           — Borrower

_____ (Seal)
                                           — Borrower

_____ (Seal)
                                           — Borrower

- CONV/VA Second Home Rider
1365R-XX (02/07)                    Page 2 of 2                    Form 3890 1/01

EXHIBIT B

LOAN #: 177759345

# FIXED/ADJUSTABLE RATE RIDER

(LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this SEVENTH      day of SEPTEMBER, 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
Countrywide Bank, FSB.

("Lender") of the same date and covering the property described in the Security Instrument and located at:
1021 ROYAL SAINT GEORGE DR
NAPERVILLE, IL 60563-2322
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of      7.500 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

### 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of OCTOBER, 2014   , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

• FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)(d)            Page 1 of 5





* 2 3 9 9 1 *

* 1 7 7 7 5 9 3 4 5 0 0 0 0 0 1 E 4 6 0 *

EXHIBIT
B

LOAN #: 177759345

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE−QUART percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.500 % or less than 2.500 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

• FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)          Page 2 of 5



EXHIBIT
B

LOAN #: 177759345

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B.1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

EXHIBIT
B

LOAN #: 177759345

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

EXHIBIT
B

LOAN #: 177759345

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
STEVEN OLSON                                          -Borrower

_____ (Seal)
LAUREN J. TRATAR                                     -Borrower

_____ (Seal)
                                                     -Borrower

_____ (Seal)
                                                     -Borrower

• FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)                    Page 5 of 5

EXHIBIT
B

Prepared by: TARA PASCH

LOAN #: 177759345

# INTEREST ONLY ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published In *The Wall Street Journal*)
### Rate Caps – 10 Year Interest Only Period)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

SEPTEMBER 07, 2007           CHICAGO                           ILLINOIS
     [Date]                    [City]                           [State]

1021 ROYAL SAINT GEORGE DR, NAPERVILLE, IL 60563-2322
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,380,000.00     (this amount is called "Principal"), plus interest, to the order of Lender. Lender is
Countrywide Bank, FSB.
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     7.500 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will make a payment on the first day of every month, beginning on   NOVEMBER 01, 2007    . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its

● MULTISTATE ARM, ONE-YEAR LIBOR, 10-Year Interest Only Period Note
1E452-XX (09/06)(d/i)                          Page 1 of 5





*EXHIBIT B*

LOAN #: 177759345

scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on OCTOBER 01, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 660694, Dallas, TX 75266-0694 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 8,625.00 until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of OCTOBER, 2014 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUARTER percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.500 % or less than 2.500 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

● MULTISTATE ARM, ONE-YEAR LIBOR, 10-Year Interest Only Period Note
1E452-XX (09/06)                     Page 2 of 5

EXHIBIT B

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   FIFTEEN           calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be             5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.



LOAN #: 177759345

### 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.


EXHIBIT B

LOAN #: 177759345

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
STEVEN OLSON                                           -Borrower

_____ (Seal)
                                                      -Borrower

PAY TO THE ORDER OF

WITHOUT RECOURSE
COUNTRYWIDE BANK, FSB

_____ (Seal)
                                                      -Borrower

BY _____
LAURIE MEDER
SENIOR VICE PRESIDENT

_____ (Seal)
                                                      -Borrower

*[Sign Original Only]*

● MULTISTATE ARM, ONE-YEAR LIBOR, 10-Year Interest Only Period Note
1E452-XX (09/06)                    Page 5 of 5

EXHIBIT B



**UNITED STATES POSTAL SERVICE**₀

# Track & Confirm

### Search Results

Label/Receipt Number: **7009 2250 0001 4546 2685**
Class: **First-Class Mail**®
Service(s): **Certified Mail**™
      **Return Receipt**
Status: **Delivered**

Your item was delivered at 5:39 PM on July 27, 2010 in DALLAS, TX 75265.

Detailed Results:

- **Delivered, July 27, 2010, 5:39 pm, DALLAS, TX 75265**
- **Notice Left, July 27, 2010, 10:34 am, DALLAS, TX 75222**
- **Arrival at Unit, July 27, 2010, 8:25 am, DALLAS, TX 75222**
- **Acceptance, July 23, 2010, 1:42 pm, NAPERVILLE, IL 60540**

### Notification Options

**Track & Confirm by email**

Get current event information or updates for your item sent to you or others by email.  ( Go > )

---

**Track & Confirm**

Enter Label/Receipt Number.

( Go > )

---

*EXHIBIT C*

**U.S. Postal Service**
**CERTIFIED MAIL**℠ **RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com℠

DALLAS TX 75265 O F F I C I A L   U S E

| | | |
|---|---|---|
| Postage | $ | $1.39 |
| Certified Fee | | $2.80 |
| Return Receipt Fee (Endorsement Required) | | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $6.49 |

Postmark Here
NAPERVILLE IL 60540
05
JUL 23 2010
USPS 2010

Sent To
BAC HOME LOANS SERVICING, LP
Street, Apt. No.; or PO Box No.
P.O. BOX 6500 70
City, State, ZIP+4
DALLAS TEXAS 75265-0070

7009 2250 0001 4546 2685

PS Form 3800, August 2006                 See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BAC Home Loans Servicing LP
P.O. Box 6500 70
DALLAS, TEXAS
75265-0070

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)       B. Date of Delivery
                                                            2010

C. Signature
X Buster        ☐ Agent
                    ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:            ☐ No

3. Service Type
☑ Certified Mail      ☐ Express Mail
☐ Registered            ☐ Return Receipt for Merchandise
☐ Insured Mail         ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number (Copy from service label)
7009   7009 2250 0001 4546 2685

PS Form 3811, July 1999          Domestic Return Receipt          102595-00-M-0...

EXHIBIT C



Kenneth H. Fisher
Barry M. Fisher
Gerald M. Shapiro
   Also licensed in Florida
David S. Kreisman

# FISHER and SHAPIRO, LLC

## THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED MAY BE USED FOR THAT PURPOSE.

August 6, 2010

Steven Thomas Olson
1021 Royal Saint George Drive
Naperville, IL 60563

     **RE:** **Response to Fair Debt dispute**
          **Loan No.: 177759345**
          **Property c/k/a: 1021 Royal Saint George Drive, Naperville, IL 60563**
          **F&S File No.: 09-027899**

Dear Steven Thomas Olson:

This letter responds to your July 22, 2010 letter disputing the debt owed for the above mentioned loan. Please note that our office ceased all collection efforts upon receipt of your July 22, 2010 letter.

As I understand your July 22, 2010 letter, the Fair Debt dispute arises from the July 2, 2010 letter sent by our office. As stated in that letter, the amount of the debt as of **June 22, 2009** was $1,615,195.72. This is based upon the fact that the loan is outstanding for the mortgage payment due **October, 2008** and for all subsequent monthly payments and other incurred charges (such as late fees and reimbursable corporate advances).

As stated in our July 2, 2010 letter, your current creditor is: BAC Home Loans Servicing, LP. The name and address of the original creditor was Countrywide Bank, FSB 1199 North Fairfax St., Ste. 500, Alexandria, VA 22314.

The enclosed documents evidence the debt that is owed. Enclosed are copies of the Promissory Note and Mortgage, as well as a copy of the payment history indicating how the various payments have been applied. In light of this information, we consider all matters related to your Fair Debt dispute to be addressed and will resume those collections efforts permitted by law.

Very truly yours,

Olivia Ding

Encls.

EXHIBIT D

direct dial number:
(215) 575-7245

**DP**

**Dilworth
Paxson**

Philip A. Italiano
pitaliano@dilworthlaw.com

August 26, 2010

Steven Olson
1021 Royal Saint George Drive
Naperville, IL 60563

Re:     Borrower(s): Steven Olson (the "Borrower")
        Property Address: 1021 Royal Saint George Drive, Naperville, IL 60563
        Loan Number Ending In: 59345 (the "Loan")

Dear Mr. Olson:

This firm represents BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("BAC Home Loans"), with regard to the Loan.   We are writing in response to your correspondence dated July 22, 2010 (the "Letter"), wherein you request information regarding the Loan.  Although couched as a "qualified written request," the information requested in your correspondence goes well beyond that which is available through a qualified written request made under 12 U.S.C. §2605 ("QWR").

As you may be aware, a QWR is a written correspondence which includes a statement of specific reasons why the borrower believes that its account is in error and which provides sufficient detail to allow the servicer of the loan to review the borrower's account to determine whether there were errors made in connection with the account, and to either make appropriate corrections where errors were made or explain to the borrower why the servicer believes the account is accurate.  A QWR is not a vehicle for a borrower to obtain confidential information concerning the lender's business practices, trade secrets or other proprietary information, nor can it be used to support a fishing expedition for documents that may support a claim or as a mechanism for seeking any other information which does not relate specifically to the borrower's loan.   The Letter seeks information which goes well beyond that which is available through a QWR, while failing to provide any of the necessary detail regarding any specific error(s) made by the servicer in connection with the Loan.

The Letter also purports to require BAC Home Loans to respond to each of your inquiries or waive certain of its rights, and further concludes, without any factual support, that a failure to respond will confer certain rights upon you.  Please be advised that BAC Home Loans is under no obligation to respond to the majority of the inquiries, and expressly rejects any claim, conclusion or inference that it has somehow limited or waived any rights or remedies it may now or hereafter have, whether arising under the Loan documents, at law or in equity, as the result of its response, or lack thereof, to all or any portion of the Letter, all of which rights and remedies are expressly reserved.  BAC Home Loans also expressly rejects any claim, conclusion or inference that any failure by BAC Home Loans to respond to all or any portion of the Letter will

EXHIBIT
E

Dilworth Paxson LLP                                                    Page 2

cause any right, power or authority to be granted or bestowed upon, or otherwise inure to, you or any agent. Notwithstanding any failure by BAC Home Loans to respond to all or any portion of the Letter, the Loan documents shall remain enforceable as written and the respective rights and obligations of the parties shall remain unaffected.

Although the Letter is overly broad, unduly burdensome and not in conformity with 12 U.S.C. §2605, BAC Home Loans reviewed its file documents in an attempt to obtain information responsive to those of your inquiries which were consistent with 12 U.S.C. §2605. We will address those of your inquiries which require a response in the same order as presented in the Letter as follows:

**1.) Original Note/Chain of Transfer**
With respect to your demand for evidence of the original note and a chain of transfer, you cite no authority that supports your claim that you are entitled to the information/documentation you request and we are not aware of the existence of any such authority. Accordingly, we respectfully decline this request. In lieu of allowing inspection of the original note, we have enclosed herewith a true and correct copy of the note.

**2.) Document Copies**
Enclosed are copies of the following documents:

      a)      Good Faith Estimate;
      b)      HUD-1 Settlement Statement;
      c)      Interest Only Adjustable Rate Note;
      d)      Prepayment Penalty Addendum;
      e)      Mortgage;
      f)      Second Home Rider;
      g)      Fixed/Adjustable Rate Rider;
      h)      Truth in Lending Disclosure Statements;
      i)      Uniform Residential Loan Application; and
      j)      Appraisal Reports.

Your requests for all other documents and copies of checks have been declined, as such requests are either overly broad, do not concern the application of payments or the disbursement of funds, or do not relate to any specific acts of wrongdoing that you have alleged.

**3.) Account Accounting and Servicing Systems**
Enclosed is a Payment History that provides a detailed outline of transactions for this Loan during BAC Home Loans' servicing. The Payment History provides pertinent information on payments received, tax and insurance payments disbursed, funds in the suspense/unapplied funds balance, and late charges assessed and paid. The Payment History is designed to be user-friendly and there are no codes or terms used in the Payment History that require specific definitions.

Fees that have been charged against the account and that are not reflected in the Payment History have been requested and will be forwarded to you under separate cover. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of

Dilworth Paxson LLP                                                                           Page 3

funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**4.) Debits and Credits**
See paragraph 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**5.) Mortgage and Assignments**
The current owner of the note is BAC Home Loans Servicing, LP, f/k/a Countrywide Home Loans Servicing, LP, which has an address of 400 National Way, Simi Valley, CA 93065. BAC Home Loans is the servicer of the Loan. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**6.) Attorney Fees**
See paragraph 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**7.) Suspense/Unapplied Accounts**
See paragraph 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**8.) Late Fees**
Late charges are reported as interest paid effective with the 2008 tax year. Prior to the 2008 tax year, there was no interest paid or reported to the IRS relating to late charges assessed and paid to this account. See paragraph 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**9.) Land and Chattel Property Inspections**
Please review paragraph 3 above for the fees due in connection with any property inspections performed. Please refer to the enclosed documents for information regarding the circumstances

Dilworth Paxson LLP                                                                 Page 4

whereby property inspections may be performed. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

## 10.) BPO Fees
See paragraph 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

## 11.) Forced Placed Insurance
Per the terms and conditions of the aforementioned documents, forced placed insurance, also known as lender secured insurance, can be secured by the lender if notification is received via property inspections that indicates the property as being vacant during the delinquency of the loan. Lender secured insurance can also be placed if a borrower does not provide the lender with his preferred insurance information in a timely manner.

As of the date of this correspondence, no lender secured insurance has been purchased in connection with the Loan.

The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

## 12.) Servicing Related Questions
These requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

## 13.) Request for Verification of Debt
To the extent the Letter can be construed as a request for verification of the debt, please be advised that the Loan is evidenced by an Interest Only Adjustable Rate Note dated September 7, 2007, in the principal amount of $1,380,000.00, executed by the Borrower in favor of Countrywide Bank, FSB, a copy of which is enclosed. The Loan is secured by a Mortgage dated the same date, a copy of which is enclosed. Please see paragraph 5 above for information concerning the current owner of the note. Please refer to the enclosed documents for additional information.

The payoff amount of the Loan through September 7, 2010, is $1,644,645.89. Please refer to the enclosed payoff demand statement for additional information.

Dilworth Paxson LLP                                                                        Page 5

The remainder of the requests contained in the Letter are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans.  Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

If you have further questions or concerns regarding the foregoing, please contact BAC Home Loans' FREM Customer Escalation Team at (866) 200-9624.

In providing the above response, BAC Home Loans is not limiting or waiving any rights or remedies it may now or hereafter have, whether arising under the Loan documents, at law or in equity, all of which rights and remedies are expressly reserved.

Very truly yours,

Philip A. Italiano

Enclosures

# Dilworth Paxson LLP

DIRECT DIAL NUMBER:
(215) 575-7140

Michael N. DeAngelo
mdeangelo@dilworthlaw.com

August 27, 2010

**VIA CERTIFIED MAIL**

Steven Thomas Olson
1021 Royal Saint George Drive
Naperville, IL 60563

> RE:  **Property Address: 1021 Royal Saint George Drive, Naperville, IL 60563**
>      **BAC Loan Number Ending in: 59345**

Dear Mr. Olson:

This office represents BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("BAC Home Loans"), in regard to the above-referenced mortgage loan transaction. BAC Home Loans is in receipt of your correspondence dated July 22, 2010, wherein you request to rescind the subject loan transaction.

We have reviewed the loan files for the right of rescission pursuant to federal Truth in Lending Act and Regulation Z ("TILA"). TILA provides that if required notices or material disclosures are not delivered to the consumer, the right to rescind shall expire three (3) years after consummation of the loan. As part of our thorough investigation of this matter, the loan file was reviewed. The right of rescission found in TILA does not apply to loans secured by property that is not the borrower's principal dwelling, and it is evident from our review that the subject loan was secured by a secondary residence.

Based on the foregoing, your claim to rescind the subject loan transaction pursuant to TILA is denied and this matter is now closed. In providing this response, BAC Home Loans is making no admission of any TILA violations related to this transaction. The remainder of your correspondence will be addressed by BAC Home Loans under separate cover.

Very truly yours,

Michael N. DeAngelo

cc: Rosa Reyes

EXHIBIT
P

880691 1500 Market Street • Suite 3500E • Philadelphia, PA 19102-2101 • 215-575-7000 • fax: 215-575-7200
www.dilworthlaw.com • Cherry Hill, NJ • Harrisburg, PA • Washington, DC • Neptune, NJ • Wilmington, DE

**Bank of America** 

**Home Loans**

1757 Tapo Canyon Road
Mailstop CA6-913-02-29
Simi Valley, CA  93063

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED #7009 2820 0001 7060 4121**

August 27, 2010

Steven Olson
1021 Royal Saint George Drive
Naperville, IL 60563

Re:     Loan Number:            xxxx59345
        Property Address:       1021 Royal Saint George Drive, Naperville, IL 60563

Dear Mr. Olson:

BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("BAC Home Loans"), f/k/a Countrywide Home Loans Servicing, L.P., is in receipt of your correspondence dated July 22, 2010, concerning the TILA violations in connection with the origination of the referenced loan.

The origination loan file has been requested; once received, we will review and determine if there is basis for a rescission.  In order to provide an appropriate response to you, BAC Home Loans, requests additional time to adequately and fully investigate this matter.

In the interim, please feel free to contact me in writing should you have any questions.


Sincerely,

Christina Santana
Litigation Specialist

EXHIBIT

F

STEVEN T. OLSON AND LAUREN J. TRATAR
1021 ROYAL SAINT GEORGE DR.
NAPERVILLE, IL. 60563

To: COUNTRYWIDE BANK FSB,
1199 NORTH FAIRFAX STREET SUITE 500
ALEXANDRIA, VIRGINIA 23314
Certified Mail #7010 0780 0001 9578 2144

To: BAC HOME LOANS SERVICING
P.O. BOX 6500 70
DALLAS, TEXAS 75265-0070
Certified Mail #7010 0780 0001 9578 2137

To: MERS
3300 S.W. 34TH AVENUE
OSCALA, FLORIDA 34474
Certified Mail #7010 0780 0001 9578 2151

## NOTICE OF RIGHT TO CANCEL

You received a Qualified Written Request from me on JULY 23, 2010. Appropriate response addressing my concerns and questions has not been received as of this date. Non response/deficient response is a violation of the Truth and Lending Act.

Pursuant to Reg. Z §§ 226.15(a)(2), 226.23(a)(2), Official Staff Commentary § 226.23(a)(2)-1) and 15

U.S.C. § 1635(b).

The FRB Model Notice simply says: "I WISH TO CANCEL," followed by a signature and date line (Arnold v. W.D.L. Invs., Inc., 703 F.2d 848, 850 (5th cir. 1983) (clear intention of TILA and Reg. Z is to make sure that the creditor gets notice of the consumer's intention to rescind)).

See Official Staff Commentary § 226.23(d)(2)-1. (See Willis v. Friedman, Clearinghouse No. 54,564 (Md. Ct. Spec. App. May 2,2002) (Once the right to rescind is exercised, the security interest in the Plaintiff's property becomes void ab initio). Thus, the security interest is void and of no legal effect irrespective of whether the creditor makes any affirmative response to the notice.

YOU ARE OFFICIALLY NOTICED THAT I WISH TO CANCEL AND ALL YOUR INTEREST IN THE PROPERTY TIED TO YOUR ACCOUNT # 271154 / 177759345 IS VOID AS A MATTER OF LAW AS OF TODAYS DATE. You are required to terminate all interest currently on the Public Record.

Date _Nov 17 2010_

STEVEN T. OLSON

LAUREN J. TRATAR

This document shall be recorded

EXHIBIT
G



**UNITED STATES
POSTAL SERVICE**®

Home | Help | Sign In

Track & Confirm          FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: **7010 0780 0001 9578 2144**
Expected Delivery Date: **November 20, 2010**
Class: **First-Class Mail**®
Service(s): **Certified Mail**™
        **Return Receipt**
Status: **Acceptance**

Your item was accepted at 3:00 pm on November 17, 2010 in
NAPERVILLE, IL 60540. Information, if available, is updated periodically
throughout the day. Please check again later.

**Track & Confirm**

Enter Label/Receipt Number.

( **Go >** )

## Notification Options

### Track & Confirm by email

Get current event information or updates for your item sent to you or others by email.    ( **Go >** )

Site Map    Customer Service    Forms    Gov't Services    Careers    Privacy Policy    Terms of Use    Business Customer Gateway

Copyright© 2010 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

*Exhibit H*



UNITED STATES
POSTAL SERVICE®

Home | Help | Sign In

Track & Confirm          FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: **7010 0780 0001 9578 2151**
Expected Delivery Date: **November 20, 2010**
Class: **First-Class Mail**®
Service(s): **Certified Mail**™
      **Return Receipt**
Status: **Delivered**

Your item was delivered at 11:53 am on November 22, 2010 in OCALA,
FL 34474.

Detailed Results:

• **Delivered, November 22, 2010, 11:53 am, OCALA, FL 34474**
• **Arrival at Unit, November 20, 2010, 9:23 am, OCALA, FL 34477**
• **Acceptance, November 17, 2010, 2:59 pm, NAPERVILLE, IL 60540**

### Notification Options

### Track & Confirm by email

Get current event information or updates for your item sent to you or others by email. ( **Go >** )

---

**Track & Confirm**

Enter Label/Receipt Number.

( **Go >** )

---

Site Map    Customer Service    Forms    Gov't Services    Careers    Privacy Policy    Terms of Use    Business Customer Gateway

Copyright© 2010 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

*Exhibit H*



**UNITED STATES POSTAL SERVICE**®

Home | Help | Sign In

Track & Confirm          FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: 7010 0780 0001 9578 2137
Expected Delivery Date: **November 20, 2010**
Class: **First-Class Mail**®
Service(s): **Certified Mail**™
            **Return Receipt**
Status: **Delivered**

Your item was delivered at 8:41 pm on November 22, 2010 in DALLAS, TX 75285.

Detailed Results:

• Delivered, November 22, 2010, 8:41 pm, DALLAS, TX 75285
• Acceptance, November 17, 2010, 2:58 pm, NAPERVILLE, IL 60540

### Notification Options

**Track & Confirm by email**

Get current event information or updates for your item sent to you or others by email. ( **Go >** )

---

**Track & Confirm**

Enter Label/Receipt Number.

( **Go >** )

---

Site Map      Customer Service      Forms      Gov't Services      Careers      Privacy Policy      Terms of Use      Business Customer Gateway

**Copyright**© 2010 USPS. All Rights Reserved.        No FEAR Act EEO Data      FOIA      

*Exhibit-A*



**U.S. Postal Service**
**CERTIFIED MAIL.. RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.88 | 0566 |
| Certified Fee | $2.80 | |
| Return Receipt Fee (Endorsement Required) | $2.30 | Postmark Here NOV 17 2010 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.98 | 11/17/2010 |

NAPERVILLE, IL 60540 USPS

Sent To: Fisher & shapire 4th
Street, Apt. No.; or PO Box No. 2121 Waukegan Rd Suite 301
City, State, ZIP+4 Bannockburn IL 60015



**U.S. Postal Service**
**CERTIFIED MAIL.. RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.88 | 0566 |
| Certified Fee | $2.80 | |
| Return Receipt Fee (Endorsement Required) | $2.30 | Postmark Here NOV 17 2010 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.98 | 11/17/2010 |

NAPERVILLE, IL 60540 USPS

Sent To: BAC HomeLoans Servicing
Street, Apt. No.; or PO Box No. P.O. Box 650070
City, State, ZIP+4 DALLAS, TEXAS 75265-0070



**U.S. Postal Service**
**CERTIFIED MAIL.. RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.88 | 0566 |
| Certified Fee | $2.80 | |
| Return Receipt Fee (Endorsement Required) | $2.30 | Postmark Here NOV 17 2010 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.98 | 11/17/2010 |

NAPERVILLE, IL 60540 USPS

Sent To: CONTRYWIDE BANK FSB
Street, Apt. No.; or PO Box No. 1199 FAIRFAX ST. STE.500
City, State, ZIP+4 ALEXANDRIA VA 23314



**U.S. Postal Service**
**CERTIFIED MAIL.. RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.88 | 0566 |
| Certified Fee | $2.80 | |
| Return Receipt Fee (Endorsement Required) | $2.30 | Postmark Here NOV 17 2010 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.98 | 11/17/2010 |

NAPERVILLE, IL 60540 USPS

Sent To: MERS
Street, Apt. No.; or PO Box No. 3300 SW. 34th St
City, State, ZIP+4 OCALA, FLA 34474

Exhibit A

A.

OMB No. 2502-0265

Page 1

**GREATER ILLINOIS TITLE COMPANY**
CLOSER: Lauren Callahan
DATE OF PRINTING: 09/07/07
TIME OF PRINTING: 11:28

**SETTLEMENT STATEMENT**
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| | TYPE OF LOAN | |
|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. |
| 4. ☐ VA | 5. ☐ CONV. INS. | |

6. File Number: 271154 | JXF
7. Loan Number: 177759345 | 000271154-001 LXC | LOO
8. Mortgage Insurance Case Number

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME OF BORROWER: STEVEN OLSON AND LAUREN J. TRATAR
ADDRESS: 1021 ROYAL ST. GEORGE DRIVE
NAPERVILLE IL 60562

E. NAME OF SELLER: REFINANCE
ADDRESS:

F. NAME OF LENDER: COUNTRYWIDE BANK, FSB.
ADDRESS: 2 MID AMERICA SUITE #450
OAKBROOK TERRACE IL 60181

G. PROPERTY LOCATION: 1021 ROYAL ST. GEORGE DRIVE
NAPERVILLE IL 60562

H. SETTLEMENT AGENT: GREATER ILLINOIS TITLE COMPANY
ADDRESS: 120 N. LA SALLE, SUITE 900
CHICAGO IL 60602

PLACE OF SETTLEMENT: GREATER ILLINOIS TITLE COMPANY
ADDRESS: 120 N. LA SALLE, SUITE 900
CHICAGO IL 60602

I. SETTLEMENT DATE:
September 07, 2007
10:30
DISBURSEMENT DATE:
September 07, 2007

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER: | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | | 403. | |
| 104. MORTGAGE PAYOFF TO FIRST FEDERAL | 49,534.33 | 404. | |
| 105. MORTGAGE PAYOFF TO FIRST FEDERAL | 946,169.82 | 405. | |
| Adjustments for items paid by seller in advance | 148,619.52 | Adjustments for items paid by seller in advance | |
| 106. City/town taxes to | | 406. City/town taxes to | |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMT DUE FROM BORROWER | 1,144,323.67 | 420. GROSS AMT DUE TO SELLER | |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 1,380,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | | |
| 206. | | 505. Payoff of second mortgage loan | |
| 207. | | 506. | |
| 208. | | 507. | |
| 209. | | 508. | |
| Adjustments for items unpaid by seller | | 509. | |
| 210. City/town taxes to | | Adjustments for items unpaid by seller | |
| 211. County taxes to | | 510. City/town taxes to | |
| 212. Assessments to | | 511. County taxes to | |
| 213. | | 512. Assessments to | |
| 214. | | 513. | |
| 215. | | 514. | |
| 216. | | 515. | |
| 217. | | 516. | |
| 218. | | 517. | |
| 219. | | 518. | |
| 220. TOTAL PAID BY/FOR BORROWER | 1,380,000.00 | 519. | |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER | | 520. TOTAL REDUCTIONS AMT DUE SELLER | |
| 301. Gross amt due from borrower (line 120) | 1,144,323.67 | 600. CASH AT SETTLEMENT TO/FROM SELLER | |
| 302. Less amts paid by/for borrower (line 220) | 1,380,000.00 | 601. Gross amt due to seller (line 420) | |
| 303. CASH (☐ FROM) (☒ TO) BORROWER | 235,676.33 | 602. Less reductions in amt due seller (line 520) | |
| | | 603. CASH (☐ TO) (☒ FROM) SELLER | 0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower

LAUREN J. TRATAR

Seller

REFINANCE

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Settlement Agent

Date 9/7/07

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

HUD-1 (3/86) RESPA, HB 4305.2

Exhibit I

F-2857-01 4/80

| | | Page 2 | | OMB No. 2502-0285 |
|---|---|---|---|---|

**ORD#/ABS#** 271154    JXK     **L. SETTLEMENT CHARGES**
**RSP#** 000271154    LXC   LOO

TIME OF PRINTING: 11:28
DATE OF PRINTING: 09/07/07

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700.** | **TOTAL SALES/BROKER'S COMMISSION** based on price $ @ % | | |
| | Division of Commission (line 700) as follows: | | |
| 701. | LB: $    to | | |
| 702. | SB: $    to | | |
| 703. | Commission paid at Settlement (Money retained by broker applied to commission $ ) | | |
| 704. | Other sales agent charges: | | |
| 705. | Additional commission: $    to | | |
| **800.** | **ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. | Loan Origination Fee    % | | |
| 802. | Loan Discount    % | | |
| 803. | Appraisal Fee to LANDSAFE APPRAISAL SER.$572/$250.00 (POC) | | |
| 804. | Credit Report to LANDSAFE CREDIT, INC. | 222.00 | |
| 805. | Lender's Inspection Fee to | 35.00 | |
| 806. | Mortgage Insurance Application Fee to | | |
| 807. | Assumption Fee to | | |
| 808. | LENDER FEE TO COUNTRYWIDE BANK, FSB. | | |
| 809. | TAX SERVICE FEE TO COUNTRYWIDE TAX SERVICE CORP. | 585.00 | |
| 810. | FLOOD CHECK FEE TO LANDSAFE FLOOD DETERMINATION, INC. | 90.00 | |
| 811. | | 26.00 | |
| 812. | | | |
| **900.** | **ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. | Interest from 09/07/07 to 10/01/07 @$ 283.5600 /day for 24 days | | |
| 902. | Mortgage Insurance Premium for 0.00 months to | 6,805.44 | |
| 903. | Hazard Insurance Premium for 0.00 years to | | |
| 904. | | | |
| 905. | | | |
| **1000.** | **RESERVES DEPOSITED WITH LENDER** | | |
| 1001. | Hazard Insurance 3.00 month @$ 143.58 per month | | |
| 1002. | Mortgage Insurance 0.00 month @$ per month | 430.77 | |
| 1003. | City property taxes 0.00 month @$ per month | | |
| 1004. | County property taxes 5.00 month @$ 253.09 per month | | |
| 1005. | Annual assessments 0.00 month @$ per month | 1,265.45 | |
| 1006. | | | |
| 1007. | 0.00 month @$ per month | | |
| 1008. | Aggregate Accounting Adjustment 0.00 month @$ per month | | |
| **1100.** | **TITLE CHARGES** | ( 506.16) | 0.00 |
| 1101. | Settlement or Closing Fee to GREATER ILLINOIS TITLE COMPANY | | |
| 1102. | Abstract or title search to | 200.00 | |
| 1103. | Title examination to | | |
| 1104. | Title insurance binder to | | |
| 1105. | Document preparation to | | |
| 1106. | Notary fees to | | |
| 1107. | Attorney's fee to | | |
| 1108. | Title Insurance to GREATER ILLINOIS TITLE COMPANY | | |
| | (includes above items numbers) MISCELLANEOUS ENDORSEMENT | 765.00 | |
| 1109. | Lender's coverage $1,380,000.00 | | |
| 1110. | Owner's coverage $0.00    765.00 | | |
| 1111. | CONSTRUCTION ESCROW FEE TO GREATER ILLINOIS TITLE COMPANY | | |
| 1112. | EMAIL$15/DELIVERY$25 (IN-O42 E/O) /POST&HAND$2 TO GREATER IL | 200.00 | |
| 1113. | STATE OF ILLINOIS POLICY FEE TO CHICAGO TITLE INSURANCE COMP | 112.00 | |
| **1200.** | **GOVERNMENT RECORDING AND TRANSFER CHARGES** | 3.00 | |
| 1201. | Recording fees: Deed $ ; Mortgage $ 57.00 ; Release $ | | |
| 1202. | City/county tax/stamps: Deed $ ; Mortgage $ | 57.00 | |
| 1203. | State tax/stamps: Deed $ ; Mortgage $ | | |
| 1204. | | | |
| 1205. | | | |
| **1300.** | **ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. | Survey to | | |
| 1302. | Pest inspection to | | |
| 1303. | FINAL CONSTRUCTION DRAW TO GREATER IL TITLE | | |
| 1304. | | 39,244.03 | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| **1400.** | **TOTAL SETTLEMENT CHARGES** (enter on lines 103, Section J and 502, Section K) | 49,534.33 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower STEVEN OLSON
LAUREN J. TESTAS

Seller REFINANCE

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Settlement Agent      Date 9/7/07

WARNING: It is a crime to knowingly make false statement to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

LXC

HUD-1 (3/86) RESPA, HB 4305.2

Exhibit I

Prepared by TARA PASCH

# TRUTH IN LENDING DISCLOSURE STATEMENT
**(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)**

**LENDER:** Countrywide Bank, FSB.

      1199 North Fairfax St. Ste.500
      Alexandria, VA 22314

**BORROWERS:** STEVEN OLSON

| | |
|---|---|
| ☐ Preliminary ☒ Final |
| DATE 09/07/2007 |
| LOAN | 177759345 |
| CASE NO. | |
| Type of Loan | CONV UNINSURED |
| | HC ARM LIBR 7/1 EC |
| | 10yIO 525 |

| | |
|---|---|
| **ADDRESS** | 910 S MICHIGAN UNIT 1803 |
| **CITY STATE/ZIP** | CHICAGO, IL 60605 |
| **PROPERTY** | 1021 ROYAL SAINT GEORGE DR |
| | NAPERVILLE, IL 60563-2322 |

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.558 % | $ 2,331,529.68 | $ 1,371,593.56 | $ 3,703,123.24 |

**PAYMENT SCHEDULE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 120 | 8,625.00 | MONTHLY BEGINNING 11/01/2007 |
| 239 | 11,117.19 | MONTHLY BEGINNING 11/01/2017 |
| 1 | 11,114.83 | LAST PAYMENT DUE 10/01/2037 |

**DEMAND FEATURE:** ☒ This loan does not have a Demand Feature.     ☐ This loan has a Demand Feature as follows.

**VARIABLE RATE FEATURE:**
☒ This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at:
1021 ROYAL SAINT GEORGE DR, NAPERVILLE, IL 60563-2322

**ASSUMPTION:** Someone buying this property   ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**PROPERTY INSURANCE:** Hazard insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

**LATE CHARGES:** If your payment is more than 15     days late, you will be charged a late charge of     5.000%
of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
☐ may   ☒ will not   be entitled to a refund of part of the finance charge.
☒ may   ☐ will not   have to pay a penalty.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

"*" means an estimate
I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

| | | | |
|---|---|---|---|
| _____ | 9/7/07 | _____ | _____ |
| BORROWER STEVEN OLSON | DATE | BORROWER | DATE |
| _____ | 9-7-07 | _____ | _____ |
| BORROWER LAUREN J. TRATAR | DATE | BORROWER | DATE |

* Truth In Lending Disclosure Statement
2C298-US (01/07)(d/l)        Page 1 of 2

* 2 3 9 9 1 *

* 1 7 7 7 5 9 3 4 5 0 0 0 0 0 2 C 2 9 8 *



## DEFINITION OF TRUTH-IN-LENDING TERMS

LOAN #: 177759345

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate higher than the interest rate shown on your Mortgage/Deed of Trust Note.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower only, and not the seller if applicable. Non-inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate. For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.



Prepared by: TARA PASCH

**Countrywide Bank, FSB.**

DATE:             09/07/2007
BORROWER:  STEVEN OLSON
CASE #:
LOAN #:          177759345
PROPERTY ADDRESS: 1021 ROYAL SAINT GEORGE DR
                  NAPERVILLE, IL 60563-2322

Branch #: 0000342
2 MID AMERICA SUITE 400
OAKBROOK TERRACE, IL 60181
Phone: (630)99 -9- 0
Br Cde Rate (%)

## ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| 1. | Loan Amount | 1,380,000.00 |
| 2. | Prepaid Finance Charges: | |
| | Origination Fee | 0.00 |
| | Discount Points | 0.00 |
| | Tax Service Fee | 90.00 . |
| | Lender Fee | 585.00 . |
| | Prepaid Interest ( _24_ days) | |
| | of % per annum | 6,805.44 . |
| | Mortgage Insurance Premium | 0.00 |
| | Mortgage Insurance Impounds | 0.00 |
| | Warehouse Fee | 0.00 |
| | VA Funding Fee | 0.00 |
| | FHA UFMIP | 0.00 |
| | Buydown | 0.00 |
| | Courier/Express Mail-Clsng | 100.00 |
| | Closing/Escrow | 800.00 |
| | Flood Check Fee | 26.00 . |

|  | **TOTAL** | 8,406.44 |
|---|---|---|
| 3. | Amount Financed  (1 minus 2) | 1,371,593.56 |

I/We hereby acknowledge reading and receiving a completed copy of this disclosure.

_Steven Olson_    9/7/07
Borrower                                Date          Borrower                                Date
STEVEN OLSON

_Lauren J Tratar_   9-7-07
Borrower                                Date          Borrower                                Date
LAUREN J. TRATAR

* Itemization of Amount Financed - Reg Z
2C120-US (09/06)(d/i)





*Exhibit J*